EXHIBIT 1

EXHIBIT 1

F I L E D
Electronically
CV17-00360
2017-02-21 11:25:21 AM
Jacqueline Bryant
Clerk of the Court
Transaction # 5958775 : csulezic

Code: $1425
PAUL J. ANDERSON, ESQ.
Nevada Bar No. 709
PROCTER J. HUG, IV, ESQ.
Nevada Bar No. 12403
MAUPIN, COX & LeGOY
4785 Caughlin Parkway
Reno, Nevada  89519
Telephone: (775) 827-2000
Facsimile: (775) 827-2185
*Attorneys for Plaintiff*

IN THE SECOND JUDICIAL DISTRICT COURT OF THE STATE OF NEVADA

IN AND FOR THE COUNTY OF WASHOE

BAKKEN RESOURCES, INC., a Nevada
corporation,

              Plaintiffs,

vs.

ALLAN G. HOLMS, an individual, MANUEL
GRAIWER, and individual, DOES 1-10 and ROE
ENTITIES I-X,

              Defendants.

Case No.:

Dept. No.:

## **VERIFIED COMPLAINT**

Plaintiff, BAKKEN RESOURCES, INC., a Nevada Corporation, alleges as follows:

### **PARTIES AND JURISDICTION**

1.     Plaintiff, BAKKEN RESOURCES, INC., is a Nevada Corporation, organized and existing pursuant to the laws of the state of Nevada, and doing business in the state of Nevada ("BRI," or "Company" or "Plaintiff").

2.     Defendant ALLAN G. HOLMS ("Allan") is an individual who, upon information


MAUPIN | COX | LEGOY
ATTORNEYS AT LAW
P.O. Box 30000
Reno, Nevada 89520

and belief is a resident of the state of Washington and who owns a small percentage of the common stock of BRI.  Throughout this Verified Complaint Holms shall be referred to by his first and last name where appropriate to differentiate Holms from other natural persons, including Holms brother, Val Holms, Deceased ("Val") and Val's widow Mari Holms ("Mari").

3.      Defendant MANUEL GRAIWER ("Graiwer") is an individual who, upon information and belief is a resident of the state of California, and who is a Plaintiff in Case No. CV14-00544 presently pending in Department 7 of this court.  Throughout this Complaint Graiwer shall be referred to as "Graiwer."

4.      Upon information and belief, the true names and capacities, whether individual, corporate, associate or otherwise of Defendants named herein as JOHN DOES 1-10 and ROE ENTITIES I-X, are unknown to Plaintiff who, therefore, sues said Defendants by such fictitious names.  Plaintiff will request leave to amend this Complaint to show the true names and capacities of the fictitiously named Defendants when the same have been ascertained.

5.      Each of the Defendants designated herein as a DOE and/or ROE Defendant are or were legally responsible in some manner for the events and happenings herein referred to, and caused injury and damages to Plaintiff as alleged.

**FACTUAL BACKGROUND**

A.      **The Eagle Private Equity Transaction**

6.      On May 10, 2016, The Company announced in a public document (Current Report on Form 8-K) that it had entered into transactions with a company by the name of Eagle Private Equity ("Eagle"). *See,* Current Report on Form 8-K and Exhibit 3.1, attached hereto as Exhibit "1."

7.      The Company's transaction with Eagle initially involved providing a $1 million

2

credit facility which was secured by various options granted by the Company to Eagle to put loans to the Company and/or convert loans to shares of a newly created class of preferred stock called Series A Convertible Preferred Stock.

8.      The Company filed its Certificate of Designation relating to the Series A Convertible Preferred Stock on May 6, 2016. Such Certificate of Designation is a document that is available to the public. *See,* Exhibit "1."

9.      On May 9, 2016, Val, the half-brother of Allan, and Graiwer filed a pleading entitled "Defendant Val Holm's Motion for Court Approval and Determination of Good Faith Settlement" ("Motion for Good Faith Settlement"), in Case No. CV14-00544, (hereinafter the "Derivative Action"), in an attempt to settle certain claims that existed against Val as alleged by the Derivative Plaintiff, Graiwer. The Settlement Agreement included Graiwer's agreement to purchase Val's shares for Twelve Cents ($0.12) per share.

10.     Val challenged the transaction with Eagle by filing a Complaint in Nevada on or around May 17, 2016. That action is designated as Case No. CV16-01086 and has been consolidated with the Derivative Action pursuant to Stipulation and Order dated June 15, 2016, and is currently pending in Department 7 of the Second Judicial District Court of the State of Nevada, Washoe County, Nevada. For convenience purposes that case is referred to as the "Injunction Action." In the Injunction Action Val claimed, among other things, that the Eagle transaction was purposely designed to circumvent the Settlement Agreement he had with Graiwer and to prevent Val from obtaining the consideration contemplated by the Settlement Agreement, despite the fact that the Eagle transaction was closed prior to the filing of the Settlement Agreement.

11.     Val was initially able to obtain a Temporary Restraining Order (the "First NV

3



TRO") on an ex parte basis that, among other things, enjoined the Company from taking loans under the Eagle loan facility until the matter could be heard at a preliminary injunction hearing.

12.    A Preliminary Injunction hearing relating to the First NV TRO was heard by Judge Flanagan on June 27, 2016 (the "First Preliminary Injunction Hearing").

13.    At the First Preliminary Injunction Hearing, testimony was taken relating to the Eagle transaction from the Chief Financial Officer of the Company, Dan Anderson, and Eagle's principal officer, Carl George.

14.    Following such testimony, the Court entered an Order vacating the First NV TRO and denying Val's request for a Preliminary Injunction. The Order also confirmed the Eagle Transaction was legal and proper, and entered into by BRI in compliance with the business judgment rule, NRS 78.138.

15.    The July 14, 2016 Order states, in pertinent part:

> The Court finds the ability of a company to maintain institutional knowledge is important, that capitalism is a game of risk, and none of the procedures set forth in the agreement between Eagle Private Equity and BRI are illegal or improper. This includes the BRI Board's amendment to its Bylaws on February 9, 2016, to provide for staggered Board terms as well as the terms of the Eagle Private Equity financing.  Importantly, Plaintiff's counsel admitted during argument that nothing BRI or its Directors had done was illegal.

16.    Allan was present in Reno during the First Preliminary Injunction Hearing, but did not attend the hearing.  Allan indicated to the Company's counsel, Wesley J. Paul Esq. ("Paul"), that he was in Reno at the invitation of Manuel Graiwer. *See,* Declaration of Wesley J. Paul, Esq., attached hereto as Exhibit "2."

17.    Allan acknowledged to Paul that Graiwer had suffered a setback based on the outcome of the First Preliminary Injunction Hearing.

4


LAUPINI COX LEGOY
ATTORNEYS AT LAW
P.O. Box 30000
Reno, Nevada 89520

**B.     Allan's Attempt to Takeover the Company by Illegal Proxy Solicitation**

18.     On or around July 7, 2016, Allan purportedly received proxies from Val for Val's Twenty-Six Million Two Hundred Thirty-Five Thousand (26,235,000) shares of the Company's common stock.  Such proxies allowed Allan to vote Val's shares in the Company.

19.     Beginning June 29, 2016 and continuing into early July 2016, Allan received an additional twenty-two (22) voting proxies.  All the proxies, including Val's, were on identical or nearly identical forms (collectively, the "Proxies"). The Proxies included a proxy from Graiwer dated June 29, 2016 which Graiwer later withdrew on or about July 28, 2016.

20.     On July 20, 2016, Allan and a number of his business associates, including Val, attempted to use the Proxies to gain control of the Company.  Specifically, Allan and his legal counsel, Bil Childress, Esq., as well as other individuals, including Allan's wife and at least one openly armed person, charged into the Company office in Helena, Montana in an attempt to gain control of the Company. Among the actions by Allan and his group were (a) attempts to dismiss the Company's officers, (b) replacement of the Company's directors and (c) placement of "litigation hold" directions to all of the Company's counsel.

21.     Allan and his business associates also attempted to gain control of the Company's bank accounts at Wells Fargo, located in Helena, Montana.

22.     On July 22, 2016, the Company sought and obtained two temporary restraining orders ("TRO's").  A TRO was entered by Judge Flanagan on July 22, 2016 in the consolidated actions (the "Second NV TRO"). Another TRO issued on July 22, 2016 related to a Complaint the Company had filed against Allan, Val and certain of their business associates (the "Montana TRO").

23.     The Second NV TRO states in relevant part:

5


{AUPIN|COX|LEGOY
ATTORNEYS AT LAW
P.O. Box 30000
Reno, Nevada 89520

The Court finds that the Defendants have a reasonable probability of success on their arguments that the voting proxies executed by Val Holms on July 7, 2016 purporting to transfer to Allan Holms twenty-six million two hundred thirty-five thousand (26,235,000) shares of Common Stock in BRI, and by Manuel Graiwer on June 29, 2016, purporting to transfer his shares to Allan Holms are invalid based on SEC regulations pertaining to proxy solicitations. *17 C.F.R. 240.41a-2, et. seq.*

The Court further finds that Defendants have a reasonable probability of success on their arguments that Eagle Private Equity has properly exercised its rights to convert its loans in the Company to Series A Preferred Stock under the agreement it has with BRI and in so doing has obtained six hundred thousand (600,000) shares of Series A Preferred Stock granting to Eagle Private Equity sixty million (60,000,000) shares of Common Stock in BRI. The 60,000,000 shares held by Eagle Private Equity are the majority of voting shares of all BRI stock. Consequently, the Court also finds Defendants have a reasonable probability of success on their argument that even if the subject voting proxies are valid Eagle Private Equity holds a majority of the voting shares in the Company and thus renders the subject takeover attempt ineffectual.

Counsel for BRI, as well as counsel for the Directors and Wesley Paul, Esq., and corporate counsel to BRI, which constitute all defense counsel in the consolidated action, are authorized to take any and all actions necessary in the State of Nevada, particularly before this Court, to contest any takeover attempts against BRI which is presently before, and subject to, the jurisdiction of this Court.

24. The Montana TRO entered by Judge Kathy Seeley, District Court Judge on July 22, 2016, states in pertinent part, as follows:

IT IS HEREBY FURTHER ORDERED THAT pursuant to Montana Rule of Civil Procedure 65 and Montana Code Annotated §§ 27-19-101 through 27-19-319 that Defendants Allan G. Holms, Todd Jensen and Allen Collins or their agents from any of the following actions:

    a)  taking any action on behalf of BRI including attempts to replace BRI's Board, Corporate Officer or BRI's attorneys;

    b)  taking any action purportedly on behalf of BRI to access BRI's bank accounts including those accounts with Wells Fargo;

6



MAUPIN COX LEGOY
ATTORNEYS AT LAW
P.O. Box 30000
Reno, Nevada 89520

   c) representing to any person or entity that they are Directors of BRI with authority to conduct business or take actions on behalf of BRI;

   d) attempting to act on behalf of BRI in any matter whatsoever;

   e) taking any actions that could affect the business/operations of BRI in any respect; and

   f) exercising any of the proxies included in Exhibit A to the Complaint.

25.    Both the Second NV TRO and the Montana TRO continue to be in effect as of the filing of this Complaint, the Second NV TRO having been extended by Judge Flanagan pursuant to Order dated November 1, 2016.

**C.    Allan's Attempts to Convert Val's Shares**

26.    On or about January 31, 2017, the Company's stock transfer agent, Nevada Agency and Transfer Company ("NATCO") received a call from Don Walford ("Walford"). Walford indicated that a major shareholder recently died and that he was trying to help the grieving widow get new share certificates. *See*, Affidavit of Gaylon Erickson, attached hereto as Exhibit "3."

27.    NATCO asked if the certificates were "medallion guaranteed." Walford indicated that they were not Medallion guaranteed. *See*, Exhibit "3."

28.    Medallion guarantee is a special program that provides a special surety by financial institutions to help guaranty the authenticity of signatures and the underlying transactions and is often used in the transfer of securities evidenced by a physical certificate.

29.    NATCO, as with nearly every transfer agent, requires that transfers of physical certificates include stock powers signed by the original stock holder that are Medallion

7

guaranteed.

30.     Mr. Walford works with Ed Nichols ("Nichols"), a former member of the Company's Board of Directors. Nichols was the former head of the Company's Audit Committee who was asked to investigate certain activities of Val, the Company's CEO at that time.

31.     Nichols' investigation took place from December 2014 through March 2015.

32.     During that time, Nichols used Walford as an investigator for the Audit Committee investigation. Walford, as part of the investigation, conducted interviews with Allan and certain of his business associates.

33.     Nichols and Walford indicated that they were recommending the Company merge into T-Rex Oil, Inc., an oil and gas company based out of Denver, Colorado.  Nichols and Walford, however, were both principals of T-Rex Oil. Walford was the CEO of T-Rex and remains so to this day.

34.     The Board of Directors of the Company, upon learning of this situation, determined that Nichols had a conflict of interest and would no longer be able to conduct the internal investigation of Val.

35.     Nichols elected to resign from the Company's Board of Directors.

36.     Walford's discussions with NATCO were a precursor of a series of discussions or communications between Allan and NATCO, commencing at or around February 7, 2017 and continuing to at least February 16, 2017.

37.     On February 7, 2017, Allan contacted NATCO via email and provided copies of various documents, including (a) an Assignment Agreement and (b) stock powers. *See,* Affidavit of Tiffany Baxter, attached hereto as Exhibit "4;" Affidavit of Amanda Cardinalli, attached hereto as Exhibit "5."

8

38.     The Assignment Agreement was purportedly dated December 10, 2016 and purportedly signed by Allan and Val. *See,* Exhibit "A," attached to the Affidavit of Amanda Cardinalli. The Assignment Agreement contained provisions that assigned to Allan a total of Twenty-Six Million Two Hundred Thirty-Five (26,235,000) shares of the Company's common stock that were owned by Val. Such 26,235,000 shares (the "VH Shares") of common stock constitute all of the ownership of Val's stock in the Company, and are the same shares Val purportedly proxied to Allan on or about July 7, 2016.

39.     The five stock powers that accompanied Allan's February 7, 2017 email to NATCO were purportedly signed by Val and each stock power contained Medallion guarantee stamps from Washington Trust Bank. All stock powers were dated December 10, 2016. *See,* Exhibit "A," attached to the Affidavit of Amanda Cardinalli.

40.     Stock powers are generally attached to original share certificates and are signed by the transferor.

41.     Medallion guarantees are generally provided by certain financial institutions and contain such financial institution's guarantee on the genuineness of the signature and a guarantee against the forgery of the underlying instrument.

42.     Many stock transfer agents, including NATCO, require Medallion guarantees on physical share certificates that are transferred.

43.     Val died on December 24, 2016, at his residence in Polson, Lake County, Montana.

44.     The proxies, including the voting proxy provided by Val to Allan, were on their face, set to expire on or around January 7, 2017. *See,* Proxies to Allan Holms from July, 2016 takeover attempt, attached hereto as Exhibit "6."

9


MAUPIN|COX|LEGOY
ATTORNEYS AT LAW
P.O. Box 30000
Reno, Nevada 89520

45.     Allan specifically questioned NATCO as to the process to get the share certificates that are in the name of Val renamed to Allan. *See,* Exhibit "4," at paragraph 12.

46.     Allan originally indicated to NATCO that he had one original certificate evidencing the VH Shares and copies of four other certificates evidencing the VH Shares. *See,* Exhibit "4," at paragraph 13.

47.     On the morning of February 8, 2017, NATCO contacted Washington Trust Bank ("WTB"), the financial institution that Medallion guaranteed the stock powers, asking WTB to confirm that the Medallion guarantees were issued by WTB. *See,* Exhibit "B," attached to the Affidavit of Amanda Cardinalli.

48.     On the afternoon of February 9, 2017, NATCO received an email from Jody McCormick, an in-house corporate counsel of WTB. *See,* Exhibit "B," attached to the Affidavit of Amanda Cardinalli.

49.     Ms. McCormick's email read, "This is to confirm that WTB is unable to verify the Medallion Stamps on the transaction."

50.     NATCO also emailed Allan on February 9, 2017 to confirm that he has one original certificate evidencing VH Shares and four copies of certificates evidencing VH Shares. *See,* Exhibit "C," attached to the Affidavit of Amanda Cardinalli.

51.     Allan called NATCO following this email and indicated that he does not have any original share certificates.  This is inconsistent with the statement made by Allan the previous day relating to the VH Shares. *See,* Exhibit "5," at a paragraph 13.

52.     On February 10, 2017, NATCO and Allan again communicated. NATCO indicated that five items are required for NATCO to issue new certificates in the name of Allan. These five items are: (a) A copy of Val Holms' Death Certificate; (b) Letters Testamentary

10

which confirm the appointment of the authorized representative of Val's Estate; (c) A stock power signed by the authorized representative of Val's Estate with the signature Medallion guaranteed and confirming the Medallion limit exceeds the value of the shares; (d) A Lost Instrument Bond in an open penalty amount naming NATCO and BRI as obligees; and (e) An Affidavit of Loss executed by the authorized representative of Val's Estate. *See*, Exhibit "C," attached to the Affidavit of Amanda Cardinalli.

53.     Upon information and belief, none of the information set forth in paragraph 52, above, has been provided to NATCO by Allan.

54.     On February 14, 2017, Allan contacted NATCO and indicated that he was working with Val's estate to obtain a lost instrument bond, one of the items required by NATCO as described in paragraph 52, above. *See*, Exhibit "5," at paragraph 13.

55.     Allan also indicated to NATCO that Mari Holms, the widow of Val, was the executrix of Val's Estate. *See*, Exhibit "5," at paragraph 13.

56.     According to probate records, the personal representative (executor) of Val's Estate is James Madson Holms, Val's son. *See*, Order of Informal Probate of Will, and for Appointment of Personal Representative, attached hereto as Exhibit "7." Upon information and belief, Mari Holms is challenging the appointment of James Madson Holms as the personal representative of Val's estate.

57.     The VH Shares are an asset that would otherwise be property of Val's Estate, if not for the purported transfers to Allan.

58.     Allan also previously indicated to NATCO that Val's signature on the various documents he provided to NATCO could be verified by Mari Holms.



59.     Allan also indicated to NATCO that Val's signature on the various documents could be verified by John Doubek. Mr. Doubek is an attorney with the firm Doubek, Pyfer & Fox LLP, in Helena, Montana who is currently representing Val in the Montana Case. *See,* Exhibit "5," at paragraph 14.

60.     Despite Allan's claims that Mr. Doubek can verify Val's signatures, Allan provided an affidavit from Mr. Doubek that confirms that Mr. Doubek was not physically present at any time when Val purportedly signed the Assignment Agreement or the stock powers. *See,* Exhibit "D," attached to the Affidavit of Amanda Cardinalli.

61.     On February 13, 2017, Allan filed a Form 5 with the Securities Exchange Commission ("SEC"). The Form 5 is an "initial statement of beneficial ownership" that is required to be filed whenever an executive officer or director comes aboard a public company or when a shareholder acquires more than 10% of the equity securities of a public company.

62.     A copy of the filed Form 5 was provided to the Company by Richard Repp, Esq., of the Witherspoon Kelley Davenport law firm in Spokane, Washington, Allan's corporate and securities attorney.

63.     The Form 5 filed by Allan contains false information. For instance, the Form 5 indicates Allan is president of the Company and is also a Director of the Company. *See,* Form 5 Filing dated February 13, 2017, attached hereto as Exhibit "8."

64.     The Form 5 also indicates Val purportedly transferred half of the VH Shares to Allan pursuant to a "representation agreement" dated August 1, 2016. This disclosure is inconsistent with Allan's statements to NATCO on or about February 7, 2017 that the VH Shares were transferred to Allan on December 10, 2016. *See,* Exhibit "5." All of the stock powers

12

MAUPIN COX LEGOY
ATTORNEYS AT LAW
P.O. Box 30000
Reno, Nevada 89520

provided to NATCO on February 7, 2017 were dated December 10, 2016; none were dated on or around August 1, 2016.

65.    No filings have been made by Val or Val's Estate relating to the change in beneficial ownership that is alleged by Allan in his statements to NATCO or as described in the Form 5 executed by Allan.

66.    On the morning of February 14, 2017, corporate and securities counsel to the Company, Paul, contacted Mr. Repp. Paul requested copies of the documents referenced in Allan's Form 5 that was filed the previous day. *See*, Exhibit "2."

67.    Paul also indicated to Mr. Repp that Allan's filing of the Form 5 appeared to violate a TRO issued in Montana in connection with the Montana Case. *See*, Exhibit "2."

68.    Paul requested that Allan withdraw the Form 5 by the close of business on Thursday, February 16, 2017. *See*, Exhibit "2."

69.    Mr. Repp in the afternoon of February 14, 2017, provided a copy of a Schedule 13D filed by Allan that day. *See*, Form 8-K filed on February 16, 2017, attached hereto as Exhibit "9."

70.    The Company has similar concerns and suspicions regarding many of the disclosures in the Schedule 13D as it does with the Form 5 as set forth in paragraphs 64 and 65, above.

71.    Mr. Repp, in response to Paul's request to see documents to substantiate the disclosures in the Form 5, indicated that he was not authorized to provide such documents. *See*, Exhibit "2."

72.    As corporate and securities counsel to the Company, Paul's request on behalf of the Company to see documents to substantiate public disclosures is a necessary request to help

13


MAUPIN|COX|LEGOY
ATTORNEYS AT LAW
P.O. Box 30000
Reno, Nevada 89520

ensure that public disclosures are accurate. Allan's refusal to provide documents to the Company to support publicly-filed SEC documents that are linked to the Company's filings makes it impossible for the Company to verify the accuracy of Allan's statements. Allan refused to withdraw or retract the filings or statement he made publicly in the Form 5 and Schedule 13D by 5:00 p.m., EST, on February 16, 2017 as requested by the Company. Accordingly, after the deadline passed on February 16, 2017, the Company filed a Current Report on Form 8-K disputing the validity of the Form 5 and Schedule 13D filed by Allan. *See*, Current Report on Form 8-K, filed on February 16, 2017, attached hereto as Exhibit "10."

73.     Forensic handwriting analysis on the documents provided to NATCO on February 7, 2017, indicate that the signatures of Val are not genuine. Specifically, Mark Songer, a Forensic Document Examiner, has examined the signatures on the Irrevocable Stock/Bond Power Forms allegedly executed by Val to effectuate the transfer of the VH shares to Allan and has concluded in a report dated February 15, 2017, that the signatures of Val on those forms are not consistent with known samples of actual signatures belonging to Val. *See,* Curriculum Vitae and Expert Report of Mark L. Songer, D-ABFE, CFC, Forensic Examiner, attached hereto as Exhibit "11."

**D.     Graiwer's Conversion of Company Funds by Falsification of Documents**

74.     The Company was created by virtue of a reverse merger that occurred in late November, 2010 through the efforts of several individuals, including Jay Edington ("Edington"), a consultant who had been engaged by the Company and who was primarily responsible for overseeing an equity financing transaction during the summer and fall of 2010.

75.     As part of his efforts, Edington arranged for Graiwer's investment in the Company. Similarly, Graiwer arranged for various other individuals and/or entities he had

14



MAUPIN COX LEGOY
ATTORNEYS AT LAW
P.O. Box 30000
Reno, Nevada 89520

relationships with to provide funds to invest in the Company through the same equity financing transaction.

76.     At all times relevant and material herein Graiwer was an attorney engaged in the private practice of law in Southern California. As such Graiwer could not legally be paid a finder's fee for investors he brought to the Company. Nevertheless, Graiwer expected finder's fees for his efforts.

77.     To overcome the legal obstacles that prevented payment of a finder's fee, and to ensure Graiwer received his finder's fees, Graiwer and Edington entered into a scam by which Graiwer's law firm sent an invoice on November 24, 2010 to Multisys Language Solutions, Inc. ("MLS"), the shell corporation in the reverse merger, in the amount of Nineteen Thousand Nine Hundred Twenty-Nine Dollars ($19,929.00) representing seventy (70) hours of legal work at a rate of Two Hundred Seventy-Five Dollars per hour ($275/hr.), and an additional Six Hundred Seventy-Nine Dollars ($679.00) in costs. *See,* Invoice #3001, dated November 24, 2010, from the office of Manuel P. Graiwer PC, attached hereto as Exhibit "12."

78.     Two days later on November 26, 2010, Edington wire transferred from the MLS account number 501004702900 at Bank of America to Graiwer the sum of $19,929.00 in full payment of the Graiwer November 24, 2010 invoice.

79.     Edington confirmed the illegal nature of this transfer pursuant to an email dated November 25, 2010 which he sent to Val entitled "Late Accounting Issues." There, Edington initially expressed his displeasure with the Company's soon-to-be CFO, Kent Jensen, stating to Val:

> This is exactly where I DID NOT want to be the night before the
> closings!!!!!!!!!!!!!  Pisses me off to wait until the very last minute

15


MAUPIN COX LEGOY
ATTORNEYS AT LAW
P.O. Box 30000
Reno, Nevada 89520

> and I can tell you that Kent is a nice religious man, but he does not
> know jack shit about how a public company needs to operate. . . .

Following this opening rant Edington then described how he had fabricated books and records so

that he could direct funds to himself or Graiwer, or both, without leaving evidence of doing so.

However, the message was worded so as to obfuscate that fact. The message continued:

> I have a commission schedule all worked out and I have things worked
> out with Manny to get part of his fees via a legal invoice to MLS.  The
> reality is that Jerod and I did all the work he is going to invoice for, so this
> is a real number, but just a legal way of getting funds to him in the form of
> services rendered and not so much for finder's fee. The consultant for a
> portion of finders [sic] fee is an investment company in HK that will
> document the clients they introduced to MLS. Most of these will be
> Manny's clients, but I have piggy backed a few into this invoice. All
> distributions will be done legally correct and pursuant to the terms of the
> PPM, so we will not have any audit problems or SEC problems.

*See,* Email communications dated November 25, 2010, attached hereto as Exhibit "13."

80.     Graiwer's deposition was taken in the Derivative Action on December 9, 2014

where he denied any knowledge of the false invoice from his law firm to MLS stating under oath

"I have never done any legal work for Multisys, I have never done any legal work for Bakken."

*See,* Vol. I, Deposition of Manuel Graiwer, Vol. (12/09/14) at 109:13 – 116:22, attached hereto

as Exhibit "14."

81.     Records which were subpoenaed from Bank of America in the Derivative Action

belie Graiwer's assertion and establish that a $19,929.00 wire transfer was made from the MLS

account to Graiwer's account on November 26, 2010. When confronted with this fact Graiwer

attempted to distance himself from the transfer through a written declaration dated November 19,

2015 where he blamed a legal secretary for depositing the $19,929.00 "check" into his firm's

bank account and explaining that particular legal secretary had been fired due to incompetence.

16

MAUPIN COX LEGOY
ATTORNEYS AT LAW
P.O. Box 30000
Reno, Nevada 89520

*See,* Bank of America statement indicating wire transfer to Graiwer on November 26, 2010, attached hereto as Exhibit "15."

82.     Graiwer's deposition is further contradicted by bank records showing the $19,929.00 payment was a wire transfer as opposed to a check. Additionally, the Bank of America records name "Manuel Graiwer" personally as beneficiary of the payment, as opposed to his law firm's account.

## FIRST CLAIM FOR RELIEF
## (INJUNCTIVE RELIEF)

83.     BRI incorporates by reference each and every allegation set forth in paragraphs 1 through 82, above.

84.     The conduct of Allan, as set forth above, violates federal securities laws, as well as state law pertaining to forgery, and conversion among other.

85.     Additionally, Allan's conduct, if allowed to continue, will cause irreparable harm to the Company and to other entities and individuals, including, but not limited to the actual beneficiaries of Val's Estate.

86.     As a result of Allan's conduct, and in order to prevent irreparable injury to the Company, a temporary restraining order should be entered immediately against Allan precluding Allan or any person or entity purporting to be working with or affiliated with Allan from transferring or attempting to transfer any shares evidenced by BRI stock numbers 335, 1342, 1343, 1344 and 1345 through NATCO or any other transfer agent. A temporary restraining order is also necessary to prevent NATCO and any other transfer agent from carrying out any instructions from Allan, or any person, or entity purporting to be working with or affiliated with Allan, from transferring any shares evidenced by BRI stock numbers 335, 1342, 1343, 1344 and

MAUPIN | COX | LEGOY
ATTORNEYS AT LAW
P.O. Box 30000
Reno, Nevada 89520

1345. Additionally, the temporary restraining order is necessary to prevent Allan from filing or attempting to file any additional documents with the SEC that purport, indicate or in any way claim that Allan is either an officer, director, or ten percent (10%) shareholder of BRI.

87.     Injunctive relief in the form of a temporary restraining order is necessary to prevent immediate and irreparable injury, loss, or damage to the Company before this matter can be set for preliminary injunction.

88.     Unless Allan is enjoined from continuing his illegal conduct, the Company will suffer additional and immediate and irreparable harm thereby warranting the entry of the injunctive relief requested herein.

## SECOND CLAIM FOR RELIEF
### (CONVERSION)

89.     BRI incorporates by reference each and every allegation set forth in paragraphs 1 through 88, above.

90.     The conduct of Graiwer, as set forth above, constitutes conversion of Company funds.

91.     Graiwer was legally precluded from seeking a finder's fee for any efforts he expended in bringing investors to the Company.

92.     Graiwer never performed any legal services for the Company either during its creation and initial financing, or thereafter.

93.     Despite the above, Graiwer sent an invoice to the Company on or about November 24, 2010 setting forth attorney's fees incurred and costs advanced in the amount of Nineteen Thousand Nine Hundred Twenty-Nine Dollars ($19,929.00) representing seventy (70) hours of legal work at a rate of Two Hundred Seventy-Five Dollars per hour ($275/hr.), together

18

MAUPIN COX LEGOY
ATTORNEYS AT LAW
P.O. Box 30000
Reno, Nevada 89520

with costs advance in the amount of Six Hundred Seventy-Nine Dollars ($679.00). This invoice was false in that none of the services referenced therein were ever performed by Graiwer or any member of Graiwer's firm on behalf of the Company.

94.　　The Company, while under the direction of Edington, paid the false invoice described in paragraph 94, above, to Graiwer by wire transfer dated November 26, 2010 from the MLS account number 501004702900 at Bank of America which was deposited directly into Graiwer's personal account.

95.　　The Company did not discover Graiwer's actions until Graiwer's deposition on December 9, 2014. The Company has been damaged in the amount of Nineteen Thousand Nine Hundred Twenty-Nine Dollars ($19,929.00), together with interest at the legal rate from November 26, 2010, to and including the present as a direct result of Graiwer's conversion of Company assets.

### THIRD CLAIM FOR RELIEF
### (FRAUD)

96.　　BRI incorporates by reference each and every allegation set forth in paragraphs 1 through 95, above.

97.　　The conduct of Graiwer and Edington, as set forth above, was designed to defraud the Company of cash assets which could not otherwise be legally obtained by Graiwer.

98.　　The invoice presented by Graiwer dated November 24, 2010 was false as no legal services had been provided by Graiwer to the Company.

99.　　Graiwer knew the November 24, 2010 invoice was false but chose to send it to the Company despite his knowledge of the falsity of the invoice.

100.　　By presenting the November 24, 2010 invoice Graiwer intended to induce

19

MAUPIN COX LEGOY
ATTORNEYS AT LAW
P.O. Box 30000
Reno, Nevada 89520

payment from the Company in the amount of Nineteen Thousand Nine Hundred Twenty-Nine Dollars ($19,929.00).

101.    The Company, not knowing of the fraudulent conduct of Graiwer and Edington until taking Graiwer's deposition in the Derivative Action on December 9, 2014, paid the invoice in full to Graiwer.

102.    The Company has been damaged in the amount of Nineteen Thousand Nine Hundred Twenty-Nine Dollars ($19,929.00) plus interest at the legal rate from November 26, 2010 through and including the entry of a judgment in favor of the Company.

### FOURTH CLAIM FOR RELIEF
### (CLAIM FOR DECLARATORY RELIEF)

103.    BRI incorporates by reference each and every allegation set forth in paragraphs 1 through 102, above.

104.    Since July 20, 2016 Allan has claimed to be the President of BRI and a Director of BRI by virtue of the proxies executed by Val, Graiwer, and others in late June and early July, 2016.

105.    The proxies have all extinguished by virtue of the passage of time or have been withdrawn by the stockholder who provided the proxy, including Graiwer.

106.    Allan has continued to attempt to  obtain control of the Company through his most recent actions in attempting to have Val's stock certificate numbers 335, 1342, 1343, 1344 and 1345 which have a combined total of Twenty-Six Million Two Hundred Thirty-Five Thousand (26,235,000) shares of common stock of BRI transferred to him. Allan's actions in attempting to transfer the VH Shares have been done through forged documents and other illegal means. Additionally, Allan has filed a Form 5 and a Schedule 13D with the SEC claiming to be

20

MCL
[LAUPIN] COX [LEGOY]
ATTORNEYS AT LAW
P.O. Box 30000
Reno, Nevada 89520

the President of the Company and a Director. These documents are available to the general public, and misleading as to shareholders and the public at large.

107.    Chapter 30 of the Nevada Revised Statutes ("NRS") grants jurisdiction to this Court "...to declare rights, status, and other legal relations whether or not further relief is or could be claimed" under a contract, which includes the documents Allan has used to claim his position as President and a Director of BRI and to attempt to gain control of the VH Shares.

108.    Based on the events that occurred on July 20, 2016, and which have continued to take place through the conduct of Allan, BRI requests the Court declare the rights of the Parties with respect to control of the Company in order to resolve that issue and bring stability to the Company.

## FIFTH CLAIM FOR RELIEF
### (ATTORNEY'S FEES AND COSTS)

109.    BRI incorporates by reference each and every allegation set forth in paragraphs 1 through 108, above.

110.    The Company has been required to retain the services of the law firm of Maupin, Cox & LeGoy to pursue its rights and to protect the Company from the fraudulent and illegal acts of the Defendants, thereby entitling the Company to recover its costs and attorney's fees incurred in prosecuting this action.

Based on the foregoing, Plaintiff requests the following relief:

A.    That the Court enter a temporary restraining order immediately restraining Allan Holms, or any person or entity purporting to be working with or affiliated with Allan from transferring or attempting to transfer any shares evidenced by BRI stock numbers 335, 1342, 1343, 1344 and 1345 through NATCO or any other transfer agent. NATCO and any other

21


MAUPIN|COX|LEGOY
ATTORNEYS AT LAW
P.O. Box 30000
Reno, Nevada 89520

transfer agent are precluded from carrying out any instructions from Allan, or any person, or entity purporting to be working with or affiliated with Allan, to transfer any shares evidenced by BRI stock numbers 335, 1342, 1343, 1344 and 1345. Additionally, Allan Holms is immediately restrained from filing or attempting to file any additional documents with the SEC that purport, indicate or in any way claim that Allan Holms is either an officer, director, or ten percent (10%) shareholder of BRI;

      B.     For declaratory relief as to the rights of the Parties as set forth above;

      C.     For the recovery of the sum of $19,929.00 together with interest at the legal rate from November 26, 2010, to and including the present based on conversion of said funds by Graiwer against the Company;

      D.     For costs incurred in bringing this action together with a reasonable attorney's fee; and

      E.     For such other and further relief as the Court deems just and proper.

### NRS 239B.030 Affirmation

Pursuant to NRS 239B.030, the undersigned hereby affirms that this document does not contain the Social Security Number of any person.

Dated this _21st_ day of February, 2017.

Maupin, Cox & LeGoy

By: _____

Paul J. Anderson, NSB # 709
Procter J. Hug, IV, Esq., NSB #12403
4785 Caughlin Parkway
Reno, NV 89519
Tel.: (775) 827-2000
Fax: (775) 827-2185
*Attorneys for Plaintiff*

22



VERIFICATION

STATE OF MONTANA              )
                             :ss
COUNTY OF LEWIS & CLARK      )

     Dan Anderson, being first duly sworn, deposes and states that he has read and assisted in preparing the foregoing Complaint, knows the contents thereof, and that the same is true as of his own knowledge, except as to those matter state upon information and belief, and he believes those matters to be true.

     I declare under penalty of perjury under the laws of the State of Nevada that the foregoing is true and correct.

     Date this 17 day of February, 2017.

                              DAN ANDERSON

Subscribed and sworn to before me

this 17 day of February, 2017.

Notary Public

CATHERINE A. HAAG
NOTARY PUBLIC for the
State of Montana
Residing at Helena, Montana
My Commission Expires
November 23, 2017

23

MAUPIN COX LEGOY
ATTORNEYS AT LAW
P.O. Box 30000
Reno, Nevada 89520

**INDEX OF EXHIBITS**

| NO. | DESCRIPTION | PAGES |
|---|---|---|
| 1. | Current Report on Form 8-K Report and Exhibit 3.1, filed on May 10, 2016 | 27 |
| 2. | Declaration of Wesley J. Paul, Esq. | 2 |
| 3. | Affidavit of Gaylon Erickson | 3 |
| 4. | Affidavit of Tiffany Baxter | 5 |
| 5. | Affidavit of Amanda Cardinalli | 59 |
| 6. | Proxies to Allan Holms from July, 2016 Takeover Attempt | 46 |
| 7. | Order of Informal Probate of Will, and for Appointment of Personal Representative | 3 |
| 8. | Form 5 Filing, dated February 13, 2017 | 3 |
| 9. | Schedule 13D, dated February 14, 2017 | 5 |
| 10. | Current Report on Form 8-K, filed on February 16, 2017 | 10 |
| 11. | Curriculum Vitae and Expert Report of Mark L. Songer, D-ABFE, CFC, Forensic Examiner | 41 |
| 12. | Invoice #3001, dated November 24, 2010, from the office of Manuel P. Graiwer PC | 1 |
| 13. | Email communications dated November 25, 2010 | 3 |
| 14. | Excerpts from the Deposition of Manuel Graiwer, Volume I | 4 |
| 15. | Bank of America Statement Indicating Wire Transfer to Manuel Graiwer on November 26, 2010 | 1 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

AUPIN COX LEGOY
ATTORNEYS AT LAW
P.O. Box 30000
Reno, Nevada 89520

F I L E D
Electronically
CV17-00360
2017-02-21 11:25:21 AM
Jacqueline Bryant
Clerk of the Court
Transaction # 5958775 : csulezic

# EXHIBIT 1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

# EXHIBIT 1

8-K 1 bakken_8k.htm CURRENT REPORT

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
## WASHINGTON, D.C. 20549

## FORM 8-K

## CURRENT REPORT

**Pursuant to Section 13 or 15(d) of
the Securities Exchange Act of 1934**

Date of Report (Date of earliest event reported): **May 6, 2016**

## Bakken Resources, Inc.
(Exact name of registrant specified in charter)

| | | |
|---|---|---|
| **Nevada** | **000-53632** | **26-2973652** |
| (State of Incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

**1425 Birch Ave., Suite A, Helena, MT 59601**
(Address of principal executive offices) (Zip Code)

**(406) 442-9444**
Issuer's Telephone Number

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instruction A.2. below):

[ ] Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

[ ] Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

[ ] Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

[ ] Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 1.01 Entry into a Material Definitive Agreement**

Bakken Resources, Inc. ("Bakken," "our," or the "Company") entered into a loan agreement with Eagle Private Equity ("Eagle") on May 6, 2016. The loan agreement permits the Company to draw up to One Million dollars ($1,000,000) from a non-revolving credit facility provided by Eagle (the "Facility"). The Facility is initially open for 270 days but may be extended at the Company's option. Loans drawn on the Facility accrue interest at 4% above LIBOR, and the Facility includes a 5% fee. Any loans on the Facility are due on May 5, 2018. In certain events, the loan agreement permits Eagle to put loans to the Company up to the balance of the Facility.

The Facility is unsecured, but upon certain triggering events generally described as changes in control of the Company, loans under the Facility are convertible into shares of a newly-designated class of the Company's Series A Preferred stock, described below under Item 5.03 of this Report.

The loan agreement contains representation and warranties of the Company that are customary for transactions of this type.

**Item 5.03 Amendments to Articles of Incorporation or Bylaws; Change in Fiscal Year.**

On May 6, 2016, the Company filed a Certificate of Designation with the Nevada Secretary of State. The Certificate of Designation creates a series of preferred stock comprised of one million (1,000,000) shares designated "Series A Preferred" pursuant to Article IV of our Articles of Incorporation, which authorizes up to ten million (10,000,000) shares of preferred stock by resolution of the Board of Directors ("Board").

Series A Preferred rights, designations, preferences and terms include (but are not limited to):

1. <u>Dividends</u>: The Series A Preferred participates with Common Stock ("Common") and gives the Board discretion to issue separate Series A Preferred dividends not available to Common.

2. <u>Liquidation</u>: Priority over Common upon a Liquidation Event up to twice the initial price per share for each share of Series A Preferred, participating with Common thereafter.

3. <u>Voting</u>: Each share of Series A Preferred votes with Common and has one vote for each share of Common into which each stock of Series A Preferred is convertible (initially 100 shares of Common).

4. <u>Conversion</u>: Holders of Series A Preferred may elect to convert each such share into one hundred (100) shares of Common, subject to Bakken's authorized limit of Common shares and any applicable adjustment to shares of Series A Preferred contained in the Certificate of Designation.

5. <u>Anti-Dilution Protection</u>: Series A Preferred is protected by "full-ratchet" anti-dilution rights for the first Ten Million dollars ($10,000,000) in equity financing raised by the Company following the closing of the Facility. After such full ratchet period, adjustment to the conversion price will be based on the "weighted average" formula described in the Certificate of Designation.

6. <u>Limitations</u>: The Series A Preferred must vote as a class in order to approve certain events outside the course of normal business.

7.   <u>Registration Rights</u>: Converting shares of Series A Preferred into Common shares entitles the holders of the converted Common shares to register those shares with the SEC, in accordance with and subject to the terms of Section D of the Certificate of Designation.

The Board reserves all rights concerning the remaining nine million (9,000,000) preferred shares reserved under Article IV of the Company's Articles of Incorporation and any shares that may be redeemed, retired, cancelled or amended relating to Series A Preferred.

A copy of the Certificate of Designation for Series A Preferred is attached hereto as Exhibit 3.1

**Item 9.01 Financial Statements and Exhibits.**

(d)   Exhibits


Exhibit 3.1   Certificate of Designation for Series A Preferred Stock of Bakken Resources, Inc. (filed on May 6, 2016 with the Nevada Secretary of State)

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

Bakken Resources, Inc.

By: /s/ Dan Anderson

Dan Anderson
Chief Financial Officer
May 10, 2016

6/15/2016                    https://www.sec.gov/Archives/edgar/data/1450390/000120677416005905/exhibit3-1.htm

EX-3.1 2 exhibit3-1.htm CERTIFICATE OF DESIGNATION FOR SERIES A PREFERRED STOCK OF BAKKEN RESOURCES

6/15/2016                    https://www.sec.gov/Archives/edgar/data/1450390/000120677416005905/exhibit3-1.htm

## STATE OF NEVADA



**BARBARA K. CEGAVSKE**
*Secretary of State*

**JEFFERY LANDERFELT**
*Deputy Secretary*
*for Commercial Recordings*

**OFFICE OF THE
SECRETARY OF STATE**

### Certified Copy

May 6, 2016

**Job Number:**          C20160506-1455
**Reference Number:**   00010295028-77
**Expedite:**
**Through Date:**

The undersigned filing officer hereby certifies that the attached copies are true and exact copies of all requested statements and related subsequent documentation filed with the Secretary of State's Office, Commercial Recordings Division listed on the attached report.

| **Document Number(s)** | **Description** | **Number of Pages** |
|---|---|---|
| 20160208117-58 | Certificate of Designation | 18 Pages/1 Copies |



Respectfully,

*Barbara K. Cegavske*

BARBARA K. CEGAVSKE
Secretary of State

Certified By: Sandy Edwards
Certificate Number: C20160506-1455
You may verify this certificate
online at http://www.nvsos.gov/

**Commercial Recording Division**
202 N. Carson Street
Carson City, Nevada 89701-4201
Telephone (775) 684-5708
Fax (775) 684-7138

6/15/2016                                    https://www.sec.gov/Archives/edgar/data/1450390/000120677416005905/exhibit3-1.htm





**BARBARA K. CEGAVSKE**
Secretary of State
202 North Carson Street
Carson City, Nevada 89701-4201
(775) 684-5708
Website: www.nvsos.gov

| Filed in the office of | Document Number |
|---|---|
| *Barbara K Cegavske* | 20160208117-58 |
| Barbara K. Cegavske | Filing Date and Time |
| Secretary of State | 05/06/2016 2:10 PM |
| State of Nevada | Entity Number |
| | E0365262008-2 |

## Certificate of Designation
### (PURSUANT TO NRS 78.1955)

USE BLACK INK ONLY - DO NOT HIGHLIGHT                                    ABOVE SPACE IS FOR OFFICE USE ONLY

### Certificate of Designation For
### Nevada Profit Corporations
### (Pursuant to NRS 78.1955)

**1. Name of corporation:**

Bakken Resources, Inc.

**2. By resolution of the board of directors pursuant to a provision in the articles of incorporation this certificate establishes the following regarding the voting powers, designations, preferences, limitations, restrictions and relative rights of the following class or series of stock.**

Series A Preferred

The attached document (Certificate of Designation of Bakken Resources, Inc. of Series A Preferred) is specifically incorporated by reference in its entirety into this Certificate of Designation form. Such document sets forth all information required under the applicable provisions in Chapter 78 of the Nevada Revised Statutes.

**3. Effective date of filing: (optional)** [ ]

(must not be later than 90 days after the certificate is filed)

**4. Signature: (required)**

X _____

Signature of Officer    Dan Anderson, CFO

**Filing Fee: $175.00**

**IMPORTANT:** Failure to include any of the above information and submit with the proper fees may cause this filing to be rejected.

*This form must be accompanied by appropriate fees.*                    Nevada Secretary of State Stock Designation
                                                                                                    Revised: 1-3-13

## CERTIFICATE OF DESIGNATION

## OF

## BAKKEN RESOURCES, INC.

To be Designated
Series A Preferred Stock

---

*Pursuant to Section 1955 of
Chapter 78 of the Nevada Revised Statutes*

---

A. Under Article IV of the Articles of Incorporation of Bakken Resources, Inc. (the "Corporation"), this Corporation is authorized to issue two classes of stock, designated common stock ("Common Stock") and preferred stock ("Preferred Stock"). The total number of shares of Common Stock that the Corporation is authorized to issue is One Hundred Million (100,000,000). The total number of shares of Preferred Stock this Corporation is authorized issue is Ten Million (10,000,000). Both the Preferred Stock and the Common Stock shall have a par value of $0.001 per share.

B. The Preferred Stock may be divided into series. The first series shall consist of One Million (1,000,000) shares and is hereby designated "Series A Preferred." The price at which the first share of Series A Preferred originally issues is designated the "Series A Price Per Share," which shall be one dollar ($1.00) per share. The remaining Nine Million (9,000,000) shares of authorized Preferred Stock are not hereby designated but may be designated and issued from time to time in one or more series or classes. Except as otherwise set forth in this Certificate of Designation, this Corporation's Board of Directors ("Board") is authorized to determine or alter the rights, preferences, privileges and restrictions granted to or imposed upon any wholly unissued series of Preferred Stock and, within the limits and restrictions stated in any resolution or resolutions of the Board originally fixing the number of shares constituting any series, to increase or decrease (but not below the number of shares of such series then outstanding) the number of shares of any such series subsequent to the issue of shares of that series, unless a vote of the holders of such series is required pursuant to the certificate or certificates establishing the series of Preferred Stock.

6/15/2016                                    https://www.sec.gov/Archives/edgar/data/1450390/000120677416005905/exhibit3-1.htm

C. Except as set forth in this Sections C, and subject to Section F, the Series A Preferred shall have the identical powers, preferences, rights, and restrictions to the Common Stock, such provisions being set forth for the Series A Preferred as follows:

1. **Dividends.**

(a) <u>Rate and Preference</u>. Each share of Series A Preferred shall entitle the holder thereof to participate on a fully diluted based with the Common Stock in any Common Stock dividend or similar payment that the Board may declare or issue and also to receive any Series A Preferred dividend or similar payment that the Board may declare or issue, in the manner and at the rate that the Board may determine.

(i) No dividends shall be paid on any Common Stock of the Corporation until dividends on the Series A Preferred shall also have been paid or declared and set apart during that fiscal year and any prior year in which dividends accumulated but remain unpaid, and no dividends shall be paid on any share of Common Stock unless a dividend (not including any amount declared or issued to the Series A Preferred pursuant to Section C.1(a)) is paid with respect to all outstanding shares of Series A Preferred in an amount for each such share of Series A Preferred equal to or greater than the aggregate amount of such dividends for all shares of Common Stock into which each such share of Series A Preferred could then be converted.

(ii) Except as otherwise provided herein, no right shall accrue to holders of shares of Series A Preferred by reason of the fact that dividends on said shares are not declared in any prior year, nor shall any undeclared or unpaid dividend bear or accrue any interest.

(b) <u>Participation</u>. In the event the Corporation shall declare a distribution (other than any distribution described in Section C.2) payable in securities of other persons, evidences of indebtedness issued by the Corporation or other persons, assets (excluding cash dividends) or options or rights to purchase any such securities or evidences of indebtedness, then, in each such case the holders of the Series A Preferred shall be entitled to a proportionate share of any such distribution as though the holders of the Series A Preferred were the holders of the number of shares of Common Stock of the Corporation into which their respective shares Series A Preferred are convertible as of the record date fixed for the determination of the holders of Common Stock of the Corporation entitled to receive such distribution.

2. **Liquidation.**

(a) <u>Preference</u>. In the event of any liquidation, dissolution or winding up of the Corporation, whether voluntary or involuntary (each, a "Liquidation Event"), the holders of the Series A Preferred shall be entitled to receive, prior and in preference to any distribution of any of the assets or surplus funds of the Corporation to the holders of the Common Stock by reason of their ownership thereof, the Series A Price Per Share (as adjusted for any stock dividends, combinations or splits with respect to such shares) with interest accrued to the date of conversion plus all accumulated but unpaid dividends on such shares for each share of

2

Series A Preferred then held by them (the "Series A Preference"). If, upon any such Liquidation Event, the assets of the Corporation shall be insufficient to make payment in full to all holders of Series A Preferred of the Series A Preference set forth in this Section C.2(a), then such assets shall be distributed among the holders of the Series A Preferred at the time outstanding, ratably in proportion to the full amounts to which they would otherwise be entitled if the assets of the Corporation were sufficient to make such payment in full to holders of the Series A Preferred.

(b) Cap. For any Liquidation Event or Deemed Liquidation Event (defined below), if the amount payable on each share of Series A Preferred upon such distribution (inclusive of the preferential liquidation proceeds) would exceed twice the amount of the Series A Price Per Share (as adjusted for any stock dividends, combinations or splits with respect to such shares and treating the Series A Preferred on an as converted basis), then the Series A Preference mentioned in Section C.2(a) shall be of no force or effect as to any such amount payable on each share of Series A Preferred that exceeds twice the amount of such Series A Price Per Share, and all amounts payable upon such a distribution in excess of such amount shall be allocated amongst all the shareholders of the Corporation as set forth in Section C.2(c).

(c) Participation. After payment to the holders of the Series A Preferred of the amounts set forth in Section C.2(a), as limited by Section C.2(b) above, the entire remaining assets and funds of the Corporation legally available for distribution, if any, shall be distributed among the holders of the Common Stock and the Series A Preferred in proportion to the shares of Common Stock then held by them and the shares of Common Stock which they then have the right to acquire upon conversion of the shares of Series A Preferred then held by them.

(d) Deemed Liquidation Events. For purposes of this Section C.2, (i) any acquisition of the Corporation by means of merger or other form of corporate reorganization in which outstanding shares of the Corporation are exchanged for securities or other consideration issued, or caused to be issued, by the acquiring corporation or its subsidiary (other than a mere reincorporation transaction) (ii) a sale of all or substantially all of the assets of the Corporation, (iii) the sale of all or substantially all of the outstanding shares of capital stock of the Corporation, (iv) any change of control of the Board, the Corporation's voting stock, or that is otherwise not covered herein, and (v) a bankruptcy, shall, unless provided otherwise by the option of a majority the holders of Series A Preferred, voting together as a class, each be treated as Liquidation Event and shall entitle the holders of the Series A Preferred and Common Stock to receive at the closing in cash, securities or other property (valued as provided in Section C.2(e) below) amounts as specified in Sections C.2(a) through C.2(c) above if occurring or discovered at or within a reasonable time after occurrence (a "Deemed Liquidation Event").

(e) Non-Cash Valuation. Whenever the distribution provided for in this Section C.2 shall be payable in securities or property other than cash, the value of such distribution shall be the fair market value of such securities or other property as determined in good faith by the Board.

3

3. **Voting Rights; Directors.**

(a) <u>Preferred Voting with Common.</u> Each holder of shares of the Series A Preferred shall be entitled to the number of votes equal to the number of shares of Common Stock into which such shares of Series A Preferred could be converted (such number being initially one hundred (100) shares Common Stock) and shall have voting rights and powers equal to the voting rights and powers of the Common Stock (except as otherwise expressly provided herein or as required by law, voting together with the Common Stock as a single class) and shall be entitled to notice of any stockholders' meeting in accordance with the bylaws of this Corporation. Fractional votes shall not, however, be permitted and any fractional voting rights resulting from the above formula (after aggregating all shares into which shares of Series A Preferred held by each holder could be converted) shall be rounded to the nearest whole number (with one-half being rounded upward). Each holder of Common Stock shall be entitled to one (1) vote for each share of Common Stock held.

(b) <u>Conditional Board Seat.</u> As of the date on this Certificate of Designation, the Board consists of seven (7) members but may consist of no less than two (2) and no more than nine (9) members. The holders of Series A Preferred shares shall be entitled to elect one (1) member of the Board (voting as a class) on the condition that the number of seats on the Board is increased to either eight (8) or nine (9) seats, or to a any greater number of directors that may be later authorized by an amendment to the Corporation's Articles of Incorporation in accordance with that document, the Corporation's bylaws, and any applicable laws. The member elected by the holders of Series A Preferred, if applicable, shall be designated the "Series A Preferred Director." All other board members shall be elected by normal vote as described herein and consistent with this Corporation's bylaws.

(c) <u>Filling Vacancy of Conditional Board Seat.</u> In the case of a vacancy in the office the Series A Preferred Director, such vacancy shall remain vacant to be filled only by the vote of a majority of the shares of the Series A Preferred. Any director who shall have been elected by the holders of the Series A Preferred may be removed during the aforesaid term of office, whether with or without cause, only by the affirmative vote of the holders of a majority of the Series A Preferred.

4. **Conversion.**

The holders of the Series A Preferred shall have conversion rights specified in this Section C.4, <u>except that</u> in all cases conversion of any Series A Preferred stock into Common Stock shall be limited by the amount of available Common Stock authorized under this Corporation's Articles of Incorporation unless such Articles are amended by an affirmative vote in accordance with this Certificate of Designation and the relevant provisions of this Corporation's Articles of Incorporation or bylaws, as the case may be, where such amendment will take place within a reasonable time after this Corporation receives a relevant conversion notice attached hereto as Exhibit 1, and if approved, would increase the authorized number of shares of Common Stock by an amount sufficient to satisfy full conversation of any applicable request to convert shares of Series A Preferred into shares of Common Stock that would require such an amendment, as follows (the "Conversion Rights"):

4

(a) <u>Right To Convert</u>. Each share of the Series A Preferred shall be convertible, at the option of the holder thereof, at any time after the date of issuance of such share, at the office of the Corporation or any transfer agent for such stock, into one hundred (100) fully paid and nonassessable shares of Common Stock. The price at which shares of Common Stock shall be deliverable upon conversion of shares of the Series A Preferred (the "Conversion Price") shall initially be the Series A Price Per Share. Such initial Conversion Price shall be adjusted as hereinafter provided.

(b) <u>Automatic Conversion</u>. Each share of Series A Preferred shall automatically be converted into shares of Common Stock at the then-effective Conversion Price immediately upon either (i) the election of the holders of a majority of the shares of the Series A Preferred then-outstanding (voting together as a class), or (ii) the closing of the sale of the Corporation's Common Stock in a firm commitment, underwritten public offering registered under the Securities Act of 1933, as amended (the "Securities Act"), other than a registration relating solely to a transaction under Rule 145 under such Act (or any successor thereto) or to an employee benefit plan of the Corporation, at a public offering with aggregate proceeds to the Corporation (after deduction for underwriters' discounts and expenses relating to the issuance, including without limitation fees of the Corporation's counsel) exceeding Twenty-Five Million dollars ($25,000,000).

(c) <u>Mechanics of Conversion</u>.

(i) Before any holder of the Series A Preferred shall be entitled voluntarily to convert the same into shares of Common Stock, he shall surrender the certificate or certificates therefor, duly endorsed, at the office of the Corporation or of any transfer agent for such stock, and shall give written notice to the Corporation at such office that he elects to convert the same and shall state therein the number of shares to be converted and the name or names in which he wishes the certificate or certificates for shares of Common Stock to be issued. The Corporation shall, as soon as practicable thereafter, issue and deliver at such office to such holder of Series A Preferred, a certificate or certificates for the number of shares of Common Stock to which he shall be entitled. Such conversion shall be deemed to have been made immediately prior to the close of business on the date of surrender of the shares of Series A Preferred to be converted, and the person or persons entitled to receive the shares of Common Stock issuable upon such conversion shall be treated for all purposes as the record holder or holders of such shares of Common Stock on such date.

(ii) If the conversion is in connection with an underwritten offering of securities pursuant to the Securities Act, the conversion may, at the option of any holder tendering shares of Series A Preferred for conversion, be conditioned upon the closing with the underwriters of the sale of securities pursuant to such offering, in which event the person(s) entitled to receive the Common Stock upon conversion of the Series A Preferred shall not be deemed to have converted such Series A Preferred until immediately prior to the closing of such sale of securities.

5

(d) <u>Adjustments to Conversion Price for Certain Diluting Issues</u>. No adjustment described below in Sections C.4(d)(i)-(vi) shall affect the conversion price of the Series A Preferred if any such adjustment would apply in relation to any of the following: (a) securities issued or issuable to employees or directors of, or consultants to, the Corporation pursuant to any plan approved by the Corporation's Board of Directors, (b) Common Stock issued pursuant to a stock split or similar reorganization, (c) Common Stock issued upon conversion of Preferred Stock, (d) securities issued in connection with a bona fide business acquisition by the Corporation or an initial public offering, (e) securities issued to persons or entities with which the Corporation has business relationships, which issuances are approved by the Corporation's Board of Directors, and for primarily non-equity financing purposes, (f) securities issued or issuable pursuant to equipment lease financings or bank credit arrangements that are approved by the Board and for primarily non-equity financing purposes; or (g) securities that are otherwise excluded by consent of holders of a majority of the Series A Preferred.

(i) *Special Definitions*. For purposes of this Section C.4(d), the following definitions apply:

(1) "Options" shall mean rights, options, or warrants to subscribe for, purchase or otherwise acquire either Common Stock, Convertible Securities (defined below), or Series A Preferred.

(2) "Original Issue Date" shall mean the date on which a share of Series A Preferred stock was first issued.

(3) "Convertible Securities" shall mean any evidences of indebtedness, shares (other than Common Stock) or other securities convertible into or exchangeable for Common Stock.

(4) "Additional Shares of Common Stock" shall mean all shares of Common Stock issued (or deemed to be issued under Section C.4(d)(iii)) by the Corporation after the Original Issue Date, other than shares of Common Stock issued or issuable:

(A) upon conversion of shares of the Series A Preferred;

(B) to employees, directors, consultants or advisors under stock option, stock bonus or stock purchase plans or agreements or similar plans or agreements approved by the Board (including the affirmative vote of the Directors elected by the holders of the Series A Preferred);

(C) as a dividend or distribution on the Series A Preferred; or

(D) for which adjustment of the Conversion Price is made pursuant to Section C.4(e).

6

(5) "Ratchet Period" shall mean the time between the Original Issue Date and the date which is one day after the date on which at least an additional Ten Million dollars ($10,000,000) in equity or convertible debt financing at a per share price in excess of the Series A Price Per Share is obtained by the Corporation (which does not include proceeds from existing shareholders or the issuance of Series A Preferred) in one or more such financings.

(ii) *Condition for Adjustment of Conversion Price.* Any provision herein to the contrary notwithstanding, no adjustment in the Conversion Price shall be made in respect of the issuance of Additional Shares of Common Stock unless the consideration per share (determined pursuant to Section C.4(d)(vi) hereof) for an Additional Share of Common Stock issued or deemed to be issued by the Corporation is less than the Conversion Price in effect on the date of, and immediately prior to, such issue.

(iii) *Deemed Issuance of Additional Shares of Common Stock.* If the Corporation causes after the Original Issue Date there to be issued any Options or Convertible Securities, or if the Corporation fixes a record date designating which holders are then entitled to any receive such securities, then the maximum number of shares of Common Stock issuable under the terms of any such security (without regard to any relevant anti-dilution provisions) shall be deemed to be Additional Shares of Common Stock issued after the Original Issue Date. Common Stock deemed issued in this way shall be considered issued on the same date that the relevant Options or Convertible Securities were issued, or if Common Stock is deemed issued because the Corporation sets a record date, such Common Stock will be considered issued as of the close of business on such record date. The forgoing provisions of this Paragraph C.4(d)(iii) applicable to Additional Shares of Common Stock that are deemed to be issued are subject to the following:

(1) no further adjustments in the Conversion Price shall be made upon the issuance or exercise of any Option or Convertible Security discussed in this Paragraph C.4(d)(iii) or its subsections;

(2) if any Option or Convertible Security discussed in Paragraph C.4(d) contains terms that, by the passage of time or otherwise, cause any adjustment, upon exercise, conversion or exchange, in price payable to the Corporation or in Common Stock issuable under such security, the Conversion Price and all adjustment computed therefrom shall, upon any such increase or decrease becoming effective, be recomputed to reflect any such increase or decrease to the extent it affects such Option or Convertible Security; provided, however, that no adjustments under this Paragraph C.4(d)(iii)(2) shall apply to Common Stock previously issued upon conversion from Series A Preferred;

(3) upon the expiration of any unexercised right of conversion or exchange contained in any such Option or Convertible Security, the Conversion Price and all adjustment computed therefrom shall, upon such expiration, be recomputed so as to exclude such expiration and to include only the relevant securities actually issued and payments received or receivable by the

7

Corporation in relation to such security prior to expiration of any such unexercised right;

(4) no readjustment pursuant to clause (2) or (3) above shall increase a Conversion Price to exceed the lesser of (a) the Conversion Price on the original adjustment date, or (b) the Conversion Price that would have resulted from any issuance of Additional Shares of Common Stock between the original adjustment date and such readjustment date;

(5) in the case of any Options which expire by their terms not more than thirty (30) days after the date of issue thereof, no adjustment of the Conversion Price shall be made until the expiration or exercise of all such Options, whereupon such adjustment shall be made in the same manner provided in clause (3) above.

(iv) *Adjustment of Conversion Price Upon Issuance of Additional Shares of Common Stock During the Ratchet Period.* During the Ratchet Period, in the event this Corporation shall issue Additional Shares of Common Stock (including Additional Shares of Common Stock deemed to be issued pursuant to Section C.4(d)(iii)) for a consideration per share less than the Conversion Price in effect on the date of and immediately prior to such issue, then and in such event, the Conversion Price shall be reduced to the price at which any Additional Shares of Common Stock (including Additional Shares of Common Stock deemed to be issued pursuant to Section C.4(d)(iii)) are issued. The Conversion Price, as adjusted by the Ratchet Period, will not be affected by the conclusion thereof, except for any subsequent readjustments to be made in accordance with the provisions of Section C.4(d)(iii)(2) and (3).

(v) *Adjustment of Conversion Price Upon Issuance of Additional Shares of Common Stock After the Ratchet Period.* In the event this Corporation, at any time after the Ratchet Period shall issue Additional Shares of Common Stock (including Additional Shares of Common Stock deemed to be issued pursuant to Section C.4(d)(iii)) for a consideration per share less than the Conversion Price in effect on the date of and immediately prior to such issue, then and in such event, the Conversion Price shall be reduced, concurrently with such issue, to a price (calculated to the nearest cent) determined by multiplying the Conversion Price by a fraction, the numerator of which shall be the number of shares of Common Stock outstanding immediately prior to such issue plus the number of shares of Common Stock which the aggregate consideration received by the Corporation for the total number of Additional Shares of Common Stock so issued would purchase at the Conversion Price in effect immediately prior to such issuance, and the denominator of which shall be the total number of shares of Common Stock outstanding immediately after issuing such Additional Shares of Common Stock. For the purpose of the above calculation, the number of shares of Common Stock outstanding immediately prior to such issue shall be calculated on a fully diluted basis, as if all shares of Series A Preferred, Options and Convertible Securities had been fully converted into shares of Common Stock to the extent possible immediately prior to such issuance. Calculating the number of shares of Common Stock outstanding immediately prior to such issue shall exclude any Additional Shares

8

of Common Stock issuable with respect to shares of Series A Preferred, Convertible Securities, or outstanding options, warrants or other rights for the purchase of shares of stock or convertible securities, solely as a result of the adjustment of the Conversion Price (or other conversion ratios) resulting from the issuance of Additional Shares of Common Stock causing such adjustment.

(vi) *Determination of Consideration.* For purposes of this Section C.4(d), the consideration received by the Corporation for the issue of any Additional Shares of Common Stock shall be computed as follows:

(1) *Cash and Property.* Such consideration shall:

(A) insofar as it consists of cash, be computed at the aggregate amount of cash received by the Corporation excluding amounts paid or payable for accrued interest or accrued dividends;

(B) insofar as it consists of property other than cash, be computed at the fair value thereof at the time of such issue, as determined in good faith by the Board; and

(C) in the event Additional Shares of Common Stock are issued together with other shares or securities or other assets of the Corporation for consideration which covers both, be the proportion of such consideration so received, computed as provided in clauses (A) and (B) above, as determined in good faith by the Board.

(2) *Options and Convertible Securities.* The consideration per share received by the Corporation for Additional Shares of Common Stock deemed to have been issued pursuant to Section C.4(d)(iii), relating to Options and Convertible Securities shall be determined by dividing:

(A) the total amount, if any, received or receivable by the Corporation as consideration for the issue of such Options or Convertible Securities, plus the minimum aggregate amount of additional consideration (as set forth in the instruments relating thereto, without regard to any relevant anti-dilution provisions) payable to the Corporation upon the exercise of such Options or the conversion or exchange of such Convertible Securities, or in the case of Options for Convertible Securities or for Series A Preferred, the exercise of such Options for Convertible Securities or for Series A Preferred and the conversion or exchange of such Convertible Securities or Series A Preferred by

(B) the maximum number of shares of Common Stock (as set forth in the instruments relating thereto, without regard to any relevant anti-dilution provisions) issuable upon the exercise of such Options or conversion or exchange of such Convertible Securities.

9

(e) Adjustments to Conversion Price for Stock Dividends and for Combinations or Subdivisions of Common Stock. If the Corporation causes after the Original Issue Date there to be a declaration or payment, without consideration, any dividend on the Common Stock payable in Common Stock or in any right to acquire Common Stock for no consideration, or shall effect a subdivision of the outstanding shares of Common Stock into a greater number of shares of Common Stock (by stock split, reclassification or otherwise than by payment of a dividend in Common Stock or in any right to acquire Common Stock), or in the event the outstanding shares of Common Stock shall be combined or consolidated, by reclassification or otherwise, into a lesser number of shares of Common Stock, then the Conversion Price in effect immediately prior to such event shall, concurrently with the effectiveness of such event, be proportionately decreased or increased, as appropriate. In the event that this Corporation shall declare or pay, without consideration, any dividend on the Common Stock payable in any right to acquire Common Stock for no consideration, then the Corporation shall be deemed to have made a dividend payable in Common Stock in an amount of shares equal to the maximum number of shares issuable upon exercise of such rights to acquire Common Stock.

(f) Adjustments for Reclassification and Reorganization. If the Common Stock issuable upon conversion of the Series A Preferred shall be changed into the same or a different number of shares of any other class or classes of stock, whether by capital reorganization, reclassification or otherwise (other than a subdivision or combination of shares provided for in Section C.4(e) above or a merger or other reorganization referred to in Section C.2(d) above), the Conversion Price then in effect shall, concurrently with the effectiveness of such reorganization or reclassification, be proportionately adjusted so that the Series A Preferred shall be convertible into, in lieu of the number of shares of Common Stock which the holders would otherwise have been entitled to receive, a number of shares of such other class or classes of stock equivalent to the number of shares of Common Stock that would have been subject to receipt by the holders upon conversion of the Series A Preferred immediately before that change.

(g) No Impairment. The Corporation will not, by amendment of its Certificate of Designation or through any reorganization, transfer of assets, consolidation, merger, dissolution, issue or sale of securities or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms to be observed or performed hereunder by the Corporation, but will at all times in good faith assist in the carrying out of all the provisions of this Section C.4 and in the taking of all such action as may be necessary or appropriate in order to protect the Conversion Rights of the holders of the Series A Preferred against impairment.

(h) Certificates as to Adjustments. Upon the occurrence of each adjustment or readjustment to the Conversion Price pursuant to this Section C.4, the Corporation at its expense shall promptly compute such adjustment or readjustment in accordance with the terms hereof and prepare and furnish to each holder of Series A Preferred a certificate executed by the Corporation's President or Chief Financial Officer setting forth such adjustment or readjustment and showing in detail the facts upon which such adjustment or readjustment is based. The Corporation shall, upon the written request at any time of any holder of Series A Preferred stock, furnish or cause to be furnished to such holder a like

10

certificate setting forth (i) such adjustments and readjustments, (ii) the Conversion Price at the time in effect, and (iii) the number of shares of Common Stock and the amount, if any, of other property which at the time would be received upon the conversion of the Series A Preferred stock.

(i) <u>Notices of Record Date</u>. In the event that the Corporation shall propose at any time: (i) to declare any dividend or distribution upon its Common Stock, whether in cash, property, stock or other securities, whether or not a regular cash dividend and whether or not out of earnings or earned surplus; (ii) to offer for subscription *pro rata* to the holders of any class or series of its stock any additional shares of stock of any class or series or other rights; (iii) to effect any reclassification or recapitalization of its Common Stock outstanding involving a change in the Common Stock; or (iv) to merge or consolidate with or into any other corporation, or sell, lease or convey all or substantially all of its assets, or to liquidate, dissolve or wind up; then, in connection with each such event, the Corporation shall send to the holders of Series A Preferred:

(1) at least twenty (20) days' prior written notice of the date on which a record shall be taken for such dividend, distribution or subscription rights (and specifying the date on which the holders of Common Stock shall be entitled thereto) or for determining rights to vote, if any, in respect of the matters referred to in (iii) and (iv) above; and

(2) in the case of the matters referred to in (iii) and (iv) above, at least twenty (20) days' prior written notice of the date when the same shall take place (and specifying the date on which the holders of Common Stock shall be entitled to exchange their Common Stock for securities or other property deliverable upon the occurrence of such event).

(j) <u>Issue Taxes</u>. The Corporation shall pay any and all issue and other taxes that may be payable in respect of any issue or delivery of shares of Common Stock on conversion of the Series A Preferred pursuant hereto; provided, however, that the Corporation shall not be obligated to pay any transfer taxes resulting from any transfer requested by any holder in connection with any such conversion.

(k) <u>Fractional Shares</u>. No fractional share shall be issued upon the conversion of any share or shares of Series A Preferred. All shares of Common Stock (including fractions thereof) issuable upon conversion of more than one share of Series A Preferred by a holder thereof shall be aggregated for purposes of determining whether the conversion would result in the issuance of any fractional share. If, after such aggregation, the conversion would result in the issuance of a fraction of a share of Common Stock, the Corporation shall, in lieu of issuing any fractional share, pay the holder otherwise entitled to such fraction a sum in cash equal to the fair market value of such fraction on the date of conversion (as determined in good faith by the Board).

(l) <u>Notices</u>. Any notice required by the provisions of this Section C.4 to be given to the holders of shares of Series A Preferred shall be deemed given if deposited in the United

11

States mail, postage prepaid, and addressed to each holder of record at his address appearing on the books of the Corporation.

5. **Restrictions and Limitations.**

(a) Required Consents. Until such time that all of the shares of Series A Preferred originally issued have converted to Common Stock, the Corporation shall not, without the vote or written consent by the holders of at least a majority of the then outstanding shares of the Series A Preferred (voting together as a class):

(i) amend the Articles of Incorporation in a manner that would adversely affect the rights, preferences, privileges or powers of or restrictions on the Series A Preferred;

(ii) increase or decrease the authorized number of shares of Series A Preferred;

(iii) authorize or create (by reclassification or otherwise) any new class or series of stock having rights, preferences or privileges with respects to dividends or liquidation senior to or on parity with the Series A Preferred;

(iv) approve any transaction or series of transactions deemed to be a liquidation of the Corporation;

(v) approve any merger, sale or assets or other corporate reorganization or acquisition in which the Corporation is valued at less than Twenty Million dollars ($20,000,000);

(vi) approve the voluntary liquidation or dissolution of the Corporation;

(vii) issue or approve any security or contract that would cause or permit any of the forgoing to occur with respect to the Corporation or any of its subsidiaries;

(viii) declare or pay any dividend or distribution or approve any repurchase with respect to the Series A Preferred (except as otherwise provided in the Corporation's Articles of Incorporation or in this Certificate of Designation) or to the Common Stock (except in relation to employees, officers, directors, consultants or other persons performing services for the Corporation pursuant to an agreement permitting the Corporation to cause a dividend, distribution or repurchase to or from such persons);

(ix) elect the Series A Preferred Director described in Section C.3 as any single director of the Board who, upon joining the Board as a member thereof, would cause the total number of members of the Board to increase to a number of directors exceeding seven (7) directors, where the Series A Preferred holders may choose to elect the eighth (8th), the ninth (9th) or other director whose addition to the Board would increase the total number of members to any number greater than seven (7) members, but in no case may the Series A Preferred elect more than one such director;

12

(x) form any entity or acquire the stock or assets of any entity which is not wholly owned by the Corporation;

(xi) make any material change in the nature of the Corporation's or any subsidiary's primary business as presently conducted;

(xii) effect any dissolution, liquidation, or other winding up of the Corporation or any subsidiary; or

(xiii) effect any cessation of all or a substantial part of the business of the Corporation or any subsidiary.

**6. No Reissuance of Series A Preferred.**

(a) Series A Preferred is not Reissuable. No share or shares Series A Preferred acquired by the Corporation by reason of redemption, purchase, conversion or otherwise shall be reissued, and all such shares shall be cancelled, retired and eliminated from the shares which the Corporation shall be authorized to issue.

D. The Series A Preferred shall have registration rights consistent with this Section D and its subsections below, provided, however, that all rights set forth in this Section D shall be subject to and limited by the number of authorized shares available pursuant to the Corporation's Articles of Incorporation (and in such event, the registration rights specified below).

(a) Registration of Common Stock Related to the Series A Preferred. The expenses related to any registration rights described in this Section D will be paid by this Corporation (exclusive of underwriting discounts and commissions), provided, however, that this Corporation will not be required to pay the reasonable fees of more than one counsel to all holders of securities covered under this Paragraph D. All registration rights described under this Section D will terminate on the earlier of (a) such date, on or after this Corporation's initial public offering, on which holders of securities covered by this Section D may immediately sell all covered shares under Rule 144 during any three-month period, and (b) three years after the Corporation's initial public offering. Holders of securities covered under this Section D may transfer any registration right described herein to this Corporation's directors or officers, to affiliates of such a holder, or to other persons acquiring at least 100,000 shares of this Corporation's outstanding Common Stock, provided, however, that this Corporation is given written notice and consents to such transfer. Holders of any securities covered under this Paragraph D hereby agree not to effect any transactions with respect to any of this Corporation's securities within one hundred and eighty (180) days following the initial public offering by this Corporation, provided, however, that all officers and directors of this Corporation are similarly bound.

13

(i) <u>Registration upon Conversion or Demand</u>. All Common Stock issued or issuable upon conversion of the Series A Preferred will be "Registrable Securities" that may be registered under the Securities Act of 1933, as amended, and consistent with any other applicable laws. Holders of at least fifty percent (50%) of the Registrable Securities will be entitled to demand that this Corporation effect up to two firmly underwritten registrations; <u>provided</u>, <u>however</u>, that each such registration has aggregate proceeds payable to the Corporation after all applicable fees and commissions of at least Twenty-Five Million Dollars ($25,000,000). Holders of the Series A Preferred may make such a demand at any time following the earlier of either (i) five years following the closing of the financing contemplated in the Convertible Loan Credit Agreement, or (ii) one hundred and eighty (180) days following this Corporation's initial public offering. The Corporation will have the right to delay such registration under certain circumstances for up to two periods of up to one hundred and twenty (120) days each in any twelve month period.

(ii) <u>"Piggyback" Registration</u>. The holders of Registrable Securities will be entitled to tender such securities into any registered offering by the Corporation on its own behalf or on behalf of selling stockholders. In an underwritten offering, the managing underwriters will have the right, in the event of marketing limitations, to limit the number of Registrable Securities included in the offering, <u>provided, however,</u> that in an offering other than the initial public offering, the Registrable Securities may not be limited to less than twenty five percent (25%) of the total offering. In the event of such marketing limitations, each holder of Registrable Securities will have the right to include shares on a *pro rata* basis as among all such holders.

(iii) <u>S-3 Rights</u>. Holders of Registrable Securities will be entitled to demand registrations on Form S-3 (if available to the Corporation) so long as the offering is for common stock having an aggregate offering price of not less than One Million dollars ($1,000,000). This Corporation will not be required to file more than two such Form S-3 registration statements in any twelve month period, and this Corporation may defer an S-3 filing two times during any twelve month period for up to one hundred and twenty (120) days.

E. The powers, preferences, rights, restrictions, and other matters relating to the Common Stock are as follows:

**1. Common Stock Relative to Preferred Stock.**

(a) <u>Relative Rights of Preferred Stock and Common Stock</u>. All preferences, voting powers, relative, participating optional or other special rights and privileges, and qualifications, limitations, or restrictions of the Common Stock are expressly made subject and subordinate to those that are hereby or later fixed with respect to any shares of any series of the Preferred Stock, consistent with the provisions of this Certificate of Designation

(b) <u>Voting Rights</u>. Except as otherwise required by law, in the Corporation's Articles of Incorporation, in its bylaws or in this Certificate of Designation, each holder of Common Stock shall, subject to the provisions of this Certificate of Designation, have one (1)

14

vote in respect of each share of stock held by such holder of record on the books of the corporation for the election of directors and on all matters submitted to a vote of stockholders of the corporation

(c) <u>Dividends</u>. Subject to the preferential rights of the Preferred Stock, the holders of shares of Common Stock shall be entitled to receive, when and if declared by the Board, out of the assets of the corporation that are by law available therefor, dividends payable either in cash, in property or in shares of capital stock.

(d) <u>Dissolution, Liquidation or Winding Up</u>. In the event of any dissolution, liquidation or winding up of the affairs of the corporation, after distribution in full of the preferential amounts, if any, to be distributed to the holders of shares of the Preferred Stock, holders of Common Stock shall be entitled to participate with the Preferred Stock in any distribution of the assets of the corporation in accordance with the provisions of this Certificate of Designation.

F. The provisions contained in this Certificate of Designation pertaining to the Series A Preferred's number of shares, voting powers, designations, preferences, limitations, restrictions or relative rights shall remain consistent with this Section F as follows:

1. **Matters Regarding Certain Provisions of the Nevada Revised Statues.**

(a) <u>Reservation</u>. This Corporation hereby specifically reserves all rights, abilities, and authority conferrable to its officers or directors, as the case may be, under the provisions of NRS § 78.1955 to amend or cancel this Certificate of Designation to the extent permitted under such law, and this specific reservation shall be considered incorporated into any form or other document related the filing of this Certificate of Designation that may be filed with the Secretary of State of the State of Nevada for the purpose of affecting such certificate consistent with the laws of that state, such that any relevant amendment or cancellation contemplated under the referenced statute may be affected by a future resolution filed with or referenced in a filing submitted to the Secretary of State of the State of Nevada along with any appropriate form or other required document.

*[signature page follows]*

15

IN WITNESS WHEREOF, the Corporation has caused this Certificate of Designation to be duly executed on its behalf by the undersigned as of the date below.

Bakken Resources, Inc.

By:
Name: Dan Anderson
Title:  Chief Financial Officer
Date:  May 6, 2016

16

6/15/2016                    https://www.sec.gov/Archives/edgar/data/1450390/000120677416005905/exhibit3-1.htm

EXHIBIT 1

## CONVERSION NOTICE

The undersigned hereby elects to convert shares of Series A Preferred, represented by stock certificate No(s). _____, into shares of common stock ("Common Stock") of Bakken Resources, Inc. (the "Corporation") according to the terms and conditions of the Certificate of Designation relating to the Series A Preferred (the "Certificate of Designation"), as of the date written below. Capitalized terms used herein and not otherwise defined shall have the respective meanings set forth in the Certificate of Designation.

Conversion Date:                            _____

Number of Series A Preferred shares to Convert:    _____

Applicable Conversion Price:                _____

Number of Shares of Common Stock to be Issued:    _____

Name of Holder:                             _____

Address:              _____

                      _____

                      _____

Signature:            _____

Name:                 _____

Title:                _____

### Holder Requests Delivery to be made
*(check one)*

☐ — By delivery of physical certificates to the address above

☐ — Through the Nevada Agency and Trust Company (NATCO)
       NATCO Account No: _____

6/15/2016                                      exhibit3-1x1x1.jpg (589×955)

**STATE OF NEVADA**



*BARBARA K. CEGAVSKE*
Secretary of State

*JEFFERY LANDERFELT*
Deputy Secretary
for Commercial Recordings

**OFFICE OF THE
SECRETARY OF STATE**

**Certified Copy**

May 6, 2016

**Job Number:**        C20160506-1455
**Reference Number:**   00010295028-77
**Expedite:**
**Through Date:**

The undersigned filing officer hereby certifies that the attached copies are true and exact
copies of all requested statements and related subsequent documentation filed with the
Secretary of State's Office, Commercial Recordings Division listed on the attached
report.

| Document Number(s) | Description | Number of Pages |
|---|---|---|
| 20160208117-58 | Certificate of Designation | 18 Pages/1 Copies |

Respectfully,

*Barbara K. Cegavske*

BARBARA K. CEGAVSKE
Secretary of State

Certified By: Sandy Edwards
Certificate Number: C20160506-1455
You may verify this certificate
online at http://www.nvsos.gov/

Commercial Recording Division
202 N. Carson Street
Carson City, Nevada 89701-4201
Telephone (775) 684-5708
Fax (775) 684-7138

6/15/2016                                      exhibit3-1x2x1.jpg (690×908)





**BARBARA K. CEGAVSKE**
Secretary of State
202 North Carson Street
Carson City, Nevada 89701-4201
(775) 684-5708
Website: www.nvsos.gov

| Filed in the office of | Document Number |
|---|---|
| *Barbara K. Cegavske* | **20160208117-58** |
| Barbara K. Cegavske | Filing Date and Time |
| Secretary of State | **05/06/2016 2:10 PM** |
| State of Nevada | Entry Number |
| | **E0365262008-2** |

## Certificate of Designation
### (PURSUANT TO NRS 78.1955)

USE BLACK INK ONLY - DO NOT HIGHLIGHT                    ABOVE SPACE IS FOR OFFICE USE ONLY

### Certificate of Designation For
### Nevada Profit Corporations
### (Pursuant to NRS 78.1955)

**1. Name of corporation:**

Bakken Resources, Inc.

**2. By resolution of the board of directors pursuant to a provision in the articles of incorporation this certificate establishes the following regarding the voting powers, designations, preferences, limitations, restrictions and relative rights of the following class or series of stock:**

Series A Preferred

The attached document (Certificate of Designation of Bakken Resources, Inc. of Series A Preferred) is specifically incorporated by reference in its entirety into this Certificate of Designation form. Such document sets forth all information required under the applicable provisions in Chapter 78 of the Nevada Revised Statutes.

**3. Effective date of filing: (optional)** [                        ]
                              (must not be later than 90 days after the certificate is filed)

**4. Signature: (required)**

X _____
Signature of Officer   Dan Anderas, CFD

**Filing Fee: $175.00**

**IMPORTANT:** Failure to include any of the above information and submit with the proper fees may cause this filing to be rejected.

*This form must be accompanied by appropriate fees.*

Nevada Secretary of State Stock Designation
Revised: 1-5-12

F I L E D
Electronically
CV17-00360
2017-02-21 11:25:21 AM
Jacqueline Bryant
Clerk of the Court
Transaction # 5958775 : csulezic

# EXHIBIT 2

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

# EXHIBIT 2

## DECLARATION OF WESLEY J. PAUL, ESQ.

STATE OF NEW YORK          )
                           ) ss.:
COUNTY OF NEW YORK         )

      Wesley J. Paul, Esq., an individual, declares that the assertions set forth in this Declaration are true:

      1.    I am an attorney licensed to practice law before all state courts in the State of New York as well as in the federal courts located in the Southern District of New York.

      2.    I was previously a Defendant in the case entitled Graiwer, et al. v. Val Holms, et al., Case No. CV14-00544 (the "Derivative Action"), now consolidated with Val Holms v. Bakken Resources, Inc., et al., Case No. CV16-01086 (the "Injunction Action"), presently pending in the Business Department of Department 7, Second Judicial District Court, Washoe County, Nevada. I have been dismissed as a Defendant in this case.

      3.    I am familiar with the Complaint filed February 17, 2017 entitled Bakken Resources, Inc. v. Allan Holms, et al. (the "Complaint").

      4.    The assertions that I make in this Declaration are based on my own personal knowledge except for those matters set forth herein upon information and belief, as to which matters, I believe them to be true. If called as a witness to testify to the matters set forth herein, I could, and would, be able to testify competently to each and every assertion set forth herein.

      5.    Since late March, 2011, I have continuously served as outside corporate and securities counsel, and, more recently, as outside general counsel for the Defendant, Bakken Resources, Inc., a Nevada corporation ("BRI" or the "Company").

6.      I was present for the oral argument regarding Holms Motion of Preliminary Injunction set for Monday, June 27, 2016 at 10:00 a.m., in Department B7 of the Second Judicial District Court.

7.      Following oral argument on June 27, 2016, I was en route back to New York City from Reno when I identified an individual named Allan Holms at the Reno International Airport. I am familiar with Allan Holms as I was opposing counsel in an action brought by Allan Holms in the State of Washington. I was also accompanied at the airport by Solange Charas, a member of the Board of Directors of the Company, who also attended the hearings on June 27, 2016 and who resides in New York City.

8.      Allan Holms was on the same initial leg of the flight as me. I asked Allan why he was in Reno and he responded that he came as the request of Manuel Graiwer, the lead plaintiff in the Derivative Action. Allan Holms acknowledged to me that Mr. Graiwer had suffered a defeat in the hearings in Reno earlier that day.

9.      I am familiar with the document identified as Exhibit "8," in the Complaint which is the Form 5 filed by Allan Holms on February 13, 2017 with the SEC.

10.     I am familiar with the document identified as Exhibit "9," in the Complaint which is the Schedule 13D filed by Allan Holms on February 14, 2017 with the SEC.

11.     I am familiar with the document identified as Exhibit "10," in the Complaint which is the Current Report on Form 8-K filed by the Company on February 16, 2017 with the SEC.

Dated this 17th day of February, 2017.

Wesley J. Paul

2

F I L E D
Electronically
CV17-00360
2017-02-21 11:25:21 AM
Jacqueline Bryant
Clerk of the Court
Transaction # 5958775 : csulezic

# EXHIBIT 3

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

# EXHIBIT 3

## AFFIDAVIT OF GAYLON ERICKSON

Gaylon Erickson, swears under penalty of perjury that the assertions set forth in this Affidavit are true:

1.      My name is Gaylon Erickson and I am a Registered Agent Manager employed by Nevada Agency and Transfer Company ("NATCO") which is located at 50 W. Liberty Street, Suite 880, Reno, Nevada 89501.

2.      The assertions that I make in this Affidavit are based on my personal knowledge. If called as a witness to testify to the assertions set forth herein I could, and would, be able to competently testify to each and every assertion in this Affidavit.

3.      On January 31, 2017 at approximately 9:20 a.m., I answered a telephone call from an individual who asked to speak to an agent in our company regarding the transfer of shares. I advised this individual that Tiffany Baxter, our transfer agent, was on the telephone and asked what his question was to determine if I was able to assist him. This individual, a male, indicated he was helping another person who needed to transfer certain shares of stock.

4.      As our conversation proceeded, this individual I was speaking with advised me that the shares of stock were registered to a shareholder who died but who had transferred his stock to his brother prior to his death. I asked him if the stock had been sent to NATCO to be re-registered prior to the death and he told me the shares had not.

5.      I then asked if he had access to email and could send an email message to Tiffany Baxter with his questions so that she could respond, in detail, to all of his questions. He said that he did have an email account but he would rather talk on the telephone to Tiffany. I explained Tiffany was still on another telephone line and again asked what exactly it was he needed to know.

LAURINICOXILEGOY
ATTORNEYS AT LAW
P.O. Box 30000
Reno, Nevada 89520

1

6.    This individual then inquired as to the paperwork that would be necessary to facilitate a transfer of the stock based on the circumstances he had previously explained. I explained that typically we require legal documentation appointing the executor or executrix of the estate, a Medallion guaranteed stock power as well as a death certificate. Before I could finish explaining what would be needed, the individual interrupted me and said the funeral of the deceased individual had just been completed and the widow required assistance. He stated that he had a letter from an attorney, an affidavit from the surviving spouse, and a stock power. I asked him if the stock power was Medallion guaranteed and he told me it was not. I told him that I would need to have Tiffany Baxter call him back, and I then obtained all of the information for her to return his call.

7.    The contact information provided to me is as follows: The individual who was speaking with me identified himself as Don Walford, the inquiry was in regard to Bakken Resources, Inc. ("BRI"), his telephone number was (303) 956-0226, and he was inquiring as to BRI Common Stock Certificate No. 1344 which he explained was one of many stock certificates in question.

8.    I have not spoken with Mr. Walford since this conversation.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

2


!AUPIN|COX||LEGOY
ATTORNEYS AT LAW
P.O. Box 30000
Reno, Nevada 89520

Dated this 16th day of February, 2017.

_____
GAYLON ERICKSON

STATE OF NEVADA        )
                                            :ss
COUNTY OF WASHOE   )

Signed and Affirmed before me on
this 16th day of February 2017,
by Gaylon Erickson

_____
Notary Public

Shondel F. Seth
Notary Public
State of Nevada
Appt. No: 03-83385-2
My Comm. Exp. 03-08-2017

LAUFEN | COX | LEGOY
ATTORNEYS AT LAW
P.O. Box 30000
Reno, Nevada 89520

F I L E D
Electronically
CV17-00360
2017-02-21 11:25:21 AM
Jacqueline Bryant
Clerk of the Court
Transaction # 5958775 : csulezic

# EXHIBIT 4

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

# EXHIBIT 4

AUPIN, COX & LEGOY
ATTORNEYS AT LAW
P.O. BOX 30000
RENO, NEVADA 89520
(775) 827-2000

## AFFIDAVIT OF TIFFANY BAXTER

Tiffany Baxter, swears under penalty of perjury that the assertions set forth in this Affidavit are true:

1.      My name is Tiffany Baxter and I am the Transfer Agent Manager employed by Nevada Agency and Transfer Company ("NATCO") which is located at 50 W. Liberty Street, Suite 880, Reno, Nevada 89501.

2.      The assertions that I make in this Affidavit are based on my personal knowledge except for those matters set forth herein on information and belief as to which matters I believe them to be true.  If called as a witness to testify to the assertions set forth herein I could, and would, be able to competently testify to each and every assertion in this Affidavit.

3.      On January 31, 2017 I was advised by Amanda Cardinalli, President of NATCO, we needed to return a telephone call to an individual by the name of Don Walford who was calling with questions concerning the transfer of Bakken Resources Inc. ("BRI"), common stock certificates.

4.      At approximately 10:00 a.m. on January 31, 2017, Amanda and I were able to contact Mr. Walford. We had him on speaker phone so that both of us could hear what was being said and could then provide any information Mr. Walford was requesting.

5.      The conversation began with me stating to Mr. Walford that it was my understanding he was looking for instructions with respect to transferring stock. Mr. Walford confirmed that fact and subsequently indicated that he was holding a stock power and an agreement that had been signed by a shareholder of a corporation; however, the stock power was not Medallion guaranteed, but the shareholder's wife was present when the shareholder signed

1

the agreement and could validate her husband's signature. Mr. Walford further explained the shareholder transferring the shares had died three (3) weeks after the agreement was signed.

6.     Mr. Walford stated that he thought a Medallion guarantee could not be provided after a registered stock owner's death. He also stated that he had been a broker for over forty (40) years. I agreed that it would not be possible to obtain a Medallion guarantee following the death of the registered stock certificate owner.

7.     Mr. Walford then explained the shares were restricted, but said the shares could be transferred with a legend. Mr. Walford reiterated the deceased individual's wife could provide an affidavit verifying that she was present when her husband signed both the stock power and agreement and that the new holder of the stock could provide a bond if necessary. Amanda suggested to Mr. Walford that he contact Wesley Paul, Esq., corporate counsel to Bakken Resources, Inc. ("BRI"), to get more details as to the requirements for a transfer. Mr. Walford said Mr. Paul was not counsel for BRI and he would be adversarial if Mr. Walford contacted him.

8.     He went on to say that the new holder of the stock certificate had a Temporary Restraining Order that placed that individual and others in control of the Company. Amanda then explained that she had personally attended a court hearing in Washoe County, Nevada, and had listened to Judge Flanagan of that court award control of BRI to the current management of BRI. She also asked Mr. Walford to provide her with a copy of the Order that placed a different Board in control of BRI. He said the Order was a temporary order but there was a hearing set in Montana on February 28, 2017 that would determine control of the Company.

9.     Amanda then asked Mr. Walford if an executor had been appointed to represent the interests of the deceased shareholder's estate. He said that a personal representative had been

2

LAUPIN COX LEGOY
ATTORNEYS AT LAW
P.O. Box 30000
Reno, Nevada 89520

appointed. Amanda also asked if that representative had authority to transfer the shares and if the appointment of that individual as the executor of the estate had been contested. Mr. Walford said he did not know one way or the other with respect to those questions.

10.     The conversation concluded with Amanda asking Mr. Walford to send her the documentation he had concerning the estate and court documents related to the Board. Amanda provided her email address so he could submit documents to her for review. He agreed that would be a good way to start the process.

11.     I have not heard anything further from Mr. Walford following this conversation on January 31, 2017.

12.     On February 7, 2017 at approximately 2:50 p.m., I received a call from an individual who identified himself as Allan Holms. He indicated that he would like to discuss the requirements to transfer shares of BRI common stock from his deceased brother, Val Holms. I advised Mr. Holms that our office was required to log all correspondence for the Securities and Exchange Commission ("SEC") and that he needed to email his inquiry to me. I provided him with my email address and he then proceeded to describe the documents which were in his possession. He said that he had an Assignment Agreement and five stock powers which had been "signed by a bank officer." I asked if the stock powers were Medallion guaranteed and he confirmed that they were.

13.     Mr. Holms also stated that he had a copy of certificate no. 1345. I asked if he had the original of that certificate and he said that he did not. He indicated that according to his brother, Val Holms, the original had been lost.

14.     Mr. Holms then went on to state that he had an order from a court in Montana concerning the management of BRI and that there is a hearing scheduled on February 28, 2017.

3


AUPIN|COX|LEGOY
ATTORNEYS AT LAW
P.O. Box 30000
Reno, Nevada 89520

15.     Our conversation concluded with me requesting that Mr. Holms email me copies of all documentation currently in his possession so that we at NATCO could review them. He confirmed that he would forward all documentation and that he hoped to speak with me again the following day concerning his request to transfer shares.

16.     On February 8, 2017, at approximately 10:15 a.m., I received another call from Allan Holms following up on his email requesting information regarding transfer requirements. I told him that we were in the process of reviewing the documents he had submitted to us. He then asked if I understood the case in Montana after reading the documents and I told him that I was only halfway through review of that document. He stated that he would be happy to travel to Reno in order to have a meeting to further discuss the issues. I told him that would not be necessary and that Amanda Cardinalli and I were both reviewing the documents and we would be in contact with him once we were finished.

17.     Later that day at approximately 4:15 p.m., Allan Holms called again to further discuss the documentation he had forwarded to us. He indicated that there may be an issue with some of the documents. He asked about the Medallion guarantee because he was unfamiliar with the significance. I explained to him that a Medallion guarantee is similar to a notary, but it is only utilized by financial institutions such as banks and brokerage firms. I further explained that the Medallion is essentially the bank's guarantee that the individual signing the stock power personally appeared at the time the stamp was placed and that the signature was valid.

18.     Mr. Holms than indicated that a broker in Spokane, Washington had "handled that" for him. I asked if that meant that Val Holms had not been present when the signature was Medallion guaranteed. He answered that he did not know and that he was going to collect facts. He said that it "was done in December" and he would need to obtain some more information. I

4

told him I appreciated his call and would like to know if Val Holms had been present at the time his signature was Medallion guaranteed.

19.     Mr. Holms then asked if I had finished reviewing the documents he had sent to us. I told him that I had, but that Amanda Cardinalli was also completing a review. He inquired as to my opinion and I told him that generally when the shareholder has passed away, we request copies of the death certificate and the court documentation that appoints an executor or personal representative. He said that he would provide the documents we required as he desired for the transaction to be done correctly and "absolutely crystal clear." I thanked him for the call and told him to please let me know if he obtains any further information concerning the Medallion guarantee.

Dated this 16th day of February, 2017.

TIFFANY BAXTER

STATE OF NEVADA          )
                                           :ss
COUNTY OF WASHOE   )

Signed and Affirmed before me on this 16th day of February, 2017, by Tiffany Baxter.

Notary Public

GAYLON J. ERICKSON
Notary Public - State of Nevada
Appointment Recorded in Washoe County
No: 09-10393-2 - Expires July 1, 2017

5



F I L E D
Electronically
CV17-00360
2017-02-21 11:25:21 AM
Jacqueline Bryant
Clerk of the Court
Transaction # 5958775 : csulezic

# EXHIBIT 5

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

# EXHIBIT 5

### AFFIDAVIT OF AMANDA CARDINALLI

Amanda Cardinalli, swears under penalty of perjury that the assertions set forth in this Affidavit are true:

1.     My name is Amanda Cardinalli and I am the President of Nevada Agency and Transfer Company ("NATCO") located at 50 W. Liberty Street, Suite 880, Reno, Nevada 89501. NATCO is a registered Transfer Agent with the Securities and Exchange Commission and a Commercial Registered Agent with the Nevada Secretary of State.

2.     The assertions that I make in this Affidavit are based on my personal knowledge except for those matters set forth herein on information and belief as to which matters I believe them to be true.  If called as a witness to testify to the assertions set forth herein I could, and would, be able to competently testify to each and every assertion set forth in this Affidavit.

3.     On January 31, 2017 at approximately 9:50, Tiffany Baxter, a NATCO employee, came into my office concerning a phone message from Don Walford concerning Bakken Resources given to her by Gayle Erickson, another NATCO employee.  I suggested that both of us return Mr. Walford's call.

4.     At approximately 10:00 a.m. on January 31, 2017, Tiffany and I were able to call Mr. Walford. We had him on speaker phone so that both of us could hear what was being said.

5.     The conversation began with Tiffany stating she understood Mr. Walford was looking for instructions with respect to transferring stock. Mr. Walford confirmed that fact and subsequently indicated that he was holding a stock power and an agreement that had been signed by a shareholder; however, he indicated that the stock power was not Medallion guaranteed, but that the shareholder's wife was present when the shareholder signed the agreement and could

1

validate her husband's signature. Mr. Walford further explained the shareholder transferring the shares had died three (3) weeks after the agreement was signed.

6.     Mr. Walford stated that he thought a Medallion guarantee could not be obtained after a registered owner's death. He also stated that he had been a broker for over forty (40) years. I agreed that it would not be possible to obtain a Medallion guarantee of the registered owner after his death.

7.     Mr. Walford then explained the shares were restricted, but said the shares could be transferred with a restrictive legend remaining on any new certificate issued. Mr. Walford reiterated the deceased individual's wife could provide an affidavit verifying that she was present when her husband signed both the stock power and agreement and that the new holder of the stock could provide a bond if necessary. I suggested to Mr. Walford that he contact Wesley Paul, Esq., corporate counsel to Bakken Resources, Inc. ("BRI"), to get more details as to the requirements for this transfer. Mr. Walford said Mr. Paul was not counsel for BRI and he would be adversarial if Mr. Walford contacted him.

8.     Mr. Walford went on to say that the new holder of the stock certificate had a Temporary Restraining Order that placed that individual and others in control of the Company. I explained that I had personally attended a court hearing in Washoe County, Nevada, and had listened to Judge Flanagan of that court award control of BRI to the current management of BRI. I also asked Mr. Walford to provide me with a copy of the Order he had that placed a different Board in control of BRI. He said the Order he had was a temporary order but there was a hearing set in Montana on February 28, 2017 that would determine control of the Company.

9.     I then asked Mr. Walford if an executor had been appointed to represent the interests of the deceased shareholder's estate. He said that a personal representative had been

2

appointed. I asked if that representative had authority to transfer the shares and if the appointment of that individual as the executor of the estate had been contested. Mr. Walford said he did not know one way or the other with respect to those questions.

10.     I concluded the conversation by asking Mr. Walford to send me the documentation he had concerning the estate and court documents related to the Board. I provided my email address so he could submit documents to me for review. He agreed that would be a good way to start the process.

11.     As of the date of this affidavit, I have not heard anything further from Mr. Walford following this conversation on January 31, 2017. However, on February 7, 2017, I was copied on an email from an individual by the name of Allan Holms written on an email address of aholms@msn.com. The email was addressed to Tiffany Baxter of NATCO. A copy of the email is attached hereto as Exhibit "A" . In his email, Mr. Holms explained that the mineral rights which are owned by BRI, were the result of a family inheritance and that those rights had been used to capitalize BRI as a corporation. However, due to various circumstances, his brother, Val Holms, wanted to make sure the shareholders of the Company, which included relatives, business associates and friends, were protected and he asked Allan Holms to assist him in that process. Allan Holms indicated that due to Val Holms' illness, and upon advice of counsel, Val Holms decided to transfer his stock to Allan Holms.

12.     Allan Holms' email of February 7, 2017 also contained as attachments copies of certain stock powers.  Given what I understand to be the value of the shares in question and the apparent limitation of the Medallion guarantee contained on the copies of the stock powers provided by Allan Holms, on February 8, 2017, I emailed Washington Trust Bank ("WTB"), the entity which appears to have signed the Medallion guarantee on the stock powers in question, to

3

confirm that the Medallion guarantees on the copies of stock powers received from Allan Holms were validly guaranteed by WTB. On February 9, 2017, I received an email back from Jody M. McCormick at WTB indicating that they could not verify the Medallion Stamps on the Holms transaction. *See,* email communication between NATCO and WTB together with pertinent documents attached hereto as Exhibit "B."

13.     On February 9, 2017, I sent an email to Allan Holms to confirm that he was in possession of BRI stock certificate numbers 1342, 1343, 1344, 1345 and 335. Mr. Holms called me on February 14, 2017 at approximately 10:20 a.m. in response to my email. He indicated that he did not have the original stock certificates and that he was working to obtain a lost instrument bond. He stated that Val Holms' widow, Mari Holms, was the executor of the estate. *See,* email communications attached hereto as Exhibit "C."

14.     Also on February 9, 2017, NATCO received an email from Allan Holms which attached the Affidavit of John C. Doubek, Esq.  Mr. Holms indicated that Mr. Doubek was Val Holms' attorney. *See,* email communication together with pertinent documents, attached hereto as Exhibit "D."

15.     On February 10, 207, I emailed Allan Holms and informed him that I received a response from WTB informing me that WTB was unable to verify the Medallion Stamp. I also instructed him that NATCO required certain items in order to issue new certificates in connection with the lost certificates in question. I informed Mr. Holms that there are  five items NATCO would require: (a) A copy of Val Holms' Death Certificate; (b) Letters Testamentary which confirm the appointment of the authorized representative of Val's Estate; (c) A stock power signed by the authorized representative of Val's Estate with the signature Medallion guaranteed and confirming the Medallion limit must exceed the value of the shares; (d) A Lost

4

LAUPIN COX LEGOY
ATTORNEYS AT LAW
P.O. Box 30000
Reno, Nevada 89520

Instrument Bond in an open penalty amount naming NATCO and BRI as obligees; and (e) An Affidavit of Loss executed by the authorized representative of Val's Estate. *See*, Exhibit "C."

16.    As of the date of this Affidavit Allan Holms has not provided NATCO with the required documentation to issue replacement certificates for numbers 335, 1342 – 1345 registered to Val M. Holms and has not otherwise submitted an appropriately documented request to transfer ownership of the Bakken Resources shares registered in the name of Val M. Holms to Allan Holms.

Dated this  21st  day of  February  , 2017.

AMANDA CARDINALLI

STATE OF NEVADA        )
                                              :ss
COUNTY OF WASHOE       )

Signed and Affirmed before me on
this 21 day of February, 2017,
by Amanda Cardinalli

Notary Public

Shondel F. Seth
Notary Public
State of Nevada
Appt. No: 03-83385-2
My Comm. Exp. 03-08-2017

5

MAUPIN COX LEGOY
ATTORNEYS AT LAW
P.O. Box 30000
Reno, Nevada 89520

## INDEX OF EXHIBITS

| NO. | DESCRIPTION | PAGES |
|-----|-------------|-------|
| A. | February 7, 2017 Email from Allan Holms with Attachments | 32 |
| B. | February 8, 2017 Email to Washington Trust Bank with Attachments | 12 |
| C. | February 10, 2017 Email to Allan Holms | 2 |
| D. | February 9, 2017 Email from Allan Holms with Attachment | 3 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

MAUPIN COX LEGOY
ATTORNEYS AT LAW
P.O. Box 30000
Reno, Nevada 89520

# EXHIBIT A

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

# EXHIBIT A



MAUPIN COX LEGOY
ATTORNEYS AT LAW
P.O. Box 30000
Reno, Nevada 89520

PROHIBITED. PLEASE NOTIFY THE SENDER IMMEDIATELY IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR. THANK YOU FOR YOUR ASSISTANCE AND CO-OPERATION.

**From:** Allan Holms [mailto:aholms@msn.com]
**Sent:** Tuesday, February 07, 2017 4:06 PM
**To:** tiffany@natco.org
**Cc:** Richard A. Repp <RAR@witherspoonkelley.com>; John Doubek <jdoubek@doubekpyfer.com>; Morrissey, Daniel <morrissey@gonzaga.edu>; Bil Childress <BChildress@dunnandblack.com>
**Subject:** Stock Transfer

The mineral rights owned by Bakken Resources are the result of a family inheritance that was used to capitalize the corporation. Due to various circumstances my brother wanted to make sure the shareholders (relatives, business associates, friends) were protected and asked me to assist him. Due to his illness and upon advice of his counsel, he decided to turn his stocks in BRI over to me.

Feel free to contact me if you require additional information. I have stacks of source documents and legal research. I also have many documents concerning Carl George which probably have no bearing, but hold a great deal of interest.

I look forward to working with you.

Thank you,
Allan Holms

3

ASSIGNMENT AGREEMENT

This Assignment Agreement (this "Assignment Agreement") is entered into as of December $\cancel{10}$, 2016, by and between __Val M. Holms (the "Assignor"), and Allan G. Holms (the "Assignee").

**WHEREAS**, Assignor currently owns __26,235,000 shares of the common stock, par value $0.001 per share, of _____ Bakken Resources, Inc. , a _____ public _____ Company, as represented by Certificates No. __335, 1342, 1343, 1344, 1345 (the "Common Stock"); and,

**WHEREAS**, Assignor has agreed to transfer and otherwise assign the Common Stock owned by him to Assignee; and,

**WHEREAS**, the Assignor wishes to transfer and assign to the Assignee all of the Assignor's rights and interests in and to the Common Stock, and the Assignee wishes to be the assignee and transferee of such right, and interests;

NOW, THEREFORE, the parties hereto, intending to be legally bound, do hereby agree as follows:

1.    Assignment. The Assignor hereby transfers and assigns to the Assignee, and the Assignee hereby acquires from the Assignor all of the Assignor's right, title, and interest, of whatever kind or nature, in and to Certificates No. 335, 1342, 1343, 1344, 1345.

2.    Retention of Obligations. Notwithstanding anything in this Assignment Agreement to the contrary, the Assignor shall remain obligated, as a principal and not a guarantor, to Assignee with respect to all of the Assignor's obligations, duties, liabilities and commitments under the Common Stock, of whatever kind or nature.

3.    Effectiveness. This Assignment Agreement shall be effective as of the date set first set forth above.

4.    Assignor's Representations and Warranties.  Assignor represents and warrants to Assignee:

    i.    he is the sole, legal and beneficial owner of the Common Stock;

    ii.    the Common Stock is not subject to a pending, or, to his knowledge, threatened, claim, proceeding or action;

    iii.    he has full legal title to all of such shares free and clear of any liens, security interests, encumbrances, pledges, charges, claims, voting trusts, restrictions on transfer, and of any rights or interest therein, direct or contingent, in favor of any other parties;

    iv.    he has full and unrestricted right, power and authority to sell, assign, transfer and deliver the same or to cause the same to be transferred to Assignee in accordance with this agreement;

    v.    he has not sold or otherwise disposed of or encumbered the Common Stock assigned herein; and,

    vi.    he has, and will convey to the Assignee hereunder, good and marketable title to the Common Stock, free and clear of any claims, liens, pledges, security interests or encumbrances, of any kind.

5.    Governing Law; Binding Effect. This Assignment Agreement shall be governed by and construed in accordance with the laws of the State of  Montana applicable to contracts made and performed in such state

1

without giving effect to the choice of law principles of such state that would require or permit the application of the laws of another jurisdiction.

6.   <u>Representations by Assignee</u>. Assignor is an "accredited investor" within the meaning of the Securities and Exchange Commission Rule 501 of Regulation D, as presently in effect and that this transaction is intended to be exempt from registration under the Act by virtue of section 4a(2) of the Act and the provisions of Rule 506 of Regulation D as promulgated thereunder.

7.   <u>Counterparts</u>. This Assignment Agreement may be executed in one or more counterparts, including facsimile counterparts, each of which shall be deemed to be an original copy of this Assignment Agreement and all of which, when taken together, shall be deemed to constitute one and the same agreement. Delivery of such counterparts by facsimile or electronic mail (in PDF or .tiff format) shall be deemed effective as manual delivery.

IN WITNESS WHEREOF, the Assignee and Assignor have executed this Assignment Agreement as of the date first set forth above.

By:
Name:
Title:

By:
Name:

2

## IRREVOCABLE STOCK/BOND POWER FORM

Date _12 /10 /16_

For value received, the Undersigned does (do) hereby sell, assign and transfer to

_ALLAN G. HOLMS_

| | Taxpayer Identifying No. |
|---|---|
| | |

If Stock, complete this portion
{ _2,35,000_ shares of the _COMMON STOCK_ stock of _BAKKEN RESOURCES, INC._ represented by Certificate(s) No.(s) _335_ inclusive, standing in the name of the undersigned on the books of said Company.

If Bonds, complete this portion
{ _____ bonds of _____ in the principal amount of $_____, No.(s)_____inclusive, standing in the name of the undersigned on the books of said Company.

The undersigned does (do) hereby irrevocably constitute and appoint _____

_____ attorney to transfer the said stock or bond(s), as

the case may be, on the books of said Company, with full power of substitution in the premises.

In Presence of

_____

_____ (SEAL)
(Person executing this power signs here)
SIGNATURE   GUARANTEED

**IMPORTANT – READ CAREFULLY**

The signature(s) to this Power must correspond with the name(s) as written upon the face of the stock certificate(s) or bond(s), as the case may be, in every particular without alteration or enlargement or any change whatever.

(Name of Bank, Trust Company or Broker)

_____
(Official Signature)



The following abbreviations, when used in the inscription of the face of this certificate, shall be construed as though they were written out in full according to applicable laws or regulations:

TEN COM — as tenants in common

TEN ENT — as tenants by the entireties

JT TEN — as joint tenants with right of survivorship and not as tenants in common

UNIF GIFT MIN ACT — _____ Custodian _____
                                    (Cust)                    (Minor)
under Uniform Gifts to Minors Act

_____
                    (State)

Additional abbreviations may also be used though not in the above list.

*For Value Received,* _____ *hereby sells, assigns and transfers unto*

PLEASE INSERT SOCIAL SECURITY
OR OTHER IDENTIFYING NUMBER

███████████

*ALLAN G. HOLMS*
(PLEASE PRINT OR TYPE NAME AND ADDRESS INCLUDING POSTAL ZIP CODE OF ASSIGNEE)

*1314 S. GRAND BLVD #2-112*

*SPOKANE, WA 99201* *Shares*

*of the Common Stock represented by this Certificate and hereby irrevocably constitues and appoints*

_____ *Attorney*

*to transfer the said stock on the books of the within-named Corporation with full power of substitution in the premises.*

*Dated* *12/10/16*

NOTICE   THE SIGNATURE(S) TO THIS ASSIGNMENT MUST CORRESPOND WITH THE NAME(S) AS WRITTEN UPON THE FACE OF THIS CERTIFICATE IN EVERY PARTICULAR WITHOUT ALTERATION OR ENLARGEMENT OR ANY CHANGE WHATSOEVER.

SIGNATURE(S) GUARANTEED

NOTICE   THE SIGNATURE(S) SHOULD BE GUARANTEED BY AN ELIGIBLE GUARANTOR INSTITUTION; (BANKS, STOCKBROKERS, SAVINGS AND LOAN ASSOCIATION AND CREDIT UNIONS) WITH MEMBERSHIP IN AN APPROVED SIGNATURE GUARANTEE MEDALLION PROGRAM PURSUANT TO S.E.C. RULE 17AD-15.

# IRREVOCABLE STOCK/BOND POWER FORM

Date _12/10/16_

For value received, the Undersigned does (do) hereby sell, assign and transfer to

_ALLAN G. HOLMS_

| | Taxpayer Identifying No. |
|---|---|
| | ████████ |

**If Stock, complete this portion**
_5,000,000_ shares of the _COMMON_ ~~class~~ stock of _BAKKEN RESOURCES, INC._
represented by Certificate(s) No.(s) _1342_ _____ inclusive,
standing in the name of the undersigned on the books of said Company.

**If Bonds, complete this portion**
_____ bonds of _____
in the principal amount of $_____, No.(s)_____inclusive,
standing in the name of the undersigned on the books of said Company.

The undersigned does (do) hereby irrevocably constitute and appoint _____

_____ attorney to transfer the said stock or bond(s), as

the case may be, on the books of said Company, with full power of substitution in the premises.

In Presence of

_____          _____ (SEAL)
(Person executing this power signs here)
SIGNATURE GUARANTEED

**IMPORTANT — READ CAREFULLY**

The signature(s) to this Power must correspond with the name(s) as written upon the face of the stock certificate(s) or bond(s), as the case may be, in every particular without alteration or enlargement or any change whatever.

(Name of Bank, Trust Company or Broker)

_____
(Official Signature)



The following abbreviations, when used in the inscription of the face of this certificate, shall be construed as though they were written out in full according to applicable laws or regulations:

TEN COM — as tenants in common

TEN ENT — as tenants by the entireties

JT TEN — as joint tenants with right of survivorship and not as tenants in common

UNIF GIFT MIN ACT — _____ Custodian _____
                              (Cust)                    (Minor)
under Uniform Gifts to Minors Act

_____
(State)

Additional abbreviations may also be used though not in the above list.

*For Value Received,* _____ *hereby sells, assigns and transfers unto*

PLEASE INSERT SOCIAL SECURITY
OR OTHER IDENTIFYING NUMBER

███████████████

ALLAN G. HOLMS
(PLEASE PRINT OR TYPE NAME AND ADDRESS INCLUDING POSTAL ZIP CODE OF ASSIGNEE)

1314 S. GRAND BLVD #2-112

SPOKANE, WA 99201                    *Shares*

*of the Common Stock represented by this Certificate and hereby irrevocably constitues and appoints*

_____ *Attorney*

*to transfer the said stock on the books of the within-named Corporation with full power of substitution in the premises.*

*Dated* __4/10/16__

NOTICE   THE SIGNATURE(S) TO THIS ASSIGNMENT MUST CORRESPOND WITH THE NAME(S) AS WRITTEN UPON THE FACE OF THIS CERTIFICATE IN EVERY PARTICULAR WITHOUT ALTERATION OR ENLARGEMENT OR ANY CHANGE WHATSOEVER.

SIGNATURE(S) GUARANTEED

NOTICE   THE SIGNATURE(S) SHOULD BE GUARANTEED BY AN ELIGIBLE GUARANTOR INSTITUTION, (BANKS, STOCKBROKERS, SAVINGS AND LOAN ASSOCIATION AND CREDIT UNIONS) WITH MEMBERSHIP IN AN APPROVED SIGNATURE GUARANTEE MEDALLION PROGRAM PURSUANT TO S.E.C. RULE 17AD-15.

# IRREVOCABLE STOCK/BOND POWER FORM

Date _12/10/16_

For value received, the Undersigned does (do) hereby sell, assign and transfer to

_ALLAN G. HOLMS_

| | Taxpayer Identifying No. |
|---|---|
| | ▉▉▉▉▉▉ |

**If Stock, complete this portion**
_5,000,00_ shares of the _COMMON_ ~~SCALA~~ stock of _BAKKEN RESOURCES, INC._ represented by Certificate(s) No.(s) _1343_ _____inclusive, standing in the name of the undersigned on the books of said Company.

**If Bonds, complete this portion**
_____ bonds of _____ in the principal amount of $_____, No.(s)_____inclusive, standing in the name of the undersigned on the books of said Company.

The undersigned does (do) hereby irrevocably constitute and appoint _____

_____ attorney to transfer the said stock or bond(s), as the case may be, on the books of said Company, with full power of substitution in the premises.

In Presence of

_____

_____(SEAL)
(Person executing this power signs here)
S I G N A T U R E   G U A R A N T E E D

## IMPORTANT – READ CAREFULLY

The signature(s) to this Power must correspond with the name(s) as written upon the face of the stock certificate(s) or bond(s), as the case may be, in every particular without alteration or enlargement or any change whatever.

(Name of Bank, Trust Company or Broker)

_____
(Official Signature)



The following abbreviations, when used in the inscription of the face of this certificate, shall be construed as though they were written out in full according to applicable laws or regulations:

TEN COM — as tenants in common

TEN ENT — as tenants by the entireties

JT TEN — as joint tenants with right of survivorship and not as tenants in common

UNIF GIFT MIN ACT — _____ Custodian _____
                                          (Cust)                    (Minor)
                             under Uniform Gifts to Minors Act

_____
                    (State)

Additional abbreviations may also be used though not in the above list.

*For Value Received,* _____ *hereby sells, assigns and transfers unto*

PLEASE INSERT SOCIAL SECURITY
OR OTHER IDENTIFYING NUMBER

███████████

ALLAN G. HOLMS

(PLEASE PRINT OR TYPE NAME AND ADDRESS INCLUDING POSTAL ZIP CODE OF ASSIGNEE)

1314 S. GRAND BLVD #2-112

SPOKANE, WA 99202 *Shares*

*of the Common Stock represented by this Certificate and hereby irrevocably constitues and appoints*

_____ *Attorney*

*to transfer the said stock on the books of the within-named Corporation with full power of substitution in the premises.*

*Dated* 12/10/16

NOTICE   THE SIGNATURE(S) TO THIS ASSIGNMENT MUST CORRESPOND WITH THE NAME(S) AS WRITTEN UPON THE FACE OF THIS CERTIFICATE IN EVERY PARTICULAR WITHOUT ALTERATION OR ENLARGEMENT OR ANY CHANGE WHATSOEVER.

SIGNATURE(S) GUARANTEED

NOTICE   THE SIGNATURE(S) SHOULD BE GUARANTEED BY AN ELIGIBLE GUARANTOR INSTITUTION (BANKS, STOCKBROKERS, SAVINGS AND LOAN ASSOCIATION AND CREDIT UNIONS) WITH MEMBERSHIP IN AN APPROVED SIGNATURE GUARANTEE MEDALLION PROGRAM PURSUANT TO S.E.C. RULE 17Ad-15.

# IRREVOCABLE STOCK/BOND POWER FORM

Date _13/10/16_

For value received, the Undersigned does (do) hereby sell, assign and transfer to

_ALLAN G. HOLMS_

| | Taxpayer Identifying No. |
|---|---|
| | ███████████ |

If Stock, complete this portion — _5000.00_ shares of the _COMMON STOCK_ stock of _BAKKEN RESOURCES, INC._ represented by Certificate(s) No.(s) _1344_ _____ inclusive, standing in the name of the undersigned on the books of said Company.

If Bonds, complete this portion — _____ bonds of _____ in the principal amount of $_____, No.(s) _____ inclusive, standing in the name of the undersigned on the books of said Company.

The undersigned does (do) hereby irrevocably constitute and appoint _____

_____ attorney to transfer the said stock or bond(s), as the case may be, on the books of said Company, with full power of substitution in the premises,

In Presence of

_____

_____ (SEAL)
(Person executing this power signs here)
SIGNATURE   GUARANTEED

## IMPORTANT -- READ CAREFULLY

The signature(s) to this Power must correspond with the name(s) as written upon the face of the stock certificate(s) or bond(s), as the case may be, in every particular without alteration or enlargement or any change whatever.

(Name of Bank, Trust Company or Broker)

_____
(Official Signature)



NUMBER

AUTHORIZED COMMON STOCK
100,000,000 SHARES
PAR VALUE $0.001

THIS CERTIFIES THAT

IS THE RECORD HOLDER OF

Shares of Bakken Resources, Inc. Common Stock

transferable on the books of the Corporation in person or by duly authorized attorney upon surrender of this Certificate properly endorsed. This Certificate is not valid until countersigned by the Transfer Agent and registered by the Registrar.

Witness the facsimile seal of the Corporation and the facsimile signatures of its duly authorized officers.

Dated   MAY 13, 2014

SECRETARY

PRESIDENT

SHARES

CUSIP NO. 05756P 10 7

***VAL M HOLMS***

***FIVE MILLION***

NOT VALID UNLESS COUNTERSIGNED BY TRANSFER AGENT.
INCORPORATED UNDER THE LAWS OF THE STATE OF NEVADA.

Nevada Agency and Transfer Company
50 West Liberty Street - Suite 880 - Reno Nevada 89501

Authorized Signature

Countersigned & Registered

UNLESS COUNTERSIGNED BY TRANSFER AGENT

The following abbreviations, when used in the inscription of the face of this certificate, shall be construed as though they were written out in full according to applicable laws or regulations:

TEN COM — as tenants in common

TEN ENT — as tenants by the entireties

JT TEN — as joint tenants with right of survivorship and not as tenants in common

UNIF GIFT MIN ACT — _____ Custodian _____
(Cust) (Minor)
under Uniform Gifts to Minors Act

_____
(State)

Additional abbreviations may also be used though not in the above list.

*For Value Received,* _____ *hereby sells, assigns and transfers unto*

PLEASE INSERT SOCIAL SECURITY
OR OTHER IDENTIFYING NUMBER

ALLAN G. HOLMS
(PLEASE PRINT OR TYPE NAME AND ADDRESS INCLUDING POSTAL ZIP CODE OF ASSIGNEE)
1314 S. GRAND BLVD # 2-112
SPOKANE, WA 99201 *Shares*

*of the Common Stock represented by this Certificate and hereby irrevocably constitues and appoints*

_____ *Attorney*

*to transfer the said stock on the books of the within-named Corporation with full power of substitution in the premises.*

*Dated* 12/10/16

NOTICE   THE SIGNATURE(S) TO THIS ASSIGNMENT MUST CORRESPOND WITH THE NAME(S) AS WRITTEN UPON THE FACE OF THIS CERTIFICATE IN EVERY PARTICULAR WITHOUT ALTERATION OR ENLARGEMENT OR ANY CHANGE WHATSOEVER.

SIGNATURE(S) GUARANTEED

NOTICE   THE SIGNATURE(S) SHOULD BE GUARANTEED BY AN ELIGIBLE GUARANTOR INSTITUTION, (BANKS, STOCKBROKERS, SAVINGS AND LOAN ASSOCIATION AND CREDIT UNIONS) WITH MEMBERSHIP IN AN APPROVED SIGNATURE GUARANTEE MEDALLION PROGRAM PURSUANT TO S.E.C. RULE 17Ad-15.

# IRREVOCABLE STOCK/BOND POWER FORM

Date _12/10/16_

For value received, the Undersigned does (do) hereby sell, assign and transfer to

_ALLAN G. HOLMS_

| | Taxpayer Identifying No. |
|---|---|
| | █████████ |

**If Stock, complete this portion**  _5,000,000_ shares of the _COMMON_ stock of _BAKKEN RESOURCES INC._ represented by Certificate(s) No.(s) _2345_ _____ inclusive, standing in the name of the undersigned on the books of said Company.

**If Bonds, complete this portion**  _____ bonds of _____ in the principal amount of $_____, No.(s)_____ inclusive, standing in the name of the undersigned on the books of said Company.

The undersigned does (do) hereby irrevocably constitute and appoint _____

_____ attorney to transfer the said stock or bond(s), as

the case may be, on the books of said Company, with full power of substitution in the premises.

In Presence of

_____

_____(SEAL)
(Person executing this power signs here)
SIGNATURE GUARANTEED

**IMPORTANT – READ CAREFULLY**

The signature(s) to this Power must correspond with the name(s) as written upon the face of the stock certificate(s) or bond(s), as the case may be, in every particular without alteration or enlargement or any change whatever.

(Name of Bank, Trust Company or Broker)

_____
(Official Signature)



The following abbreviations, when used in the inscription of the face of this certificate, shall be construed as though they were written out in full according to applicable laws or regulations:

TEN.COM — as tenants in common

TEN ENT — as tenants by the entireties

JT TEN — as joint tenants with right of survivorship and not as tenants in common

UNIF GIFT MIN ACT — _____ Custodian _____
(Cust)                                      (Minor)
under Uniform Gifts to Minors Act

_____
(State)

Additional abbreviations may also be used though not in the above list.

*For Value Received,* _____ *hereby sells, assigns and transfers unto*

PLEASE INSERT SOCIAL SECURITY
OR OTHER IDENTIFYING NUMBER

_____

ALLAN G. HOLMS

(PLEASE PRINT OR TYPE NAME AND ADDRESS INCLUDING POSTAL ZIP CODE OF ASSIGNEE)

1314 S. GRAND BLVD #2-112

SPOKANE, WA 99201           *Shares*

*of the Common Stock represented by this Certificate and hereby irrevocably constitues and appoints*

_____ *Attorney*

*to transfer the said stock on the books of the within-named Corporation with full power of substitution in the premises.*

*Dated* 12/10/16

NOTICE   THE SIGNATURE(S) TO THIS ASSIGNMENT MUST CORRESPOND
WITH THE NAME(S) AS WRITTEN UPON THE FACE OF THIS
CERTIFICATE IN EVERY PARTICULAR WITHOUT ALTERATION OR
ENLARGEMENT OR ANY CHANGE WHATSOEVER

SIGNATURE(S) GUARANTEED

NOTICE: THE SIGNATURE(S) SHOULD BE GUARANTEED BY AN ELIGIBLE
GUARANTOR INSTITUTION, (BANKS, STOCKBROKERS, SAVINGS
AND LOAN ASSOCIATION AND CREDIT UNIONS) WITH MEMBERSHIP
IN AN APPROVED SIGNATURE GUARANTEE MEDALLION PROGRAM
PURSUANT TO S.E.C. RULE 17AD-15.

ANGIE SPARKS
CLERK DISTRICT COURT

2016 DEC -9 PM 1:...

FILED
BY_____
DEPUTY

MONTANA FIRST JUDICIAL DISTRICT COURT, LEWIS AND CLARK COUNTY

\* \* \* \* \* \*

| | | |
|---|---|---|
| BAKKEN RESOURCES, INC., | ) | Cause No. DDV 2016-612 |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | ORDER GRANTING |
| VAL M. HOLMS, ALLAN G. | ) | PRELIMINARY INJUNCTION |
| HOLMS, TODD JENSEN and | ) | AND ORDERING EVIDENTIARY |
| ALLEN COLLINS, | ) | HEARING |
| | ) | |
| Defendants and | ) | |
| Third Party Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| KAREN S. MIDTLYNG, | ) | |
| DANIEL D. ANDERSON, | ) | |
| and WESLEY J. PAUL, | ) | |
| | ) | |
| Third Party Defendants. | ) | |

\* \* \* \* \* \*

The matter of this Court's October 19, 2016 *Temporary Restraining Order*

("TRO") came before this Court for a hearing at 10:00 a.m. on December 12, 2016. All

parties were represented by their respective counsel.

1

This Court's said TRO ordered that Bakken Resources, Inc. ("BRI") was enjoined from holding an annual meeting until 60 days after the Court decides whether the July 20, 2016, election of a new Board of Directors was valid and enforceable: whether the Eagle transaction was fraudulent; and whether there was a triggering event allowing Eagle to convert its loan to stock. Further, this Court's said TRO ordered that Eagle was enjoined from voting on any matters at any meeting, including an annual meeting, or a motion by shareholder consent, until the Court issues a ruling whether the July 20, 2016 election of a new Board of Directors (Allan Holms, et al.) was valid and enforceable; whether the Eagle transaction was fraudulent; and whether there was any triggering event to allow Eagle to convert its loan to stock. BRI was ordered to show cause "why the Temporary Restraining Order should not be made permanent pending further proceedings herein."

At the 12/12/2016 hearing, BRI offered no evidence in contradiction to the TRO ruling. It merely deferred to decisions of the Nevada court some made preliminarily and to be made tentatively in the spring. This Court is aware that rulings in Nevada have varied. For example, one court found Eagle Equity transaction was a sham and another that it was an exercise of business judgment. Based on the lack of any factual presentation from BRI per the TRO, this Court grants Defendants and Third Party Plaintiffs (Allan Holms, et al.) a preliminary injunction on precisely those issues addressed within this October 19, 2016 TRO. Further, with respect to the efforts of Allan Holms, Todd Jensen, and Allen Collins to take control of the Board of Directors, it is necessary in this Court's view that we have an evidentiary hearing on this precise issue to determine if those efforts were proper/lawful/and ought to be approved by this Court.

2

Further, the Eagle Equity stock conversion admittedly occurred after Allan Holms' actions and may be of no real consequence if the Allan Holms efforts to control the Company are approved by this Court, because a different Board of Directors would be involved at that juncture.  Parenthetically, Allan Holms was prepared at the 12/12/2016 hearing to offer evidence through his own testimony and that proffered from a Professor Daniel Morrissey.  This Court believed it preferable that such testimony be given at the upcoming evidentiary hearing.  This Court will likewise hold an evidentiary hearing on the legitimacy of the Eagle Equity transaction, if it proves necessary, in conjunction with the Allan Holms stock issue hearing.

A hearing shall be held on _____Feb 28_____, 2017, at 9:00 a.m.

IT IS SO ORDERED.

DATED _Jan. 3, 2017_

JAMES P REYNOLDS

District Judge James Reynolds

cc:   John C. Doubek
      Oliver Goe
      Jordan Crosby

3

MEMO

To: John Doubek, Bil Childress, Allan Holms

From: Professor Dan Morrissey

Re: Bakken Resources, Inc.

Subject: Potential Testimony at Hearing, Dec. 12, 2016

Date: Dec. 9, 2016

1. Actions that determine the rights of shareholders are adjudicated under equitable jurisprudence. In addition, the petitioners here, the Holms group, are seeking equitable relief by way of a preliminary injunction.

   <u>The Paul Group does not have Clean Hands to Claim that Allan Holms Violated SEC Regulations</u>

2. Defendants Paul, Midtlyng, and Anderson (the "Paul Group") do not have "clean hands" to protest any violation of SEC regulations such as the alleged failure of the Holms group to comply with the SEC's rules regarding proxy solicitation.

   A. While in control of Bakken, the Paul Group did not cause the Company to file its periodic reports with the SEC as required by Section 12(g) the Securities Exchange Act of 1934 ("Exchange Act"). Chief among those is the annual report on Form 10-K which is required by Exchange Act Rule 13a-11, 17 C.F.R. § 240.13a-11. Among other things it must contain audited financial statements. For two years, therefore, there was no reliable public information about the Company's financial situation. In addition, the Paul Group called no shareholder meeting during that time so its directors became "hold-overs," without any renewed mandate from the shareholders.

   B. The Paul Group would like the Court to believe that the SEC condoned these delinquencies because Paul confirmed several phone conversations with an SEC official about them with letters. However I can testify from my own experience as a lawyer in the SEC's "Delinquent Reports" unit that the SEC would give no such approval to Bakken's delinquencies.

   C. To the contrary, Exchange Act Rule 12b-25, 17 C.F.R. § 240.12b-25, provides that if a reporting company cannot file a required periodic report on time it must make a filing to that effect on SEC Form 12b-25. There it must state the reasons for its

1

EXHIBIT

\

delinquency. The Rule then give the company a 15 day grace period to make the filing. After that the company is in violation of its filing requirements.

D. In addition, no inference can be draw from the SEC's failure to take enforcement action against Bakken for its delinquent filings when it was under the control of the Paul Group. The SEC recently stated that it has resources to prosecuted only approximately 1% of the wrongful conduct that occurs under the federal securities laws. Bakken's violation also would be a small objective for the SEC given the wealthy Wall Street community that it must police.

### The Proxies Given to Allan Holms were Valid and Allowed him to take Control of Bakken

3. Even if the Court disregards the Paul group's lack of clean hands here, it should nevertheless find that the Holms group has not violated the SEC's proxy solicitation rules. And even if that has occurred, that violation is technical and de minimis. It should therefore not affect the validity of the proxies that Allan Holms voted. That action elected new directors for the Company because it was done in compliance with Nevada Corporate Law.

A. The SEC's proxy rules govern solicitation of proxies. (Emphasis added.) As Allan Holms has testified, he did nothing to request that the proxies he received be given to him.

B. Even if there were solicitations of proxies, the SEC's rules governing those transactions exempt situations where no more than 10 shareholders are solicited. Exchange Act Rule 14a-2(b)(2), 17 C.F.R. § 240.14a-2(b)(2). Here just two of the proxies that Allan Holms received, those from Val Holms and Manuel Graiwer, gave him plenary power to vote more than a majority of the Company's shares.

C. Those two proxies were all that Allan Holms needed to affect the corporate actions he took on July 20, 2016. The other proxies that he received are irrelevant. Any violation of SEC rules as to them is, at most, technical.

D. The other proxies therefore did not impact the validity of the corporate actions undertaken by Allan Holms which were properly done under Nevada corporate law. NRS 78.335(1) (Bylaws § 2.12) allows shareholders to give their proxies in writing to another person who may act for them. In addition NRS 78.320(2) (Bylaws §2.10) provides that a shareholder having a majority of the voting power may take any action by written consent that is permitted at a stockholder meeting.

E. Since Allan Holms had the written proxies of Val Holms and Manuel Graiwer, he was entitled to vote those shares. When he therefore tendered a written consent to an appropriate official of Bakken on July 20, 2016 electing himself, Jensen and Collins as the Company's three new directors that was an effective shareholder action just as if it had been taken at a shareholder meeting. Since the terms of the other Company directors had expired, Allan Holms, Jensen, and Collins then constituted Bakken's board of directors. After that the resolutions they adopted were the legitimate and duly authorized actions of Bakken.

F. Even if there are violations of the proxy solicitation rules, they are nugatory and de minimis. The equities of this case are simple and clearly favor the Holms group. The shares voted by Allan Holms represent a majority interest in the Company. The proxies that Allan Holms received came from people who wanted him to be in control of the Company. Nevada Corporate law states that an entrenched board cannot block the duly authorized actions by shareholders to take control of the Company that they own. Shoen v. Amerco, 885 F.Supp. 1332 1341 (D. Nev. 1994).

G. Nevada corporate law also recognizes the paramount right of shareholders to exercise their voting rights and elect directors. "Any interference with the shareholder franchise is especially serious." Hilton Hotels Corp. v. ITT Corp. 978 F.Supp. 1342, 1351 (D. Nev. 1997). This would include any of the tactics employed by the Paul Group to frustrate Allan Holm's use of his proxies to elect directors.

<u>The Eagle Transaction does not give it the Right to Control Bakken</u>

4.  The Eagle Transaction is inoperative.

A. Eagle claims to have made a loan to Bakken. As a term of that transaction it purports to have the right to convert that loan into preferred shares. Those supposedly allow Eagle to have 51% of Bakken's voting stock thus substantially reducing Val Holms's percentage ownership of Bakken's outstanding shares.

B. The Eagle loan however was a sham. It allegedly amounted to $600,000 but there is no showing that such funds were ever transferred to Bakken. In addition, the principal of Eagle, Carl George, has many judgments entered against him. Such unjustifiable activity, which "dilutes a percentage ownership interest in relation to the interests of other shareholders" has been held to be "actionably coercive" under

3

Nevada corporate law.  Brown v. Kinross Gold U.S.A., Inc., 531 F.Supp.2d 1234, 1246. (D. Nev. 2008)

C.   Even if $600,000 was appropriately received by Bakken, it was grossly disproportionate consideration for what Eagle and the Paul Group now claim is their majority ownership in the Company.  If that is recognized, Eagle now has control of Bakken's assets which are comprised of $5.6 million in current assets and more than $4 million in cash and other investments.  Eagle has gotten control of all that for a fraction of its value.  As Dan Anderson, the Company's CFO has acknowledged in testimony, with such power Eagle could dissolve and liquidate Bakken. It could then take 51% of those assets---thus gaining a sum much greater than the $600,000 it paid for its shares.

D,   The business judgment rule cannot be invoked to justify the Eagle transaction. Its clear purpose is to block the Holms shareholders from taking control of the company that they own.  Action such as the Eagle transaction that interferes with the effectiveness of shareholder voting is subject to a standard of review that is more demanding than the business judgment rule.  In such cases the board bears a heavy burden of demonstrating a compelling justification for its action.  Shoen v. Amereo, 885 F.Supp. at 1342.

E.   *Shoen* also holds that the board's prerogatives under the business judgment rule must always be qualify by the right of "unhappy shareholders to vote the board out of office." *Id.* at 1340.  Another case decided under Nevada law re-enforces that point holding that any actions that disenfranchise shareholders are not reasonable unless a "compelling justification exists."  Hilton Hotels Corp. v. ITT Corp. 978 F.Supp. at 1348.

F.   No such justification existed here.  Bakken had no need to borrow $600,000 from Eagle (if such transaction was indeed consummated).  Bakken already had $5.6 million in current assets and more than $4 million in cash and other investments.  The true purpose of the Eagle transaction was to dilute the ownership interest of Val Holms and pirate the Company away from him.

# DANIEL J. MORRISSEY

Gonzaga University Law School
Box 3528
Spokane, WA  99220
509-313-3693 (o)
509-879-2457 (c)

Married, two children
Member:  Florida, Illinois and
California Bars
dmorrissey@lawschool.gonzaga.edu

## EMPLOYMENT

| | |
|---|---|
| Present – | Professor of Law, Gonzaga University – Contracts, Corporate Law, Securities Regulation, Corporate Seminar |
| Summer, 2009 | Visiting Professor, De Paul University, Corporate Law |
| Summer, 2007 | Visiting Professor, New York Law School, Corporate Law |
| August 2004 –2005 | Visiting Professor, Seattle University School of Law Subjects:  Corporate Finance, Corporate Law, Securities Law and Securities Regulation |
| August 2001 – 2004 | Dean and Professor of Law, Gonzaga University School of Law, Spokane, WA |
| August 1994-2001 | Dean and Professor of Law, St. Thomas University School of Law, Miami, Florida.   Dean, 1994-99, Professor 99-01 |
| August 1982-1994 | Professor, The University of Tulsa School of Law. Subjects:  Securities, Corporations, and Jurisprudence. Contracts |
| August 1988-December 1988 | Visiting Associate Professor, University of Denver School of Law.  Subjects:  Corporations |
| August 1986-May 1987 | Visiting Associate Professor, Seton Hall University School of Law.  Subjects: Securities, Corporation Finance, and Business Association. |
| 1981- 1982 | Associate:  Freshman, Mulvaney & Marantz, Beverly |

|                          | Hills, CA. (now KLA Gates—Los Angeles)                                                                                                      |
|--------------------------|---------------------------------------------------------------------------------------------------------------------------------------------|
| December 1975-June 1981  | Staff Attorney:  Securities and Exchange Commission, Division of Enforcement (Washington, D.C. and Los Angeles, CA).                         |
| August 1979-June 1980    | Visiting Professor, Pepperdine University School of Law, Malibu, CA.  Subjects: Civil Procedure and Securities.                              |
| July 1975-December 1975  | Supervising Attorney:  Prison Legal Aid Clinic, Southern Illinois University School of Law, Carbondale, IL.                                  |
| September 1974-July 1975 | Law Clerk:  Hon. Richard B. Austin, U.S. District Judge, Chicago, IL.                                                                        |

**EDUCATION**

| **Legal**   | Georgetown University Law Center, Washington, D.C. – J.D. (1974).                                                                                                 |
|-------------|-------------------------------------------------------------------------------------------------------------------------------------------------------------------|
|             | Honors/Activities:  Editor-in-Chief, Georgetown Law Weekly:  recipient of award for Most Outstanding Law School Newspaper from the American Bar Association, Law School Division (1974) |
| **College** | Georgetown University School of Foreign Service, Washington, D.C., A.B. (1971).                                                                                   |
|             | Major:  International Affairs (History, Government, and Economics).                                                                                               |
|             | Honors:  Phi Beta Kappa, cum laude.                                                                                                                               |

**Supreme Court Cases Argued**

*In re F5 Networks, Inc.*, 207 P.3d 433 (Wash. 2009)

*Risdall v. Brown-Wilbert*, 753 N.W. 2d 723 (Minn. 2008)

**BOOK**

Securities Litigation (casebook) with Steinberg, Couture, and Kaufman (Carolina Press: 2016)

**LAW REVIEW PUBLICATIONS**

"Income Equality in Utopia," 46 UPLR __ (upcoming)

"Managing the Wealth of Nations:  What China and America may have to Teach each other about Corporate Governance," 68 S.M.U. L. Rev. 831 (2015)

"The Riddle of Shareholder Rights and Corporate Social Responsibility," 80 Brooklyn L. Rev. 353 (2015)

"Will *Allegran* Botox the Wrinkles out of Securities Litigation" 41 J. of Sec. Reg 287 (2013)

"M&A Fiduciary Duties:  Delaware's Murky Jurisprudence,"  58 Vill. Law Rev. 121 (2013)

"Executive Compensation and Income Inequality," 4 Wm. & Mary Bus. L. Rev. 1 (2013)

"Will Arbitration End Securities Litigation," 40 Sec. Reg. L. J. 159 (2012)

"Shareholder Litigation after the Meltdown," 114 W. Va. L. Rev. 531 (2012)

"After the Meltdown," 45 Tulsa L. Rev. 393 (2010)

"The Road Not Taken: Rethinking Securities Regulation and the Case for Merit Review,"  44 U. Rich. L. Rev. 647 (2010)

"The Securities Act at its Diamond Anniversary: Renewing the Case for a Robust Registration Requirement" 11 U. Penn. Bus. Law J. 749 (2009)

"The Path of Corporate Law in the 21st Century,"  86 Or. L. Rev. 975 (2008)

"Piercing All the Veils:  Apply an Established Doctrine To a New Business Order"  32 J. of Corp. L. 529 (2007)

"Saving Legal Education," 56 J. of Leg. Ed. 254 (2006)

 "Another Look at the Law of Dividends"  54 Kan. L. Rev.449 (2006)

"After the Ball is Over:  Investor Remedies in the Wake of the Dot.com crash and Recent Corporate Scandals," 83 Neb. L. Rev. 732 (2005)

"Bringing the Messiah Through Law:  Legal Education at the Jesuit Schools," 48 St. L. U. L. J 549 (2004),

"Harry Truman and the Joy of Deaning," 35 U. of Toledo L. Rev. 153 (2003)

"SEC Injunctions," 68 Tenn. L. Rev. 427 (2001)

"A Natural Lawyer Takes a Sympathetic Look at Post-Modernism," 14 J. of Law & Rel. 601 (1999-2000).

"The Separation of Church and State:  An American-Catholic Perspective," 47 Cath. U. Rev. 1 (1997)

"The Catholic Moment in Legal Education," 78 Marq. L. Rev 413 (1995)

"Pragmatism and the Politics of Meaning," 43 Drake L. Rev 615 (1994)

"Moral Truth and the Law: A New Look At An Old Link," 47 S.M.U.L. Rev. 61 (1993)

"Think Globally, Act Locally: It's Time To Reform the Intrastate Exemption," 20 Sec. Reg. L.J. 59 (1992)

"Protecting the Public Interest in Leveraged Buyouts," 69 Or.L. Rev. 47 (1990)

"Toward a New/Old Theory of Corporate Social Responsibility," 40 Syr.L. Rev. 1005 (1990)

"A Long Overdue Rendezvous for American Legal
Education," 33 Cath. Law. 227 (1990)

"Law, Ethics, and the Levered Buyout," 65 U.Det.
L. Rev. 403 (1988)

"Defensive Tactics in Tender Offers-Does Anything
Go?" 53 Tenn.L. Rev. 103 (1985)

"New Rulings Threaten the Derivative Suit – Will the
'Needed Policeman' Keep Walking the Beat?" 36
S.C.L. Rev. 631 (1985)

"Integration of Securities Offerings – The ABA's
'Indiscreet' Proposal," 26 Ariz. L. Rev. 41 (1984)


## MAGAZINE AND BAR JOURNALS

"A New Corporate Model," National Law Journal, Jan. 7, 2013

"A Fatal Threat to Shareholder Litigation," National Law Journal, Mar. 12, 2012

"It's Time for the Courts to Curb Executive Pay," National Law Journal, Aug. 15, 2011

"Wall Street Needs this Beast," National Law Journal, Feb. 28, 2011

"Dodd-Frank Reins in Wall Street," National Law Journal, August 30, 2010

"Strengthen Investor Rights," National Law Journal, Sept. 14, 2009

"Time to Tighten Regulation," National Law Journal, Oct. 6, 2008

"American Catholics in Our Precarious New Gilded Age," America, Jan. 7-14, 2008.

"Private Placements:  Protect Senior Investors"  National Law Journal, Dec. 10, 2007.

"Remedies for Options Backdating," National Law Journal, Oct. 16, 2006.

"The Catholic Moment in Legal Education," America, October 29, 1994

"Reflections of a First Year Law Professor," Syllabus, Dec. 1983.  (From an
address delivered to the annual meeting of the Central States Law School Association,
April, 1983)

"In Memoriam, Adrian S. Fisher," Res Ipsa Loquitur, Spring, 1983

"New Federal and State Securities Exemptions," California Business Law News, Fall, 1981

Numerous Articles on Legal Issues in the Tulsa World, Tulsa Tribune, and Oklahoma Eagle

## BOOK REVIEWS

Helen Chaitman and Lance Gotthoffer, JP Madoff:  The Unholy Alliance between American's Biggest Bank and America's Biggest Crook ___ Sec. Reg. L. J. ___ (upcoming) (2016)

Harper Lee. Go Set a Watchman. (NW Lawyer, Mar. 2016)

John Paul Stevens, Six Amendments:  How and Why We Should Change the Constitution (America, Nov. 17, 2014)

Richard Posner's Overcoming Law (Commonweal, July 14, 1995)

Diary of a Yuppie (Commonweal, Feb. 27 1987)

Funny Money (Commonweal, Feb. 14, 1986)

Persons and Masks of the Law and Lawyering  (Commonweal, Oct. 8, 1976)

Go East, Young Man:  The Autobiography of William O. Douglas, (Commonweal, Sept. 27, 1974)

The Bench and the Ballot:  Southern Federal Judges and Voting Rights Laws, (Commonweal, Apr. 26, 1974)

## PROFESSIONAL PRESENTATIONS

**Congressional Testimony**        Appearance before the House Subcommittee on Telecommunications and Finance, U.S. Congress, Feb. 22, 1989, testified on leveraged buyouts.

**Other Presentations**

Presentations in October, 2015 and October, 2014 at the annual Investor Protection Conference at Loyola Law School in Chicago speaking about shareholder derivative lawsuits, state securities laws, and trends in securities arbitration.

Presentations on Excessive Executive Compensation to Law School Faculties and Classes during Spring, 2012 Sabbatical

CLE on Fiduciary Duties in Mergers and Acquisitions, Seattle, June 22, 2012

CLE on Securities Litigation, Seattle, DLA Piper, Dec. 1, 2011

CLE on Securities Law Enforcement, Washington State Bar, Seattle, Sept. 15, 2011

Address before the Northwest Securities Conference, Mar. 3, 2010 – Securities Regulation After the Meltdown

Address before the Washington State Business School Forum, Nov. 12, 2010, Monetary Policy After the Meltdown

Address on Catholic Thought in Legal Education at Loyola University Law School, Chicago, January, 1995

Address to Central States Law School Annual Meeting:  "Ethics in Legal Education" April, 1989

Numerous presentations to Legal and Civic groups in Spokane, Miami, Tulsa, 1982-2004.

## CIVIC AND UNIVERSITY SERVICE HIGHLIGHTS

AALS representative, Site Visit for St. Louis U. Law School Sabbatical Inspection, Apr. 2012

Association of American Law Schools, Committee on Libraries and Technology, 2002-05.

Washington State Bar Committee on Professional Development, 2002-04

Florida Supreme Court Commission on Professionalism, 1997-2000

Miami-Dade Legal Services, Board Member, 1998-2001

Vice-President, Faculty Senate, University of Tulsa, 1993-94

# EXHIBIT B

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

# EXHIBIT B



MAUPIN COX LEGOY
ATTORNEYS AT LAW
P.O. Box 30000
Reno, Nevada 89520

**Anderson, Paul**

| | |
|---|---|
| **From:** | Amanda Cardinalli <amanda@natco.org> |
| **Sent:** | Wednesday, February 8, 2017 10:24 AM |
| **To:** | ehill@watrust.com |
| **Subject:** | Washington Trust Bank Medallion Number X0129726 (034) |
| **Attachments:** | Washington Trust Medallions.pdf |

Dear Ms. Hill:

As per our conversation this morning, attached are ten stock powers for your review.  Please confirm if the attached stock powers were signed by Val Holms and medallion guaranteed by the bank.  My concern is the stock powers are dated December 10, 2016 which was a Saturday and the bank was closed.  Also, the market value of the shares exceeds the medallion limit.

Are the attached stock powers validly medallion guaranteed by Washington Trust Bank?

*Amanda Cardinalli*

President

Nevada Agency and Transfer Company
50 West Liberty Street, Suite 880
Reno NV  89501

Tel: 775-322-0626
Fax: 775-322-5623

THIS EMAIL AND ANY FILES TRANSMITTED WITH IT ARE PRIVILEGED, CONFIDENTIAL, SUBJECT TO COPYRIGHT AND INTENDED SOLELY FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHOM THEY ARE ADDRESSED.  ANY UNAUTHORIZED USE, COPYING, REVIEW OR DISCLOSURE IS PROHIBITED.  PLEASE NOTIFY THE SENDER IMMEDIATELY IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR.  THANK YOU FOR YOUR ASSISTANCE AND CO-OPERATION.

# IRREVOCABLE STOCK/BOND POWER FORM

Date _12/10/16_

For value received, the Undersigned does (do) hereby sell, assign and transfer to

_____ ████████████████ _____

████████████████  Taxpayer Identifying No.

**If Stock, complete this portion**

235,000 shares of the COMMON STOCK stock of ████████████████

represented by Certificate(s) No.(s) _335_____ inclusive,

standing in the name of the undersigned on the books of said Company.

**If Bonds, complete this portion**

_____ bonds of _____

in the principal amount of $_____, No.(s)_____ inclusive,

standing in the name of the undersigned on the books of said Company.

The undersigned does (do) hereby irrevocably constitute and appoint _____

_____ attorney to transfer the said stock or bond(s), as

the case may be, on the books of said Company, with full power of substitution in the premises.

In Presence of

_____ _____ (SEAL)

(Person executing this power signs here)

**S I G N A T U R E   G U A R A N T E E D**

_____

(Name of Bank, Trust Company or Broker)

_____

(Official Signature)

## IMPORTANT – READ CAREFULLY

The signature(s) to this Power must correspond with the name(s) as written upon the face of the stock certificate(s) or bond(s), as the case may be, in every particular without alteration or enlargement or any change whatever.

The following abbreviations, when used in the inscription of the face of this certificate, shall be construed as though they were written out in full according to applicable laws or regulations:

TEN COM — as tenants in common

TEN ENT — as tenants by the entireties

JT TEN — as joint tenants with right of survivorship and not as tenants in common

UNIF GIFT MIN ACT — _____ Custodian _____
(Cust)              (Minor)
under Uniform Gifts to Minors Act

_____ _____
(State)

Additional abbreviations may also be used though not in the above list.

*For Value Received,* _____ *hereby sells, assigns and transfers unto*

PLEASE INSERT SOCIAL SECURITY
OR OTHER IDENTIFYING NUMBER

*Shares*

*of the Common Stock represented by this Certificate and hereby irrevocably constitues and appoints*

_____

*Attorney*

*to transfer the said stock on the books of the within-named Corporation with full power of substitution in the premises.*

*Dated* ___12/10/16___

NOTICE  THE SIGNATURE(S) TO THIS ASSIGNMENT MUST CORRESPOND WITH THE NAME(S) AS WRITTEN UPON THE FACE OF THIS CERTIFICATE IN EVERY PARTICULAR WITHOUT ALTERATION OR ENLARGEMENT OR ANY CHANGE WHATSOEVER.

SIGNATURE(S) GUARANTEED

NOTICE  THE SIGNATURE(S) SHOULD BE GUARANTEED BY AN ELIGIBLE GUARANTOR INSTITUTION. (BANKS, STOCKBROKERS, SAVINGS AND LOAN ASSOCIATION AND CREDIT UNIONS) WITH MEMBERSHIP IN AN APPROVED SIGNATURE GUARANTEE MEDALLION PROGRAM PURSUANT TO S.E.C. RULE 17AD-15.

# IRREVOCABLE STOCK/BOND POWER FORM

Date _12/10/16_

For value received, the Undersigned does (do) hereby sell, assign and transfer to

_____ ██████████████████████ _____

_____   | Taxpayer Identifying No.
██████████████████

If Stock,
complete
this
portion

_fifty one_ shares of the _COMMON STOCK_ stock of ██████████████

represented by Certificate(s) No.(s) _1342_ _____ inclusive,

standing in the name of the undersigned on the books of said Company.

If Bonds,
complete
this
portion

_____ bonds of _____

in the principal amount of $_____, No.(s)_____inclusive,

standing in the name of the undersigned on the books of said Company.

The undersigned does (do) hereby irrevocably constitute and appoint _____

_____ attorney to transfer the said stock or bond(s), as

the case may be, on the books of said Company, with full power of substitution in the premises.

In Presence of

_____ (SEAL)

_____       (Person executing this power signs here)
                              SIGNATURE GUARANTEED

## IMPORTANT – READ CAREFULLY

The signature(s) to this Power must
correspond with the name(s) as written
upon the face of the stock certificate(s)
or bond(s), as the case may be, in every
particular without alteration or
enlargement or any change whatever.

(Name of Bank, Trust Company or Broker)

(Official Signature)

The following abbreviations, when used in the inscription of the face of this certificate, shall be construed as though they were written out in full according to applicable laws or regulations:

TEN COM — as tenants in common

TEN ENT — as tenants by the entireties

JT TEN — as joint tenants with right of survivorship and not as tenants in common

UNIF GIFT MIN ACT — _____ Custodian _____
                                                (Cust)                          (Minor)
                          under Uniform Gifts to Minors Act

_____
     (State)

Additional abbreviations may also be used though not in the above list.

*For Value Received,* _____ *hereby sells, assigns and transfers unto*

PLEASE INSERT SOCIAL SECURITY
OR OTHER IDENTIFYING NUMBER

███████████████

(PLEASE PRINT OR TYPE NAME AND ADDRESS INCLUDING POSTAL ZIP CODE OF ASSIGNEE)

*Shares*

*of the Common Stock represented by this Certificate and hereby irrevocably constitues and appoints*

_____

*to transfer the said stock on the books of the within-named Corporation with full power of substitution in the premises.*

*Attorney*

*Dated* ___4/10/14___

NOTICE   THE SIGNATURE(S) TO THIS ASSIGNMENT MUST CORRESPOND WITH THE NAME(S) AS WRITTEN UPON THE FACE OF THIS CERTIFICATE IN EVERY PARTICULAR WITHOUT ALTERATION OR ENLARGEMENT OR ANY CHANGE WHATSOEVER

SIGNATURE(S) GUARANTEED

NOTICE   THE SIGNATURE(S) SHOULD BE GUARANTEED BY AN ELIGIBLE GUARANTOR INSTITUTION. (BANKS, STOCKBROKERS, SAVINGS AND LOAN ASSOCIATION AND CREDIT UNIONS) WITH MEMBERSHIP IN AN APPROVED SIGNATURE GUARANTEE MEDALLION PROGRAM PURSUANT TO S.E.C. RULE 17AD-15.

# IRREVOCABLE STOCK/BOND POWER FORM

Date  _12/10/16_

For value received, the Undersigned does (do) hereby sell, assign and transfer to

███████████████████

███████████████████                              Taxpayer Identifying No.

**If Stock, complete this portion**  {  _5,000,00_ shares of the _common_ stock of ███████
represented by Certificate(s) No.(s) _1393_ _____ inclusive,
standing in the name of the undersigned on the books of said Company.

**If Bonds, complete this portion**  {  _____ bonds of _____
in the principal amount of $_____, No.(s)_____inclusive,
standing in the name of the undersigned on the books of said Company.

The undersigned does (do) hereby irrevocably constitute and appoint _____

_____ attorney to transfer the said stock or bond(s), as

the case may be, on the books of said Company, with full power of substitution in the premises.

In Presence of

_____          _____(SEAL)
                                   (Person executing this power signs here)
                                   S I G N A T U R E   G U A R A N T E E D

**IMPORTANT – READ CAREFULLY**

The signature(s) to this Power must correspond with the name(s) as written upon the face of the stock certificate(s) or bond(s), as the case may be, in every particular without alteration or enlargement or any change whatever.

(Name of Bank, Trust Company or Broker)

_____
(Official Signature)

The following abbreviations, when used in the inscription of the face of this certificate, shall be construed as though they were written out in full according to applicable laws or regulations:

TEN COM — as tenants in common

TEN ENT — as tenants by the entireties

JT TEN — as joint tenants with right of survivorship and not as tenants in common

UNIF GIFT MIN ACT — _____ Custodian _____
                           (Cust)              (Minor)
under Uniform Gifts to Minors Act

_____
                    (State)

Additional abbreviations may also be used though not in the above list.

*For Value Received,* _____ *hereby sells, assigns and transfers unto*

PLEASE INSERT SOCIAL SECURITY
OR OTHER IDENTIFYING NUMBER

▮▮▮▮▮▮▮▮▮▮▮▮▮▮

(PLEASE PRINT OR TYPE NAME AND ADDRESS INCLUDING POSTAL ZIP CODE OF ASSIGNEE)

*Shares*

*of the Common Stock represented by this Certificate and hereby irrevocably constitues and appoints*

_____

*Attorney*

*to transfer the said stock on the books of the within–named Corporation with full power of substitution in the premises.*

*Dated* 12/10/16

NOTICE   THE SIGNATURE(S) TO THIS ASSIGNMENT MUST CORRESPOND WITH THE NAME(S) AS WRITTEN UPON THE FACE OF THIS CERTIFICATE IN EVERY PARTICULAR WITHOUT ALTERATION OR ENLARGEMENT OR ANY CHANGE WHATSOEVER.

SIGNATURE(S) GUARANTEED

NOTICE   THE SIGNATURE(S) SHOULD BE GUARANTEED BY AN ELIGIBLE GUARANTOR INSTITUTION, (BANKS, STOCKBROKERS, SAVINGS AND LOAN ASSOCIATION AND CREDIT UNIONS) WITH MEMBERSHIP IN AN APPROVED SIGNATURE GUARANTEE MEDALLION PROGRAM PURSUANT TO S.E.C. RULE 17AD-15.

# IRREVOCABLE STOCK/BOND POWER FORM

Date _17/10/16_

For value received, the Undersigned does (do) hereby sell, assign and transfer to

_____ ███████████████ _____

_____

|  | Taxpayer Identifying No. |
|---|---|

█████████████████

If Stock, complete this portion — _5,000,000_ shares of the _COMMON_ ~~STOCK~~ stock of _████████████████_

represented by Certificate(s) No.(s) _1344_ _____ inclusive,

standing in the name of the undersigned on the books of said Company.

If Bonds, complete this portion — _____ bonds of _____

in the principal amount of $_____, No.(s)_____ inclusive,

standing in the name of the undersigned on the books of said Company.

The undersigned does (do) hereby irrevocably constitute and appoint _____

_____ attorney to transfer the said stock or bond(s), as

the case may be, on the books of said Company, with full power of substitution in the premises.

In Presence of

_____     _____(SEAL)

(Person executing this power signs here)
S I G N A T U R E   G U A R A N T E E D

## IMPORTANT – READ CAREFULLY

The signature(s) to this Power must correspond with the name(s) as written upon the face of the stock certificate(s) or bond(s), as the case may be, in every particular without alteration or enlargement or any change whatever.

(Name of Bank, Trust Company or Broker)

_____

(Official Signature)

The following abbreviations, when used in the inscription of the face of this certificate, shall be construed as though they were written out in full according to applicable laws or regulations:

TEN COM — as tenants in common

TEN ENT — as tenants by the entireties

JT TEN — as joint tenants with right of survivorship and not as tenants in common

UNIF GIFT MIN ACT — _____ Custodian _____
                     (Cust)        (Minor)
under Uniform Gifts to Minors Act

_____
(State)

Additional abbreviations may also be used though not in the above list.

*For Value Received,* _____ *hereby sells, assigns and transfers unto*

PLEASE INSERT SOCIAL SECURITY
OR OTHER IDENTIFYING NUMBER

████████████████

(PLEASE PRINT OR TYPE NAME AND ADDRESS INCLUDING POSTAL ZIP CODE OF ASSIGNEE)

*Shares*

*of the Common Stock represented by this Certificate and hereby irrevocably constitues and appoints*

*Attorney*

*to transfer the said stock on the books of the within–named Corporation with full power of substitution in the premises.*

*Dated* 12/10/10

NOTICE   THE SIGNATURE(S) TO THIS ASSIGNMENT MUST CORRESPOND WITH THE NAME(S) AS WRITTEN UPON THE FACE OF THIS CERTIFICATE IN EVERY PARTICULAR WITHOUT ALTERATION OR ENLARGEMENT OR ANY CHANGE WHATSOEVER.

SIGNATURE(S) GUARANTEED

NOTICE   THE SIGNATURE(S) SHOULD BE GUARANTEED BY AN ELIGIBLE GUARANTOR INSTITUTION, (BANKS, STOCKBROKERS, SAVINGS AND LOAN ASSOCIATION AND CREDIT UNIONS) WITH MEMBERSHIP IN AN APPROVED SIGNATURE GUARANTEE MEDALLION PROGRAM PURSUANT TO S.E.C. RULE 17AD-15.

# IRREVOCABLE STOCK/BOND POWER FORM

Date _12/10/16_

For value received, the Undersigned does (do) hereby sell, assign and transfer to

_____ ████████████████ _____

_____ | _____

Taxpayer Identifying No.

████████████████

**If Stock, complete this portion**
5,000 shares of the _Common_ stock of ████████████████
represented by Certificate(s) No.(s) _2745_ _____ inclusive, standing in the name of the undersigned on the books of said Company.

**If Bonds, complete this portion**
_____ bonds of _____
in the principal amount of $_____ , No.(s)_____ inclusive, standing in the name of the undersigned on the books of said Company.

The undersigned does (do) hereby irrevocably constitute and appoint _____

_____ attorney to transfer the said stock or bond(s), as

the case may be, on the books of said Company, with full power of substitution in the premises.

In Presence of

_____ _____ (SEAL)
(Person executing this power signs here)
SIGNATURE GUARANTEED

IMPORTANT – READ CAREFULLY

The signature(s) to this Power must correspond with the name(s) as written upon the face of the stock certificate(s) or bond(s), as the case may be, in every particular without alteration or enlargement or any change whatever.

(Name of Bank, Trust Company or Broker)

_____
(Official Signature)

The following abbreviations, when used in the inscription of the face of this certificate, shall be construed as though they were written out in full according to applicable laws or regulations:

TEN COM — as tenants in common

TEN ENT — as tenants by the entireties

JT TEN — as joint tenants with right of survivorship and not as tenants in common

UNIF GIFT MIN ACT — _____ Custodian _____
                                    (Cust)              (Minor)
under Uniform Gifts to Minors Act

_____
(State)

Additional abbreviations may also be used though not in the above list.

*For Value Received,* _____ *hereby sells, assigns and transfers unto*

PLEASE INSERT SOCIAL SECURITY
OR OTHER IDENTIFYING NUMBER

███████████████

(PLEASE PRINT OR TYPE NAME AND ADDRESS INCLUDING POSTAL ZIP CODE OF ASSIGNEE)

*Shares*

*of the Common Stock represented by this Certificate and hereby irrevocably constitues and appoints*

_____ *Attorney*

*to transfer the said stock on the books of the within-named Corporation with full power of substitution in the premises.*

*Dated* _12/10/16_

NOTICE   THE SIGNATURE(S) TO THIS ASSIGNMENT MUST CORRESPOND WITH THE NAME(S) AS WRITTEN UPON THE FACE OF THIS CERTIFICATE IN EVERY PARTICULAR WITHOUT ALTERATION OR ENLARGEMENT OR ANY CHANGE WHATSOEVER

SIGNATURE(S) GUARANTEED

NOTICE   THE SIGNATURE(S) SHOULD BE GUARANTEED BY AN ELIGIBLE GUARANTOR INSTITUTION, (BANKS, STOCKBROKERS, SAVINGS AND LOAN ASSOCIATION AND CREDIT UNIONS) WITH MEMBERSHIP IN AN APPROVED SIGNATURE GUARANTEE MEDALLION PROGRAM PURSUANT TO S.E.C. RULE 17AD-15.

**Anderson, Paul**

| | |
|---|---|
| **From:** | McCormick, Jody <JMcCormick@watrust.com> |
| **Sent:** | Thursday, February 9, 2017 5:00 PM |
| **To:** | amanda@natco.org |
| **Subject:** | Medallion Validaion |

Amanda –

This is to confirm that WTB is unable to verify the Medallion Stamps on the Holms transaction.

Jody

**Jody M. McCormick**

Corporate Counsel - Commercial

**Washington Trust Bank**

717 W. Sprague Ave I Spokane, WA 99201
(509) 354-1048 (direct) I (509) 353-6969 (fax)
jmccormick@watrust.com

CONFIDENTIALITY NOTICE
This transmission is confidential and is intended solely for the use of the individual named recipient. It may be protected by the attorney-client privilege, work product doctrine, or other confidentiality protection. If you are not the intended recipient, or the person responsible to deliver it to the intended recipient, be advised that any dissemination, distribution, or copying of this communication is prohibited. If you have received this transmission in error, please immediately notify the sender via e-mail or by telephone at (509) 353-3921 that you have received the message in error, and then delete it. Thank you.

--------------------------------------------------------------------
This electronic mail message and any attachments may contain confidential or privileged information and is intended for use solely by the above-referenced recipient. Any review, copying, printing, disclosure, distribution, or other use by any other person or entity is strictly prohibited under applicable law. If you are not the named recipient, or believe you have received this message in error, please immediately notify the sender by replying to this message and delete the copy you received

--------------------------------------------------------------------

1

# EXHIBIT C

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

# EXHIBIT C



**Anderson, Paul**

| | |
|---|---|
| **From:** | Amanda Cardinalli <amanda@natco.org> |
| **Sent:** | Friday, February 10, 2017 11:27 AM |
| **To:** | 'Allan Holms'; tiffany@natco.org |
| **Cc:** | 'Richard A. Repp' |
| **Subject:** | RE: Affidavit |

Allan,

As you know, I have been waiting for Washington Trust Bank to confirm the information contained on the ten stock powers you provided.  I received a response last night from Jody McCormick, Corporate Counsel, at Washington Trust Bank.  Ms. McCormick stated "that WTB is unable to verify the Medallion Stamp on the Holms transaction".

As I understand it, you have indicated that you are not in possession of the stock certificates in question and that those stock certificates may be lost.  In order to replace all five certificates and transfer ownership to you, we will need to be provided with the following:

1. A copy of Val Holms' Death Certificate

2. Letters of Testamentary which confirm the appointment of the authorized representative of the estate

3. A stock power signed by the authorized representative of the Estate with their signature medallion guarantee (please note, the medallion's limit must exceed the value of the shares)

4. A Lost Instrument Bond in an open penalty amount naming Nevada Agency and Transfer
5. Company and Bakken Resources, Inc. as obligees

6. An Affidavit of Loss executed by the authorized representative of the Estate

While we do not recommend or endorse any bonding or insurance company which may be able to provide an appropriate lost instrument bond, we note that in the past we have seen such bonds issued by Surety1.com, however, you may contact any insurance bonding company you choose to obtain this bond.  Please contact me if you have any questions.

*Amanda Cardinalli*

President

Nevada Agency and Transfer Company
50 West Liberty Street, Suite 880
Reno NV  89501

Tel: 775-322-0626
Fax: 775-322-5623

1

THIS EMAIL AND ANY FILES TRANSMITTED WITH IT ARE PRIVILEGED, CONFIDENTIAL, SUBJECT TO COPYRIGHT AND INTENDED SOLELY FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHOM THEY ARE ADDRESSED.  ANY UNAUTHORIZED USE, COPYING, REVIEW OR DISCLOSURE IS PROHIBITED.  PLEASE NOTIFY THE SENDER IMMEDIATELY IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR.  THANK YOU FOR YOUR ASSISTANCE AND CO-OPERATION.

**From:** Allan Holms [mailto:aholms@msn.com]
**Sent:** Thursday, February 09, 2017 4:03 PM
**To:** amanda@natco.org; tiffany@natco.org
**Cc:** 'Richard A. Repp' <RAR@witherspoonkelley.com>
**Subject:** RE: Affidavit

After many discussions and asking questions, it comes down to each stock certificate represents an average of 5 million shares and each certificate has its own stock power and medallion.
Option A – A medallion is worth $2 million, so we just do three certificates with 3 stock powers which represents approx. 15 million shares @13 cents a share equals $1,950,000.
Option B – maybe I can get a bond to cover any excess over $2 million If we want to transfer all the stock.
Option C – I can have my bank guarantee the excess.

Washington Trust Bank just called me to tell me their legal person is contacting me tomorrow and they want to work this out for me.  They are comfortable with everything, other than their limit, and they are working to resolve that.

Allan Holms

**From:** Amanda Cardinalli [mailto:amanda@natco.org]
**Sent:** Thursday, February 09, 2017 11:21 AM
**To:** 'Allan Holms' <aholms@msn.com>; tiffany@natco.org
**Cc:** 'Richard A. Repp' <RAR@witherspoonkelley.com>
**Subject:** RE: Affidavit

Dear Mr. Holms,

In order to provide you with instructions, I must first know if you are in possession of Bakken certificate numbers 1342 – 1345, and 335 or if they are lost.

*Amanda Cardinalli*

President

Nevada Agency and Transfer Company
50 West Liberty Street, Suite 880
Reno NV  89501

Tel: 775-322-0626
Fax: 775-322-5623

THIS EMAIL AND ANY FILES TRANSMITTED WITH IT ARE PRIVILEGED, CONFIDENTIAL, SUBJECT TO COPYRIGHT AND INTENDED SOLELY FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHOM THEY ARE ADDRESSED.  ANY UNAUTHORIZED USE, COPYING, REVIEW OR DISCLOSURE IS PROHIBITED.  PLEASE NOTIFY THE SENDER IMMEDIATELY IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR.  THANK YOU FOR YOUR ASSISTANCE AND CO-OPERATION.

# EXHIBIT D

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

# EXHIBIT D


{AUPIN|COX|LEGOY
ATTORNEYS AT LAW
P.O. Box 30000
Reno, Nevada 89520

**Anderson, Paul**

| | |
|---|---|
| **From:** | Allan Holms <aholms@msn.com> |
| **Sent:** | Thursday, February 9, 2017 10:54 AM |
| **To:** | tiffany@natco.org |
| **Cc:** | Richard A. Repp |
| **Subject:** | Affidavit |
| **Attachments:** | 2.9.17Doubek affidavit.pdf |

As a result of our conversation yesterday, I thought it was important to reach out to Val's attorney.  He provided the attached affidavit and suggested I send it on to you.
I tried to contact the broker dealer who handled some of the pieces of the transaction, but he is out of town.

I am also copying Richard Repp on this email who is a securities lawyer with Witherspoon Kelley in Spokane, WA.  He has the full package of documents.

Also, if required, John Doubek said he would supply an affidavit to the validity of Val's signatures.

I am meeting the estate lawyers on Monday and I should be able to get a death certificate at that time.  Let me know of any other documents you feel would be necessary.

Allan Holms

AFFIDAVIT

STATE OF MONTANA              )
                             : ss.
County of Lewis and Clark     )

I, John C. Doubek, being first duly sworn upon my oath, depose and state the following:

1.     I am an attorney duly licensed to practice law in the State of Montana, in all state and federal courts therein.

2.     I have practiced law for the past 40+ years.

3.     In July of 2016, I was retained by both Allan Holms and his brother, Val M. Holms, to represent them in litigation involving Bakken Resources, Inc.  At the time I was retained and as part of the retainer agreement, Val M. Holms transferred half of his stock (half of 26,235,000 shares) to Allan Holms.  Subsequently, Val thought that he needed to sign something more detailed and told me in October, 2016, that he was working to accomplish the transfer of not only half of his shares but 100% of his shares.

4.     There are a number of reasons why Val wanted to transfer all of his Bakken, Resources, Inc. common stock shares to Allan Holms, his brother.  I asked Val Holms if he needed help doing that and he said he did not.  He had a form that he was going to use and he prepared it himself.  Val Holms called me within a day or so after he signed an agreement called "Assignment Agreement," dated December 10, 2016 wherein he assigned all of his stock to Allan Holms.  Val was actually somewhat proud of himself because he was able to work this assignment agreement up himself and didn't have to pay a lawyer to do it for him.

1

5.      Val also informed me that he couldn't put his hands on the original stock certificates as he thought they had been retained at the Company's offices during his time as a CEO and director of the Company.  He said that he had copies of all of his stock certificates representing the 26,235,000 shares of common stock and that he had noted the certificate numbers in the Assignment Agreement.  He was going to endorse those and transfer all of those along with the Assignment Agreement to Allan Holms.  He thought he had fully accomplished the transfer of his stock to Allan Holms.  There is no doubt in my mind but that Val Holms thought he had fully accomplished the assignment of all of his said shares of common stock to his brother, Allan Holms.

6.      I have read this affidavit and state that it is true and correct.

John C. Doubek

SUBSCRIBED AND SWORN TO before me this 9th day of February, 2017.

NOLA ROCK
NOTARY PUBLIC for the
State of Montana
Residing at Helena, Montana
My Commission Expires
November 04, 2019

Notary's Name (Print): Nola Rock

Notary Public for the State of Montana

Residing at  Helena , Montana

My commission expires  Nov 4, 2019

2

F I L E D
Electronically
CV17-00360
2017-02-21 11:25:21 AM
Jacqueline Bryant
Clerk of the Court
Transaction # 5958775 : csulezic

# EXHIBIT 6

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

# EXHIBIT 6

*Bill Childcars*

*Mandy Fulberg*

*Stage Coach Express*

*Socarty*

**BAKKEN RESOURCES, INC.**

**STOCKHOLDER ACTION BY WRITTEN CONSENT**

**WITHOUT A MEETING**

*Wes Wiresticki*

*Timberline Security*

**July 20, 2016**

The undersigned Stockholders, as the holders of a majority of the shares of common stock of Bakken Resources, Inc. ("Bakken Resources" or the "Corporation"), and pursuant to Section 2.10 of the Bylaws, do hereby consent to the taking of the following actions without a meeting:

## ELECTION OF SUCCESSOR DIRECTORS

WHEREAS, Section 3.3 of the Bylaws requires that *"directors shall be elected at an annual meeting of stockholders";*

WHEREAS, Section 2.1 of the Bylaws provides that *"[t]he annual meeting of stockholders shall be held each year within 180 days of the end of the prior fiscal year, on a date and at a time designated by the board of directors or as otherwise determined by the board of directors";*

WHEREAS, since November 2014, the current Board of Directors has failed or refused to hold an Annual Meeting of Stockholders as required by the plain language of the Bylaws;

WHEREAS, the current Board of Directors is comprised of six incumbent Directors and one vacant directorship;

WHEREAS, the six incumbent Directors' terms of office have expired;

WHEREAS, no Directors have been elected by the Stockholders since November 2014, despite expiration of the incumbent Directors' terms, successors having not been qualified and elected pursuant to Section 3.3 of the Bylaws; and

WHEREAS, it is in the best interests of the Corporation and its Stockholders that three Successor Directors be elected to the Board of Directors and that four directorships remain vacant;

THEREFORE, the undersigned Stockholders expressly consent to elect the following Successor Directors, with four directorships to remain vacant:

ALLAN G. HOLMS, Spokane, Washington
TODD JENSEN, Boise, Idaho
ALLEN COLLINS, Pocatello, Idaho

The Board of Directors may fix the time and place of its first meeting.

By executing this *Stockholder Action by Written Consent Without a Meeting*, the undersigned Stockholders do indicate and affirm their consent to this Stockholder Action.

IN WITNESS WHEREOF, the undersigned have executed and delivered to the Corporation this *Stockholder Action by Written Consent Without a Meeting* as of the date first above written.

Stockholder: Val M. Holms
Certificate No.: 335, 1342-45
Total Number of Shares: 26,235,000
By: Allan Holms, proxy

Stockholder: Stuart Graiwer
Certificate No.: 106, 254
Total Number of Shares: 300,000
By: Allan Holms, proxy

Stockholder: Larry Johnson
Certificate No.: 259
Total Number of Shares: 375,000
By: Allan Holms, proxy

Stockholder: Kenneth Graiwer
Certificate No.: 128, 175, 206, 260
Total Number of Shares: 230,000
By: Allan Holms, proxy

Stockholder: Livorno Latin America
Promotions BV
Certificate No.: 213
Total Number of Shares: 400,000
By: Allan Holms, proxy

Stockholder: Bruce & Marilyn Gilles
1987 Trust
Certificate No.: 204
Total Number of Shares: 400,000
By: Allan Holms, proxy

Page 2 of 4

Stockholder: Manuel Graiwer
Certificate No.: 205
Total Number of Shares: 600,000
By: Allan Holms, proxy

Stockholder: Vincent Valdez
Certificate No.: 225
Total Number of Shares: 400,000
By: Allan Holms, proxy

Stockholder: Marisa Graiwer
Certificate No.: 105, 253
Total Number of Shares: 300,000
By: Allan Holms, proxy

Stockholder: Wong Wah On (Edward)
Certificate No.: 264
Total Number of Shares: 250,000
By: Allan Holms, proxy

Stockholder: Thomas G. Walsh
Certificate No.: 1357
Total Number of Shares: 100,000
By: Allan Holms, proxy

Stockholder: Graham John Brain
Certificate No.: 199
Total Number of Shares: 200,000
By: Allan Holms, proxy

Stockholder: Merridy Buttice
Certificate No.: 257
Total Number of Shares: 500,000
By: Allan Holms, proxy

Stockholder: Donald Townshend
Certificate No.: 236
Total Number of Shares: 200,000
By: Allan Holms, proxy

Stockholder: Floyd Short
Certificate No.: 434
Total Number of Shares: 80,000
By: Allan Holms, proxy

Stockholder: Kent Jensen
Certificate No.: 250,000
Total Number of Shares: 245
By: Allan Holms, proxy

Stockholder: Peter Schmid
Certificate No.: 310, 311, 312
Total Number of Shares: 300,000
By: Allan Holms, proxy

Stockholder: Alyson Graiwer
Certificate No.: 129, 176
Total Number of Shares: 30,000
By: Allan Holms

Stockholder: Allan G. Holms
Certificate No.: 1351
Total Number of Shares: 355,000
By: Allan Holms, proxy

Total Number of Shares Voted:  31,505,000

# BAKKEN RESOURCES, INC.

## PROXY

The undersigned, Val M. Holms, a stockholder of Bakken Resources, Inc., ("BRI" or "Company"), a Nevada corporation, owning 26,235,000 shares of Common Stock represented by certificate numbers 335, 1342, 1343, 1344, and 1345, hereby appoint Allan Holms as Proxy for the undersigned, with full power of substitution. In doing so, I hereby authorize Allan Holms, without limitation; (1) to vote on behalf of the undersigned all shares of common stock of the corporation held or owned by the undersigned stockholder at any annual or special meeting of stockholders of the Corporation; (2) to express consent to dissent to corporate actions in writing without a meeting; and (3) to exercise in Allan Holms' sole discretion any and all stockholder rights, powers, or privileges of the undersigned.

This proxy automatically revokes any Proxy previously granted by the undersigned. This Proxy shall remain in force and full effect for a period of six (6) months from the date of execution.

Dated this 7th day of July, 2016.

Signature

Printed Name: _Vae M. Holms_

# BAKKEN RESOURCES, INC.

## PROXY

The undersigned, Stuart Graiwer, a stockholder of Bakken Resources, Inc., ("BRI" or "Corporation"), a Nevada corporation, owing 300,000 shares of Common Stock represented by certificate(s) number(s) 106 and 254, hereby appoint Allan Holms as Proxy for the undersigned, with full power of substitution.  In so doing, I hereby authorize Allan Holms, without limitation; (1) to vote on behalf of the undersigned all shares of common stock of the corporation held or owned by the undersigned stockholder at any annual or special meeting of stockholders of the Corporation; 2) to express consent or dissent to corporate actions in writing without a meeting; and (3) to exercise in Allan Holms' sole discretion any and all stockholder rights, powers, or privileges of the undersigned.

This proxy automatically revokes any Proxy previously granted by the undersigned.  This Proxy shall remain in force and full effect for a period of six (6) months from the date of execution.

Dated this 6th day of July, 2016.

_____
Signature

Printed Name: STUART GRAIWER

# BAKKEN RESOURCES, INC.

## PROXY

The undersigned, _LARRY JOHNSON_, a stockholder of Bakken Resources, Inc., ("BRI" or "Corporation"), a Nevada corporation, hereby appoint Allan Holms as Proxy for the undersigned, with full power of substitution. In so doing, I hereby authorize Allan Holms, without limitation; (1) to vote on behalf of the undersigned all shares of common stock of the corporation held or owned by the undersigned stockholder at any annual or special meeting of stockholders of the Corporation; 2) to express consent or dissent to corporate actions in writing without a meeting; and (3) to exercise in Allan Holms' sole discretion any and all stockholder rights, powers, or privileges of the undersigned.

This proxy automatically revokes any Proxy previously granted by the undersigned. This Proxy shall remain in force and full effect for a period of six (6) months from the date of execution.

Dated this 5th day of July, 2016.

_Larry Johnson_

Signature

Printed Name: _LARRY JOHNSON_

# BAKKEN RESOURCES, INC.
## PROXY

The undersigned, Kenneth Graiwer, a stockholder of Bakken Resources, Inc., ("BRI" or "Corporation"), a Nevada corporation, owing 230,000 shares of Common Stock represented by certificate(s) number(s) 128, 175, 206 and 260, hereby appoint Allan Holms as Proxy for the undersigned, with full power of substitution.  In so doing, I hereby authorize Allan Holms, without limitation; (1) to vote on behalf of the undersigned all shares of common stock of the corporation held or owned by the undersigned stockholder at any annual or special meeting of stockholders of the Corporation; 2) to express consent or dissent to corporate actions in writing without a meeting; and (3) to exercise in Allan Holms' sole discretion any and all stockholder rights, powers, or privileges of the undersigned.

This proxy automatically revokes any Proxy previously granted by the undersigned.  This Proxy shall remain in force and full effect for a period of six (6) months from the date of execution.

Dated this 6th day of July, 2016.

Signature

Printed Name: _KENNETH GRAIWER_

# BAKKEN RESOURCES, INC.

## PROXY

The undersigned, Livorno Latin America Promotions BV, a stockholder of Bakken Resources, Inc., ("BRI" or "Corporation"), a Nevada corporation, owing 400,000 shares of Common Stock represented by certificate(s) number(s) 213, hereby appoint Allan Holms as Proxy for the undersigned, with full power of substitution. In so doing, I hereby authorize Allan Holms, without limitation; (1) to vote on behalf of the undersigned all shares of common stock of the corporation held or owned by the undersigned stockholder at any annual or special meeting of stockholders of the Corporation; 2) to express consent or dissent to corporate actions in writing without a meeting; and (3) to exercise in Allan Holms' sole discretion any and all stockholder rights, powers, or privileges of the undersigned.

This proxy automatically revokes any Proxy previously granted by the undersigned. This Proxy shall remain in force and full effect for a period of six (6) months from the date of execution.

Dated this 6th day of July, 2016.

_____
Signature

Printed Name: Deborah de Lau-
McKenzie

# BAKKEN RESOURCES, INC.

## PROXY

The undersigned, Bruce & Marilyn Gilles 1987 Trust, a stockholder of Bakken Resources, Inc., ("BRI" or "Corporation"), a Nevada corporation, owing 400,000 shares of Common Stock represented by certificate(s) number(s) 204, hereby appoint Allan Holms as Proxy for the undersigned, with full power of substitution. In so doing, I hereby authorize Allan Holms, without limitation; (1) to vote on behalf of the undersigned all shares of common stock of the corporation held or owned by the undersigned stockholder at any annual or special meeting of stockholders of the Corporation; 2) to express consent or dissent to corporate actions in writing without a meeting; and (3) to exercise in Allan Holms' sole discretion any and all stockholder rights, powers, or privileges of the undersigned.

This proxy automatically revokes any Proxy previously granted by the undersigned. This Proxy shall remain in force and full effect for a period of six (6) months from the date of execution.

Dated this 6th day of July, 2016.

Signature

Printed Name: Bruce S. Gillis

**BAKKEN RESOURCES, INC.**

**PROXY**

The undersigned, _____, a stockholder of Bakken Resources, Inc. ("BRI" or the "Corporation"), a Nevada corporation, hereby appoints Allan Holms as proxy for the undersigned, with full power of substitution. In so doing, the undersigned hereby authorizes Allan Holms, without limitation (1) to vote on behalf of the undersigned all shares of common stock of the Corporation held or owned by the undersigned stockholder at any annual or special meeting of stockholders of the Corporation; (2) to express consent or dissent to corporate action in writing without a meeting; and (3) to exercise in Allan Holms' sole discretion any and all stockholder rights, powers, or privileges of the undersigned.

This Proxy automatically revokes any proxy previously given by the undersigned. This Proxy shall remain in force and full effect for a period of ninety (90) days from the date of execution.

Dated this 29th day of _June_, 2016.

_____
Signature

Print Name: MANUEL GRAWER

STATE OF _California_ )
                     )ss.
County of _Los Angeles_ )

I certify that I know or have satisfactory evidence that _Manuel Grawer_ is the person who appeared before me, and said person acknowledged that he/she signed this instrument and acknowledged it to be his/her free and voluntary act for the uses and purposes mentioned in the instrument.

Dated this 29 day of _June_, 2016.

_____
NOTARY PUBLIC for State of _California_
My appointment expires: _9/20/19_

VERONICA HERNANDEZ
Commission # 2124584
Notary Public - California
Los Angeles County
My Comm. Expires Sep 20, 2019

**CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT**                    CIVIL CODE § 1189

---

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California

County of _Los Angeles_

On _June 29, 2016_ before me, _Veronica Hernandez_
    *Date*                  *Here Insert Name and Title of the Officer*

personally appeared _Manuel Corralves_
                              *Name(s) of Signer(s)*

---

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.



Signature _____
                  *Signature of Notary Public*

        *Place Notary Seal Above*

---

————————————— OPTIONAL —————————————

*Though this section is optional, completing this information can deter alteration of the document or fraudulent reattachment of this form to an unintended document.*

**Description of Attached Document**

Title or Type of Document: _____ Document Date: _____

Number of Pages: _____ Signer(s) Other Than Named Above: _____

**Capacity(ies) Claimed by Signer(s)**

Signer's Name: _____
☐ Corporate Officer — Title(s): _____
☐ Partner — ☐ Limited  ☐ General
☐ Individual  ☐ Attorney in Fact
☐ Trustee  ☐ Guardian or Conservator
☐ Other: _____
Signer Is Representing: _____

Signer's Name: _____
☐ Corporate Officer — Title(s): _____
☐ Partner — ☐ Limited  ☐ General
☐ Individual  ☐ Attorney in Fact
☐ Trustee  ☐ Guardian or Conservator
☐ Other: _____
Signer Is Representing: _____

---

©2014 National Notary Association • www.NationalNotary.org • 1-800-US NOTARY (1-800-876-6827)    Item #5907



# BAKKEN RESOURCES, INC.

## PROXY

The undersigned, Marisa Grawey, a stockholder of Bakken Resources, Inc. ("BRI"), a Corporation, a Nevada corporation, owning 500,000 shares of Common Stock, represented by certificate(s) number(s) 105 and 252, hereby appoint Allan Holms as Proxy for the undersigned, with full power of substitution. In so doing, thereby authorize Allan Holms, without limitation, (a) to vote on behalf of the number, and all shares of common stock of BRI Corporation owned by the undersigned stockholder at any annual or special meeting of stockholders of the Corporation, (b) to express consent or dissent to corporate actions in writing without a meeting, and (c) to grant to Allan Holms sole discretion for any and all said proxy, consents, or proxies for the undersigned.

This proxy, when executed, hereby revokes any proxy heretofore given by the undersigned. This Proxy shall remain in force and all substitutions shall be valid for six months from the date of execution.

Dated this ____ day of ____, 20__.

_____
Signature

_____
Printed name

# BAKKEN RESOURCES, INC.

## PROXY

The undersigned, Wong Wah On Edward, a stockholder of Bakken Resources, Inc., ("BRI" or "Corporation"), a Nevada corporation, owing 250,000 shares of Common Stock represented by certificate(s) number(s) 264, hereby appoint Allan Holms as Proxy for the undersigned, with full power of substitution. In so doing, I hereby authorize Allan Holms, without limitation; (1) to vote on behalf of the undersigned all shares of common stock of the corporation held or owned by the undersigned stockholder at any annual or special meeting of stockholders of the Corporation; 2) to express consent or dissent to corporate actions in writing without a meeting; and (3) to exercise in Allan Holms' sole discretion any and all stockholder rights, powers, or privileges of the undersigned.

This proxy automatically revokes any Proxy previously granted by the undersigned. This Proxy shall remain in force and full effect for a period of six (6) months from the date of execution.

Dated this 5th day of July, 2016.

Signature

Printed Name: Wong Wah On Edward

# DAKKEN RESOURCES, INC.
## PROXY

The undersigned hereby certifies that he is a stockholder of Dakken Resources, Inc., a Nevada corporation, owning 100,000 shares of common stock of the corporation, and in so doing, I hereby appoint Allan Holms as Proxy of the undersigned. I hereby authorize Allan Holms to vote all shares of common stock of the corporation held by the undersigned as a stockholder at any annual or special meeting of stockholders, express consent or dissent to corporate actions in writing, and to exercise in Allan Holms' sole discretion any and all stockholder rights of the undersigned.

This proxy automatically revokes any Proxy previously granted by the undersigned and shall remain in force and full effect for a period of six (6) months from the date hereon.

Dated this 5th day of July, 2016.

_____
Signature

Printed Name: THOMAS G. ____

# BAKKEN RESOURCES, INC.

## PROXY

# BAKKEN RESOURCES, INC.

## PROXY

The undersigned, Merridy Buttice, a stockholder of Bakken Resources, Inc., ("BRI" or "Corporation"), a Nevada corporation, owing 500,000 shares of Common Stock represented by certificate(s) number(s) 257, hereby appoint Allan Holms as Proxy for the undersigned, with full power of substitution. In so doing, I hereby authorize Allan Holms, without limitation; (1) to vote on behalf of the undersigned all shares of common stock of the corporation held or owned by the undersigned stockholder at any annual or special meeting of stockholders of the Corporation; 2) to express consent or dissent to corporate actions in writing without a meeting; and (3) to exercise in Allan Holms' sole discretion any and all stockholder rights, powers, or privileges of the undersigned.

This proxy automatically revokes any Proxy previously granted by the undersigned. This Proxy shall remain in force and full effect for a period of six (6) months from the date of execution.

Dated this 5* day of July, 2016.

_Merridy Buttice_
Signature

Printed Name: _Merridy Buttice_

# BAKKEN RESOURCES, INC.

## PROXY

The undersigned, Donald Townshend, a stockholder of Bakken Resources, Inc., ("BRI" or "Corporation"), a Nevada corporation, owing 200,000 shares of Common Stock represented by certificate(s) number(s) 236, hereby appoint Allan Holms as Proxy for the undersigned, with full power of substitution. In so doing, I hereby authorize Allan Holms, without limitation; (1) to vote on behalf of the undersigned all shares of common stock of the corporation held or owned by the undersigned stockholder at any annual or special meeting of stockholders of the Corporation; 2) to express consent or dissent to corporate actions in writing without a meeting; and (3) to exercise in Allan Holms' sole discretion any and all stockholder rights, powers, or privileges of the undersigned.

This proxy automatically revokes any Proxy previously granted by the undersigned. This Proxy shall remain in force and full effect for a period of six (6) months from the date of execution.

Dated this 5th day of July, 2016.

_____
Signature

Printed Name: Donald Townshend

# BAKKEN RESOURCES, INC.

## PROXY

The undersigned, _Floyd Short_, a stockholder of Bakken Resources, Inc., ("BRI" or "Corporation"), a Nevada corporation, hereby appoint Allan Holms, as Proxy for the undersigned, with full power of substitution. In so doing, I hereby authorize Allan Holms, without limitation: (1) to vote on behalf of the undersigned all shares of common stock of the corporation held or owned by the undersigned stockholder at any annual or special meeting of stockholders of the Corporation; 2) to express consent or dissent to corporate actions in writing without a meeting; and (3) to exercise in Allan Holms' sole discretion any and all stockholder rights, powers, or privileges of the undersigned.

This proxy automatically revokes any Proxy previously granted by the undersigned. This Proxy shall remain in force and full effect for a period of six (6) months from the date of execution.

Dated this 7th day of July, 2016.

_Floyd Short_
Signature

Printed Name: _Floyd Short_

07/13/2016 12:20PM FAX  8667520086          FINANCE DEPARTMENT,WCT              ☎ 0002/0002

## BAKKEN RESOURCES, Inc.

### Proxy

The undersigned, Kent Jensen, a shareholder of Bakken Resource, Inc., ("BRI" or "Corporation"), a Nevada corporation, owning 250,000 shares of Common Stock represented by certificate number 245, herby appoint Allan Holms as Proxy for the undersigned, with full power of substitution.  On so doing, I hereby authorize Allan Holms, without limitation:

    (1)  to vote on behalf of the undersigned all shares of common stock of the corporation held or owned by the undersigned shareholder at any annual  or special meeting of shareholders of the Corporation;

    (2)  to express consent or dissent to corporate action in writing without a meeting;

    (3)  to exercise in Allan Holms; sol discretion any and all stockholder rights, powers, or privileges of the undersigned.

This proxy automatically revokes any Proxy previously granted by the undersigned.  This proxy shall remain in force and full affect for a period of six (6) months form the date of the execution.

Dated this 10th day of July, 2016

_____

Signature

Kent Jensen, shareholder

# BAKKEN RESOURCES, INC.

## PROXY

The undersigned, Peter Schmid, a stockholder of Bakken Resources, Inc., ("BRI" or "Corporation"), a Nevada corporation, owing 300,000 shares of Common Stock represented by certificate(s) number(s) 310, 311 and 312, hereby appoint Allan Holms as Proxy for the undersigned, with full power of substitution. In so doing, I hereby authorize Allan Holms, without limitation: (1) to vote on behalf of the undersigned all shares of common stock of the corporation held or owned by the undersigned stockholder at any annual or special meeting of stockholders of the Corporation; 2) to express consent or dissent to corporate actions in writing without a meeting; and (3) to exercise in Allan Holms' sole discretion any and all stockholder rights, powers, or privileges of the undersigned.

This proxy automatically revokes any Proxy previously granted by the undersigned. This Proxy shall remain in force and full effect for a period of six (6) months from the date of execution.

Dated this 5th day of July, 2016.

For and on behalf of
PETER SWAN INVESTMENT-CONSULTING LIMITED

_____
Authorized Signature(s)

Signature

Printed Name: Peter Schmid

# BAKKEN RESOURCES, INC.
## PROXY

The undersigned, Alyson Graiwer, a stockholder of Bakken Resources, Inc., ("BRI" or "Corporation"), a Nevada corporation, owing 30,000 shares of Common Stock represented by certificate(s) number(s) 129 and 176, hereby appoint Allan Holms as Proxy for the undersigned, with full power of substitution. In so doing, I hereby authorize Allan Holms, without limitation; (1) to vote on behalf of the undersigned all shares of common stock of the corporation held or owned by the undersigned stockholder at any annual or special meeting of stockholders of the Corporation; 2) to express consent or dissent to corporate actions in writing without a meeting; and (3) to exercise in Allan Holms' sole discretion any and all stockholder rights, powers, or privileges of the undersigned.

This proxy automatically revokes any Proxy previously granted by the undersigned. This Proxy shall remain in force and full effect for a period of six (6) months from the date of execution.

Dated this 14th day of July, 2016.

Signature

Printed Name: Alyson Graiwer

# BAKKEN RESOURCES, INC.

## STOCKHOLDER ACTION BY WRITTEN CONSENT

## WITHOUT A MEETING

### July 1/2 2016

The undersigned Stockholders, as the holders of a majority of the shares of common stock of Bakken Resources, Inc. ("Bakken Resources" or the "Corporation"), and pursuant to Section 2.10 of the Bylaws, do hereby consent to the taking of the following actions without a meeting:

## ELECTION OF SUCCESSOR DIRECTORS

WHEREAS, Section 3.3 of the Bylaws requires that *"directors shall be elected at an annual meeting of stockholders"*;

WHEREAS, Section 2.1 of the Bylaws provides that *"[t]he annual meeting of stockholders shall be held each year within 180 days of the end of the prior fiscal year, on a date and at a time designated by the board of directors or as otherwise determined by the board of directors"*;

WHEREAS, since November 2014, the current Board of Directors has failed or refused to hold an Annual Meeting of Stockholders as required by the plain language of the Bylaws;

WHEREAS, the current Board of Directors is comprised of six incumbent Directors and one vacant directorship;

WHEREAS, the six incumbent Directors' terms of office have expired;

WHEREAS, no Directors have been elected by the Stockholders since November 2014, despite expiration of the incumbent Directors' terms, successors having not been qualified and elected pursuant to Section 3.3 of the Bylaws; and

WHEREAS, it is in the best interests of the Corporation and its Stockholders that three Successor Directors be elected to the Board of Directors and that four directorships remain vacant;

THEREFORE, the undersigned Stockholders expressly consent to elect the following Successor Directors, with four directorships to remain vacant:

ALLAN G. HOLMS, Spokane, Washington
TODD JENSEN, Boise, Idaho
ALLEN COLLINS, Pocatello, Idaho

The Board of Directors may fix the time and place of its first meeting.

By executing this *Stockholder Action by Written Consent Without a Meeting*, the undersigned Stockholders do indicate and affirm their consent to this Stockholder Action.

IN WITNESS WHEREOF, the undersigned have executed and delivered to the Corporation this *Stockholder Action by Written Consent Without a Meeting* as of the date first above written.

Stockholder: Arthur R. Tyrrell
Certificate No.: 224
Total Number of Shares: 500,000
By: Allan Holms, proxy

Stockholder: Dylan Underhill
Certificate No.: 305
Total Number of Shares: 80,000
By: Allan Holms, proxy

Stockholder: Brender Services Limited
Certificate No.: 200
Total Number of Shares: 800,000
By: Allan Holms, proxy

Stockholder: Jeffrey J. Greenman
Certificate No.: 227
Total Number of Shares: 100,000
By: Allan Holms, proxy

Stockholder: Philip and Debra Sobol Trust
Certificate No.: 219
Total Number of Shares: 200,000
By: Allan Holms, proxy

Total Number of Shares Voted: 1,680,000

Page 2 of 2

# BAKKEN RESOURCES, INC.

## PROXY

The undersigned, _ARTHUR R TYRRELL_, a stockholder of Bakken Resources, Inc., ("BRI" or "Corporation"), a Nevada corporation, hereby appoint Allan Holms as Proxy for the undersigned, with full power of substitution. In so doing, I hereby authorize Allan Holms, without limitation; (1) to vote on behalf of the undersigned all shares of common stock of the corporation held or owned by the undersigned stockholder at any annual or special meeting of stockholders of the Corporation; 2) to express consent or dissent to corporate actions in writing without a meeting; and (3) to exercise in Allan Holms' sole discretion any and all stockholder rights, powers, or privileges of the undersigned.

This proxy automatically revokes any Proxy previously granted by the undersigned. This Proxy shall remain in force and full effect for a period of six (6) months from the date of execution.

Dated this ~~X~~ 12 day of July, 2016.

Signature

Printed Name: _ARTHUR R TYRRELL_



The undersigned, a Stockholder of [...]
[...] with respect to [...] 30,000 shares of [...]
[...] does hereby appoint Allan Holms [...]
[...] In so doing, I hereby authorize Allan Holms [...]
[...] the undersigned all shares of common stock of [...]
[...] stockholder at any annual or special meeting of [...]
[...] to express consent or dissent to corporate action in [...]
[...] exercise in Allan Holms' sole discretion any and all [...]
[...] the undersigned.

This proxy automatically revokes any Proxy previously granted by [...]
[...] shall remain in force and full effect for a period of six (6) [...]
[...] hours.

[...] this 5th day of July, 2016.

_____
Signature

Printed Name [...]

# BAKKEN RESOURCES, INC.

## PROXY

The undersigned, Brender Services Limited, a stockholder of Bakken Resources, Inc., ("BRI" or "Corporation"), a Nevada corporation, hereby appoint Allan Holms as Proxy for the undersigned, with full power of substitution. In so doing, I hereby authorize Allan Holms, without limitation: (1) to vote on behalf of the undersigned all shares of common stock of the corporation held or owned by the undersigned stockholder at any annual or special meeting of stockholders of the Corporation; 2) to express consent or dissent to corporate actions in writing without a meeting; and (3) to exercise in Allan Holms' sole discretion any and all stockholder rights, powers, or privileges of the undersigned.

This proxy automatically revokes any Proxy previously granted by the undersigned. This Proxy shall remain in force and full effect for a period of six (6) months from the date of execution.

Dated this 5th day of July, 2015.

For and on behalf of
BRENDER SERVICES LIMITED

_____     _____
Signature                                  *Authorized Signature(s)*

Printed Name: Wong Wah On Z_____

# BAKKEN RESOURCES, INC.

## PROXY

The undersigned, _Jeffrey J. Greenman_ a stockholder of Bakken Resources, Inc., ("BRI" or "Corporation"), a Nevada corporation, hereby appoint Allan Holms as Proxy for the undersigned, with full power of substitation.  In so doing, I hereby authorize Allan Holms, without limitation; (1) to vote on behalf of the undersigned all shares of common stock of the corporation held or owned by the undersigned stockholder at any annual or special meeting of stockholders of the Corporation; 2) to express consent or dissent to corporate actions in writing without a meeting; and (3) to exercise in Allan Holms' sole discretion any and all stockholder rights, powers, or privileges of the undersigned.

This proxy automatically revokes any Proxy previously granted by the undersigned.  This Proxy shall remain in force and full effect for a period of six (6) months from the date of execution.

Dated this 5th day of July, 2016.

Signature _____

Printed Name: _JEFFREY  J. GREENMAN_

# BAKKEN RESOURCES, INC.

## PROXY

The undersigned, Philip and Debra Sobal Trust, a stockholder of Bakken Resources, Inc., ("BRI" or "Corporation"), a Nevada corporation, owing 200,000 shares of Common Stock represented by certificate(s) number(s) 219, hereby appoint Allan Holms as Proxy for the undersigned, with full power of substitution. In so doing, I hereby authorize Allan Holms, without limitation; (1) to vote on behalf of the undersigned all shares of common stock of the corporation held or owned by the undersigned stockholder at any annual or special meeting of stockholders of the Corporation; 2) to express consent or dissent to corporate actions in writing without a meeting; and (3) to exercise in Allan Holms' sole discretion any and all stockholder rights, powers, or privileges of the undersigned.

This proxy automatically revokes any Proxy previously granted by the undersigned. This Proxy shall remain in force and full effect for a period of six (6) months from the date of execution.

Dated this 6ᵗʰ day of July, 2016.

Signature

Printed Name: _Philip A Sobol, M.D._

# RESOLUTION OF THE BOARD OF DIRECTORS

## OF

## BAKKEN RESOURCES, INC.

We, the undersigned, being the Directors of Bakken Resources, Inc. ("BRI" or the "Company"), hereby take the following actions and adopt the following resolutions pursuant to Chapter 78 of Nevada Revised Statutes on Private Corporations, the Articles of Incorporation, and the Bylaws of the Company:

## TERMINATION OF EMPLOYMENT

RESOLVED, that the employment of Dan Anderson should be and is in fact terminated, effective immediately, and removed from the BRI business premises.

FURTHER RESOLVED, that the employment of Karen Midtlyng should be and is in fact terminated, effective immediately, and removed from the BRI business premises.

## REMOVAL OF OFFICERS

RESOLVED, that the following individuals are unanimously removed from the corporate office or position set forth opposite their names:

DAN ANDERSON            Chief Financial Officer/Acting President
KAREN MIDTLYNG          Secretary

## TERMINATION OF LEGAL COUNSEL

RESOLVED, that the Company's interests are best served by retaining new corporate legal counsel;

FURTHER RESOLVED, that Wesley J. Paul should be and is in fact terminated as Corporate Counsel, effective immediately;

FURTHER RESOLVED, that the Company shall give notice to any and all outside counsel/trial counsel currently retained and/or employed by the Company that the Company terminated former Corporate Counsel Wesley J. Paul.

## ELECTION OF OFFICERS

RESOLVED, that the following individuals are unanimously elected to the corporate office or position set forth opposite their names, to serve until the next Annual Meeting of the Stockholders and/or the elections and qualifications of their successors:

| | |
|---|---|
| ALLAN G. HOLMS | President/Chairman of the Board |
| TODD JENSEN | Vice-President/Secretary |
| ALLEN COLLINS | Treasurer/Chief Financial Officer |

## NOTIFICATION TO STOCKHOLDERS

RESOLVED, that Section 2.10 of the Bylaws provides: "*Prompt notice of the taking of the corporate action without a meeting by less than unanimous consent shall be given to those stockholders who have not consented in writing.*"

FURTHER RESOLVED, that the current Board of Directors was elected by less than unanimous consent pursuant to a *Stockholder Action By Written Consent Without A Meeting* (the "Consent");

FURTHER RESOLVED, that the Secretary of the Company is directed to provide the required Notice to Stockholders in a prompt and timely manner.

## AUTHORIZATION TO SIGN CONTRACTS

RESOLVED, that Allan G. Holms is authorized to enter into any contract or execute any instrument in the name of and on behalf of the corporation.

## AUTHORIZATION FOR BANKING

The following resolutions with regard to banking authorities are adopted:

RESOLVED, that Allan G. Holms is authorized and directed to close any and all of the Company's now-existing banking account(s) as soon as is practicable;

FURTHER RESOLVED, that Allan G. Holms is authorized and directed to re-establish such banking account(s) at such institutions as he selects, in his sole discretion;

FURTHER RESOLVED, that Allan G. Holms is authorized to establish, close, and/or re-establish any and all such banking account(s) and other banking

relationships as he deems advisable, at any time and from time to time, at such institutions as he selects, in his sole discretion;

FURTHER RESOLVED, that Allan G. Holms is authorized to execute, in the name of and on behalf of the Corporation, any form of authorization of corporate signatures or signature card required by any such banking institution in order to establish such account(s), and any resolutions set forth in any such form, when so executed shall be deemed to have been adopted by the Board of Directors of the Corporation;

FURTHER RESOLVED, that Allan G. Holms is authorized to sign or endorse all checks, drafts, other orders for payment of money, notes or other evidences of indebtedness that are issued in the name of or payable to the corporation.

## AUTHORIZATION TO OBTAIN FINANCING

RESOLVED, that Allan G. Holms is hereby authorized and directed to identify, evaluate, and investigate available and appropriate sources of financing for the Company, including but not limited to lending institution(s) or private equity fund(s);

FURTHER RESOLVED, that Allan G. Holms is hereby authorized and directed to negotiate with and accept financing from any such individual or entity, including but not limited to lending institution(s) or private equity fund(s), as he shall, in his sole discretion deem appropriate and advisable.

## APPOINTMENT OF NEW LEGAL COUNSEL

RESOLVED, that Allan G. Holms is authorized and directed to retain Dunn & Black, P.S., 111 N. Post St., Ste. 300, Spokane, Washington 99201 as Corporate Counsel to the Company.

## REVIEW OF PENDING LITIGATION

RESOLVED, that the history, status, and necessity of the Company's active litigation, if any, should be reviewed to determine whether the interests of the Company and its Stockholders are best served by continued litigation;

FURTHER RESOLVED, that to allow sufficient time to complete such a review, it is in the best interest of the Company and its Stockholders to institute a "Litigation Hold" with respect to any and all active litigation involving the Company;

Page 3 of 5

FURTHER RESOLVED, that any and all outside counsel/trial counsel currently retained or employed by the Company shall be instructed to observe a "Litigation Hold" with respect to the Company's active litigation to allow sufficient time for the Company to complete the desired review.

## AUTHORIZATION TO WITHDRAW CERTIFICATE OF DESIGNATION

RESOLVED, that on or about May 6, 2016, former Acting President and Chief Financial Officer Dan Anderson, caused to be filed with the Nevada Secretary of State a purported Certificate of Designation in an effort to authorize the issuance of shares of "Series A Preferred" stock;

FURTHER RESOLVED, that former Acting President and Chief Financial Officer Dan Anderson filed the purported Certificate of Designation without informing, seeking, or receiving the consent and approval of the Company's Stockholders;

FURTHER RESOLVED, that the Company specifically reserved *"all rights, abilities, and authority conferrable to its officers or directors, as the case may be, under the provisions of NRS § 78.1955 to amend or cancel this Certificate of Designation to the extent permitted under such law...";*

FURTHER RESOLVED, that the previously-filed Certificate of Designation expressly provided that *"any relevant amendment or cancellation contemplated under the referenced statute may be affected (sic) by a future resolution filed with or referenced in a filing submitted to the Secretary of State of the State of Nevada along with any appropriate form or other required document";*

FURTHER RESOLVED, that the interests of the Company and its Stockholders would be and are in fact damaged by the designation and/or issuance of any shares of "Series A Preferred" stock;

FURTHER RESOLVED, that Allan G. Holms is hereby authorized and directed to take such action as he in his sole discretion determines after reasonable inquiry to be in the best interest of the Company and its Stockholders, including but not limited to filing with the Nevada Secretary of State a *Certificate of Withdrawal of Certificate of Designation.*

## OMNIBUS RESOLUTION

RESOLVED, that subject to the foregoing resolutions, the appropriate officers of this Company are authorized and directed to take all actions and do all other acts which they, in their sole discretion, deem appropriate and advisable in order to

Page 4 of 5

accomplish and carry out the intent of the foregoing resolutions or to advance the best interests of the Company and its Stockholders;

FURTHER RESOLVED, that any and all such actions taken by the appropriate officers of this Company should be and are in fact ratified, confirmed, approved, and adopted as the official acts and deeds of the Company.

IN WITNESS WHEREOF, this Resolution of the Board of Directors of Bakken Resources, Inc. was executed, adopted, and filed this _____ day of July, 2016.


_____
ALLAN G. HOLMS
Director, Bakken Resources, Inc.

_____
TODD JENSEN
Director, Bakken Resources, Inc.


_____
ALLEN COLLINS
Director, Bakken Resources, Inc.


Page 5 of 5

July 20, 2016

Wells Fargo Bank
Helena, MT

Re:   Bakken Resources, Inc.

To Whom It May Concern:

I am the duly authorized president of Bakken Resources, Inc. (the "Company"), as evidenced by the attached.

This is to inform you that the Board terminated the employment of the Company's previous Chief Financial Officer/Acting President Dan Anderson and the former Corporate Secretary Karen Midtlyng and removed them as officers of the Company.

As an officer of the Company, it is my duty to ensure that the interests of the Company and its shareholders are protected. Accordingly, I have been authorized and directed by the Board:

- "[T]o close any and all of the Company's now-existing banking account(s) as soon as is practicable";

- "[T]o re-establish such banking account(s)";

- "[T]o execute, in the name of and on behalf of the Corporation, any form of authorization of corporate signatures or signature card required by any such banking institution in order to establish such account(s)"; and

- "[T]o sign or endorse all checks, drafts, other orders for payment of money, notes or other evidences of indebtedness that are issued in the name of or payable to the corporation."

Accordingly, you are requested to:

1.  Cancel any and all existing debit and/or credit cards issued on the Corporation's account(s), including but not limited to any debit and/or credit cards issued to Dan Anderson and/or Karen Midtlyng, effective immediately.

2.  Remove all previously authorized signatories on any and all of the Corporation's account(s), including but not limited to Dan Anderson and/or Karen Midtlyng.

Very truly yours,


ALLAN G. HOLMS
President, Bakken Resources, Inc.

July 20, 2016

Mr. Wesley J. Paul
Paul Law Group, LLP
41 Madison Avenue, 25th Floor
New York, New York 10010

   Re: Bakken Resources, Inc.

Dear Mr. Paul:

  Bakken Resources, Inc. ("BRI" or the "Company") has determined that it is in its interests to terminate your legal services and representation, effective immediately.

  Therefore, please prepare the Company's complete client file, including but not limited to any and all client documents, communications, emails, notes, reports, memoranda, correspondence, research, and all other documents related to your representation of BRI.   To protect the Company's interests, you are additionally requested to provide a Litigation Summary identifying any pending litigation involving BRI. Further, the Company requires a full and final accounting from you, including the Company's written engagement letter, fee agreement, and itemized monthly billing statements, plus a refund of any unearned advance fee.

  You are to deliver the Company's client files, Litigation Summary, and final accounting by no later than noon on Friday, August 5, 2016 to:

  Bakken Resources, Inc.
  c/o Dunn & Black, P.S.
  111 N. Post St., Ste. 300
  Spokane, WA 99201

  Be advised that the Company will not waive its attorney-client privilege or consent to any disclosure by you of BRI's confidential information.  Indeed, you are expected to

Mr. Wesley J. Paul
July 20, 2016
Page 2

fully and promptly comply with your ethical and fiduciary obligations to the Company as
your former client.

Regards,


ALLAN G. HOLMS
Director, Bakken Resources, Inc.


TODD JENSEN
Director, Bakken Resources, Inc.


ALLEN COLLINS
Director, Bakken Resources, Inc.

July 20, 2016

Mr. Dan Anderson
Bakken Resources, Inc.
825 Great Northern Blvd., # 304
Helena, Montana 59601

Dear Mr. Anderson:

 Effective immediately, your employment with Bakken Resources, Inc. is terminated. You are to immediately relinquish your keys, key cards, telephone, business credit card, and any other Corporation property in your possession to the officer who has served you with this notice. Additionally, you are to promptly vacate the premises and henceforth are not authorized to be on the premises in the future at any time for any reason.


ALLAN G. HOLMS
Director, Bakken Resources, Inc.

TODD JENSEN
Director, Bakken Resources, Inc.


ALLEN COLLINS
Director, Bakken Resources, Inc.

July 20, 2016

Ms. Karen Midtlyng
Bakken Resources, Inc.
825 Great Northern Blvd., # 304
Helena, Montana 59601

Dear Ms. Midtlyng:

Effective immediately, your employment with Bakken Resources, Inc. is terminated. You are to immediately relinquish your keys, key cards, telephone, business credit card, and any other Corporation property in your possession to the officer who has served you with this notice. Additionally, you are to promptly vacate the premises and henceforth are not authorized to be on the premises in the future at any time for any reason.

ALLAN G. HOLMS
Director, Bakken Resources, Inc.

TODD JENSEN
Director, Bakken Resources, Inc.

ALLEN COLLINS
Director, Bakken Resources, Inc.

July 20, 2016

Ms. Amanda Cardinalli
Nevada Agency and Transfer Company
50 West Liberty St., Ste. 880
Reno, NV 89501

      Re:   Bakken Resources, Inc.

Dear Ms. Cardinalli:

      This is to advise you of certain recent changes at Bakken Resources, Inc. ("BRI" or the "Company"). First, the Company terminated former Corporate Counsel Wesley J. Paul. Because Mr. Paul no longer represents BRI, you are to have no further contact with him or his firm regarding the Company. In addition, the Company appointed new corporate officers. Please provide a new Signature Form for the Company's stock certificates and confirm that you have updated BRI's Company Information Form to reflect those changes.

      Thank you in advance for your full cooperation in this matter.

                  Regards,


ALLAN G. HOLMS             TODD JENSEN
Director, Bakken Resources, Inc.     Director, Bakken Resources, Inc.


                         ALLEN COLLINS
                         Director, Bakken Resources, Inc.

July 20, 2016

Mr. Oliver H. Goe
Browning, Kaleczyc, Berry, & Hoven, P.C.
800 North Last Chance Gulch, Ste. 101
P.O. Box 1697
Helena, MT 59624

Re:   <u>Bakken Resources, Inc. v. ProLand Services, LLC</u>, et al, U.S.D.C. for
      the District of Montana Case No. 6:15-cv-65-SEH
      <u>Bakken Resources, Inc. v. Val M. Holms</u>, Lewis & Clark County
      (Montana) District Court Case No. CDV-2015-954

Dear Mr. Goe:

This is notice to you that Bakken Resources, Inc. ("BRI" or the "Company") is instituting a "Litigation Hold" effective immediately with respect to any and all pending litigation involving BRI, including but not limited to the above-captioned matters. This requires you to cease any work effort or services that you are presently engaged in on behalf of BRI.

Further, be advised that the Company terminated former Corporate Counsel Wesley J. Paul. Because Mr. Paul no longer represents BRI, you are to have no further contact with him or his firm regarding any matters relating to your representation of the Company.

Thank you in advance for your full cooperation in this matter.

Regards,

ALLAN G. HOLMS                          TODD JENSEN
Director, Bakken Resources, Inc.        Director, Bakken Resources, Inc.


                                        ALLEN COLLINS
                                        Director, Bakken Resources, Inc.

July 20, 2016

Mr. Paul J. Anderson
Maupin, Cox & LeGoy, PC
P.O. Box 30000
Reno, NV 89520

Re:   <u>Graiwer, et al v. Holms, et al</u>, Washoe County (Nevada) District Court
      Case No. CV14-00544; consolidated with
      <u>Holms v. Bakken Resources, Inc.</u>, Washoe County (Nevada) District
      Court Case No. CF16-01086

Dear Mr. Anderson:

This is notice to you that Bakken Resources, Inc. ("BRI" or the "Company") is instituting a "Litigation Hold" effective immediately with respect to any and all pending litigation involving BRI, including but not limited to the above-captioned matters. This requires you to cease any work effort or services that you are presently engaged in on behalf of BRI.

Further, be advised that the Company terminated former Corporate Counsel Wesley J. Paul. Because Mr. Paul no longer represents BRI, you are to have no further contact with him or his firm regarding any matters relating to your representation of the Company.

Thank you in advance for your full cooperation in this matter.

Regards,

ALLAN G. HOLMS
Director, Bakken Resources, Inc.

TODD JENSEN
Director, Bakken Resources, Inc.

ALLEN COLLINS
Director, Bakken Resources, Inc.

July 20, 2016

Mr. Matthew C. Addison
McDonald Carano Wilson LLP
100 West Liberty St., 10th Floor
Reno, NV 89501

Re:   <u>Graiwer, et al v. Holms, et al</u>, Washoe County (Nevada) District Court
       Case No. CV14-00544; consolidated with
       <u>Holms v. Bakken Resources, Inc.</u>, Washoe County (Nevada) District
       Court Case No. CF16-01086

Dear Mr. Addison:

This is notice to you that Bakken Resources, Inc. ("BRI" or the "Company") is instituting a "Litigation Hold" effective immediately with respect to any and all pending litigation involving BRI, including but not limited to the above-captioned matters. This requires you to cease any work effort or services that you are presently engaged in on behalf of BRI.

Further, be advised that the Company terminated former Corporate Counsel Wesley J. Paul. Because Mr. Paul no longer represents BRI, you are to have no further contact with him or his firm regarding any matters relating to your representation of the Company.

Thank you in advance for your full cooperation in this matter.

Regards,

_____
ALLAN G. HOLMS
Director, Bakken Resources, Inc.

_____
TODD JENSEN
Director, Bakken Resources, Inc.

_____
ALLEN COLLINS
Director, Bakken Resources, Inc.

July 20, 2016

Mr. Robert F. Greer
Feltman, Gebhardt, Greer Zeinmantz, P.S.
421 West Riverside Ave., Ste. 1400
Spokane, WA 99201

Re:   **Roil Energy, LLC, et al v. Edington, et al**, Spokane County
(Washington) Superior Court Case No. 12-2-01039-5

Dear Mr. Greer:

This is notice to you that Bakken Resources, Inc. ("BRI" or the "Company") is instituting a "Litigation Hold" effective immediately with respect to any and all pending litigation involving BRI, including but not limited to the above-captioned matters. This requires you to cease any work effort or services that you are presently engaged in on behalf of BRI.

Further, be advised that the Company terminated former Corporate Counsel Wesley J. Paul. Because Mr. Paul no longer represents BRI, you are to have no further contact with him or his firm regarding any matters relating to your representation of the Company.

Thank you in advance for your full cooperation in this matter.

Regards,

ALLAN G. HOLMS
Director, Bakken Resources, Inc.

TODD JENSEN
Director, Bakken Resources, Inc.

ALLEN COLLINS
Director, Bakken Resources, Inc.

F I L E D
Electronically
CV17-00360
2017-02-21 11:25:21 AM
Jacqueline Bryant
Clerk of the Court
Transaction # 5958775 : csulezic

# EXHIBIT 7

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

# EXHIBIT 7

Matthew H. O'Neill
O'NEILL LAW OFFICE, PLLC
402 First Street East, Suite 201
P. O. Box 699
Polson, MT 59860
Telephone:   (406) 883-5444
Facsimile:    (406) 883-1585
matt@polsonlaw.com

Attorney for Personal Representative

CLERK OF THE
DISTRICT COURT
LYN FRICKER

2016 DEC 29 PM 1 47

FILED BY _____
CLERK / DEPUTY

COPY

MONTANA TWENTIETH JUDICIAL DISTRICT COURT, LAKE COUNTY

| | |
|---|---|
| IN THE MATTER OF ) | Cause No. DP-16-__63__ |
| THE ESTATE OF ) | |
| ) | HON. DEBORAH KIM CHRISTOPHER |
| VAL M. HOLMS, ) | |
| ) | ORDER OF INFORMAL |
| Deceased. ) | PROBATE OF WILL, AND FOR |
| ) | APPOINTMENT OF A |
| ) | PERSONAL REPRESENTATIVE. |

Application having been made for the informal probate of the Will of the above-named decedent and for appointment of Personal Representative having come before the Court, and it appearing that the application is complete and contains the applicant's oath or affirmation that the statements contained therein are true to the best of his knowledge and belief, the following Findings are made based upon said application:

1.     The decedent died December 24, 2016, and at least 120 hours have elapsed since his death.

2.     Applicant is an interested person as defined by 72-1-103 M.C.A. and is entitled to appointment by nomination pursuant to Section 72-3-502(1), M.C.A.

3.     Application is complete and verified as required by law.

4.     Venue is proper for the reason stated therein.

5.    The unrevoked Will and Codicile of the decedent are in the Court's possession, and appear in all respects to be the valid Last Will and Testament of the decedent.

6.    Any notice required by Section 72-3-106, M.C.A. has been given, and said application is not within Section 72-3-213(2-5), M.C.A.

7.    The time limit for original probate has not expired.

8.    A personal representative has not been appointed in this or any other county of the State of Montana, and neither the Will, which is the subject of the application, nor any other Will of the decedent, has been the subject of a previous probate order.

9.    Applicant has priority under the law which entitles him to act as Personal Representative of the decedent's Will and estate for the reason stated in the application, and no reason to the contrary appears upon the record.

NOW THEREFORE, Based upon the foregoing Findings, IT IS HEREBY ORDERED That:

I.

The application for informal probate is hereby granted, and the Will of the above-named decedent executed October 28, 2016 is hereby admitted to informal probate as the valid Last Will and Testament of the decedent;

II.

Application for informal appointment of a Personal Representative is hereby granted, and JAMES MADSON HOLMS is hereby appointed as Personal Representative of the Will and Estate of the above-named decedent, without bond; and

III.

LETTERS Shall issue to the said Personal Representative, upon his qualification and acceptance.

DATED this 29th day of December, 2016.

LYN FRICKER
CLERK OF THE DISTRICT COURT

(COURT SEAL)

By:  MARY RENSVOLD

---

Order of Informal Probate                                    Page 3 of 3

F I L E D
Electronically
CV17-00360
2017-02-21 11:25:21 AM
Jacqueline Bryant
Clerk of the Court
Transaction # 5958775 : csulezic

# EXHIBIT 8

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

# EXHIBIT 8

AUPIN, COX & LeGOY
ATTORNEYS AT LAW
P.O. BOX 30000
RENO, NEVADA 89520
(775) 827-2000

| FORM 5 | | | |
|---|---|---|---|
| ☐ Check box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. See Instruction 1(b). | | | |

**Form 3 Holdings Reported**
**Form 4 Transactions Reported**

<table>
<tr><td colspan="4">OMB APPROVAL</td></tr>
<tr><td colspan="4">OMB Number:    3235-0362</td></tr>
<tr><td colspan="4">Estimated average burden hours per response. . . . . 1.0</td></tr>
</table>

## UNITED STATES SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## ANNUAL STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934
or Section 30(h) of the Investment Company Act of 1940

| 1. Name and Address of Reporting Person* | 2. Issuer Name and Ticker or Trading Symbol | 5. Relationship of Reporting Person(s) to Issuer |
|---|---|---|
| Holms Allan G. | BAKKEN RESOURCES INC          BKKH | (Check all applicable) |

**(Last)    (First)    (Middle)**
1314 S. GRAND AVE.
STE #2-112
**(Street)**
SPOKANE WA 99201
**(City)    (State)    (Zip)**

| 3. Statement for Issuer's Fiscal Year Ended (Month/Day/Year) | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|
| 12/31/2016 | X Director    X 10% Owner |
| 4. If Amendment, Date Original Filed (Month/Day/Year) | X Officer (give    Other (specify title below)    below) |
| | President |

6. Individual or Joint/Group Reporting
(check applicable line)
X Form Filed by One Reporting Person
___ Form Filed by More than One Reporting Person

### Table I -- Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned at end of Issuer's Fiscal Year (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|
| | | | Code | Amount | (A) or (D) | Price | | | |
| Common Stock | 8/1/2016 | | P5 | 13,217,500 | A | $10,000 (1) | 26,590,000 | I | 2 (2) |
| Common Stock | 12/10/2016 | | P5 | 13,217,500 | A | $3,088,000 (3) | 26,590,000 | I | 4 (4) |

**Reminder:** Report on a separate line for each class of securities beneficially owned directly or indirectly.
* If the form is filed by more than one reporting person, see Instruction 4(b)(v).

Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB control number.

SEC2270(9-02)

FORM 5 (continued)

Table II — Derivative Securities Acquired, Disposed of, or Beneficially Owned
(e.g., puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 4) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned at End of Issuer's Fiscal Year (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |

Explanation of Responses:

See attached "FOOTNOTES" page.

** Intentional misstatements or omissions of facts constitute Federal Criminal Violations.
See 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed.
If space provided is insufficient, see Instruction 6 for procedure.

Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB control number.

Richard A Repp by Power of Attorney    2/13/2017
** Signature of Reporting Person    Date

SEC 2270 (9-02)

Page 2 of 3

FORM 5 (continued)

# FOOTNOTES

1 (1) Mr. Holms acquired 13,117,500 shares of Issuer Common Stock from Val Holms pursuant to a representation agreement by and among Allan Holms, Val Holms, Mari Holms and Doubek, Pyfer, & Fox, LLP dated August 1, 2016 (the "Representation Agreement") and Irrevocable Stock/Bond Power Forms executed by Val Holms for the stock certificates dated December 10, 2016 (the "Stock Powers"). Pursuant to the Representation Agreement. Allan Holms received the shares in exchange for payment to legal counsel of a $10,000 retainer and agreeing to pay legal fees incurred by Val, and agreeing to split with Val and Mari Holms any recovery in the case of Bakken Resources, et al. vs. Holms, et al. and related litigation, which final amount has not yet been determined.

2 (2) See Footnote #1.

3 (3) Allan Holms acquired an additional 13,117,500 shares of Issuer Common Stock previously held by Val Holms pursuant to an Assignment Agreement by and between Val Holms and Allan Holms dated December 10, 2016 (the "Assignment Agreement") and Stock Powers executed by Val Holms on December 10, 2016 in consideration for Allan Holm's agreement to a global release of all Val Holm's obligations to Allan Holms, including obligations as of December 10, 2016 valued at $1,058,000 plus a release of any past and future claims that may arise in the future, including payment of future legal fees incurred by Val in the case of Bakken Resources, et al. vs. Holms, et al. and related litigation, which final amount has not yet been determined.

4 (4) See Footnote #3.

F I L E D
Electronically
CV17-00360
2017-02-21 11:25:21 AM
Jacqueline Bryant
Clerk of the Court
Transaction # 5958775 : csulezic

# EXHIBIT 9

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

# EXHIBIT 9

AUPIN, COX & LeGOY
ATTORNEYS AT LAW
P.O. BOX 30000
RENO, NEVADA 89520
(775) 827-2000

CUSIP No. 05758P107

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## SCHEDULE 13D

### Under the Securities Exchange Act of 1934

# Bakken Resources, Inc.
#### (Name of Issuer)

**Common**
**(Title of Class of Securities)**

**05758P107**
**(CUSIP Number)**

**Allan G. Holms**
**1314 S. Grand, Ste #2-112**
**Spokane, WA 99201**
**(509) 979-5688**
**(Name, Address and Telephone Number of Person Authorized to Receive Notices and Communications)**

**August 1, 2016**
**(Date of Event which Requires Filing of this Statement)**

If the filing person has previously filed a statement on Schedule 13G to report the acquisition that is the subject of this Schedule 13D, and is filing this schedule because of §§ 240.13d-1(e), 240.13d-1(f) or 240.13d-1(g), check the following box.  ☐

Note: Schedules filed in paper format shall include a signed original and five copies of the schedule, including all exhibits. See §240.13d-7 for other parties to whom copies are to be sent.

\*    The remainder of this cover page shall be filled out for a reporting person's initial filing on this form with respect to the subject class of securities, and for any subsequent amendment containing information which would alter disclosures provided in a prior cover page.

The information required on the remainder of this cover page shall not be deemed to be "filed" for the purpose of Section 18 of the Securities Exchange Act of 1934 ("Act") or otherwise subject to the liabilities of that section of the Act but shall be subject to all other provisions of the Act (however, see the Notes).

CUSIP No. 05758P107

| 1) | NAMES OF REPORTING PERSONS<br><br>Allan G. Holms | | |
|---|---|---|---|
| 2) | CHECK THE APPROPRIATE BOX IF A MEMBER OF A GROUP (See Instructions)<br>(a) ☐    (b) ☒ | | |
| 3) | SEC USE ONLY | | |
| 4) | SOURCE OF FUNDS (See Instructions)<br><br>PF | | |
| 5) | CHECK IF DISCLOSURE OF LEGAL PROCEEDINGS IS REQUIRED PURSUANT TO ITEMS 2(d) or 2(e)   ☐ | | |
| 6) | CITIZENSHIP OR PLACE OF ORGANIZATION<br><br>U.S.A. | | |
| NUMBER OF SHARES BENEFICIALLY OWNED BY EACH REPORTING PERSON WITH | 7) | SOLE VOTING POWER<br><br>26,590,000 | |
| | 8) | SHARED VOTING POWER<br><br>0 | |
| | 9) | SOLE DISPOSITIVE POWER<br><br>26,590,000 | |
| | 10) | SHARED DISPOSITIVE POWER<br><br>0 | |
| 11) | AGGREGATE AMOUNT BENEFICIALLY OWNED BY EACH REPORTING PERSON<br><br>26,590,000 | | |
| 12) | CHECK IF THE AGGREGATE AMOUNT IN ROW (11) EXCLUDES CERTAIN SHARES (See Instructions)   ☐ | | |
| 13) | PERCENT OF CLASS REPRESENTED BY AMOUNT IN ROW (11)<br><br>46.87% | | |
| 14) | TYPE OF REPORTING PERSON (See Instructions)<br><br>IN | | |

1

CUSIP No. 05758P107

**Item 1.    Security and Issuer.**

This statement relates to the common stock, having no par value, (the "Common Stock") of Bakken Resources, Inc. (the "Company" or "Issuer"). The principal executive office of the Company is 825 Great Northern Boulevard, Expedition Block, Suite 304 Helena, MT 59601.

**Item 2.    Identity and Background.**

This Schedule 13D is being filed by:

(a)  Allan G. Holms in his individual capacity.

(b)  The address of Mr. Holms is 1314 S. Grand, Ste #2-112, Spokane, WA 99201

(c)  Mr. Holms is a private business owner and investor.

(d)  During the last five years, Mr. Holms has not been convicted in a criminal proceeding (excluding traffic violations and similar misdemeanors).

(e)  During the last five years, Mr. Holms has not been a party to a civil proceeding of a judicial or administrative body of competent jurisdiction that resulted in a judgment, decree or final order enjoining future violations of or prohibiting or mandating activities subject to federal or state securities laws or finding any violation with respect to such laws.

(f)  Mr. Holms is a citizen of the United States of America.

**Item 3.    Source and Amount of Funds or Other Consideration.**

Mr. Holms acquired 355,000 shares of Issuer Common Stock from Jay Eddington pursuant to a Release Agreement by and between Mr. Holms and Mr. Eddington dated October 31, 2014.

Mr. Holms acquired 13,117,500 shares of Issuer Common Stock from Val Holms pursuant to a representation agreement by and among Allan Holms, Val Holms, Mari Holms and Doubek, Pyfer, & Fox, LLP dated August 1, 2016 (the "Representation Agreement") and Irrevocable Stock/Bond Power Forms executed by Val Holms for the stock certificates dated December 10, 2016 (the "Stock Powers"). Pursuant to the Representation Agreement, Allan Holms received the shares in exchange for payment to legal counsel of a $10,000 retainer and agreeing to pay legal fees incurred by Val, and agreeing to split with Val and Mari Holms any recovery in the case of Bakken Resources, et al. vs. Holms, et al. and related litigation, which final amount has not yet been determined.

Allan Holms acquired an additional 13,117,500 shares of Issuer Common Stock previously held by Val Holms pursuant to an Assignment Agreement by and between Val Holms and Allan Holms dated December 10, 2016 (the "Assignment Agreement") and Stock Powers executed by Val Holms on December 10, 2016 in consideration for Allan Holm's agreement to a global release of all Val Holm's obligations to Allan Holms, including obligations as of December 10, 2016 valued at $1,088,000 plus a release of any past and future claims that may arise in the future, including payment of future legal fees incurred by Val in the case of Bakken Resources, et al. vs. Holms, et al. and related litigation, which final amount has not yet been determined.

The source of Mr. Holm's funds for the above referenced transactions was his personal savings.

**Item 4.    Purpose of the Transaction.**

Mr. Holms purchased the shares of the Issuer's Common Stock for investment purposes. It is also Mr. Holm's intent to assert he should be recognized as a member of the Issuer's Board of Directors and officer of the Company pursuant to the prior efforts of certain shareholders of the Issuer to remove the Issuer's prior Board of Directors and appoint Mr. Holms and two other individuals to serve as the Issuer's Board of Directors and to appoint Mr. Holms as President of the Company.

On July 20, 2016, Mr. Holms executed a Shareholder Action by Written Consent Without a Meeting (the "Consent") appointing himself, and two other individuals as directors of the Issuer. Mr. Holms executed the Consent on behalf of himself and as proxy for two other shareholders of the Issuer holding an aggregate of 31,505,000 shares of Issuer Common Stock. The validity of the Consent and the present constitution of the Issuer's Board of Directors and executive management is currently the subject of ongoing litigation.

2

CUSIP No. 05758P107

**Item 5.    Interest in Securities of the Issuer.**

The responses of Mr. Holms to rows (7) through (13) of the cover pages of this Schedule 13D are incorporated herein by reference.

(a)    According to the Company, the total number of outstanding shares of the Common Stock as of September 29, 2016 was 56,735,350. As of the date of this filing, Mr. Holms, may be deemed to beneficially own, as that term is defined in Rule 13d-3 under the Securities Exchange Act, an aggregate of 26,590,000 shares of Common Stock, which represents approximately 46.87% of the shares of Common Stock outstanding.

(b)    Mr. Holms, has sole voting power with regard to 26,590,000 shares of Common Stock, which represents approximately 46.87% of the shares of Common Stock outstanding.

(c)    The responses of Mr. Holms to Item 3 above is incorporated by reference herein.

Allan Holms acquired 13,117,500 shares of Issuer Common Stock previously held by Val Holms pursuant to the Assignment Agreement and Stock Powers executed by Val Holms on December 10, 2016 in consideration for Allan Holm's agreement to a global release of all Val Holm's obligations to Allan Holms, including obligations as of December 10, 2016 valued at $1,088,000 plus a release of any past and future claims that may arise in the future, including payment of future legal fees incurred by Val in the case of Bakken Resources, et al. vs. Holms, et al. and related litigation, which final amount has not yet been determined.

(d)    To the knowledge of Mr. Holms, no person other has the right to receive or the power to direct the receipt of dividends from, or proceeds from the sale of, the Common Stock that is the subject of this Schedule 13D.

(e)    Not applicable.

**Item 6.    Contracts, Arrangements, Understandings or Relationships with Respect to Securities of the Issuer.**

The responses of Mr. Holms to Item 3 above is incorporated by reference herein.

Except as described above or elsewhere in this Schedule 13D or incorporated by reference in this Schedule 13D, there are no contracts, arrangements, understandings or relationships (legal or otherwise) between Mr. Holms and any other person with respect to any securities of the Company, including, but not limited to, transfer or voting of any securities, finder's fees, joint ventures, loan or option arrangements, puts or calls, guarantees or profits, division of profits or losses, or the giving or withholding of proxies.

**Item 7.    Material to Be Filed as Exhibits**

n/a

3

CUSIP No. 05758P107

## SIGNATURE

After reasonable inquiry and to the best of my knowledge and belief, I certify that the information set forth in this statement is true, complete and correct.

Date: February 14, 2017

/s/ Allan G. Holms
Allan G. Holms

4

F I L E D
Electronically
CV17-00360
2017-02-21 11:25:21 AM
Jacqueline Bryant
Clerk of the Court
Transaction # 5958775 : csulezic

# EXHIBIT 10

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

# EXHIBIT 10

## Submission Data File

| General Information | |
|---|---|
| Form Type* | 8-K |
| Subject-Company File Number | |
| Subject-Company CIK | |
| Subject-Company Name | |
| Subject-Company IRS Number | |
| Contact Name | |
| Contact Phone | |
| Filer File Number | |
| Filer CIK* | 0001450390 (BAKKEN RESOURCES INC) |
| Filer CCC* | vk9yq$dn |
| Confirming Copy | No |
| Notify via Website only | No |
| Return Copy | No |
| Group Name | |
| Items* | 8.01 Other Events<br>9.01 Financial Statements and Exhibits |
| SROS* | NONE |
| Depositor CIK | |
| Depositor 33 File Number | |
| Fiscal Year | |
| Item Submission Type | |
| Period* | 02-13-2017 |
| ABS Asset Class Type | |
| ABS Sub Asset Class Type | |
| Sponsor CIK | |
| (End General Information) | |

| Document Information | |
|---|---|
| File Count* | 79 |
| Document Name 1* | bakken3213161-8k.htm |
| Document Type 1* | 8-K |
| Document Description 1 | Current Report |
| Document Name 2* | bakken3213161-ex991.htm |
| Document Type 2* | EX-99.1 |
| Document Description 2 | Allan Holms February 7, 2017 e-mail to Nevada Agency and Trust Company |
| Document Name 3* | bakken3213161-ex992.htm |
| Document Type 3* | EX-99.2 |
| Document Description 3 | February 9, 2017 e-mail from Washington Trust Bank's Counsel to Nevada Agency |
| Document Name 4* | bakken3213161-ex993.htm |
| Document Type 4* | EX-99.3 |
| Document Description 4 | February 14, 2017 e-mail with attachments from Bakken's corporate |
| Document Name 5* | bakken3213161-ex994.htm |
| Document Type 5* | EX-99.4 |
| Document Description 5 | Additional Paul Law Group e-mails dated February 14, 2017 to Witherspoon |
| Document Name 6* | bakken3213161-ex995.htm |
| Document Type 6* | EX-99.5 |
| Document Description 6 | Excerpted December 12, 2016 Montana hearing transcript extending Montana |
| Document Name 7* | bakken3213161-ex996.htm |
| Document Type 7* | EX-99.6 |
| Document Description 7 | November 1, 2016 Nevada court order extending Nevada restraining order |
| Document Name 8* | bakken3213161-ex997.htm |
| Document Type 8* | EX-99.7 |
| Document Description 8 | July 14, 2016 Nevada order dissolving Val Holms' temporary restraining order |
| Document Name 9* | bakken3213161-ex991x1.jpg |
| Document Type 9* | GRAPHIC |
| Document Description 9 | Graphic |
| Document Name 10* | bakken3213161-ex991x10x1.jpg |
| Document Type 10* | GRAPHIC |
| Document Description 10 | Graphic |
| Document Name 11* | bakken3213161-ex991x11x1.jpg |

| | |
|---|---|
| Document Type 11* | GRAPHIC |
| Document Description 11 | Graphic |
| Document Name 12* | bakken3213161-ex991x12x1.jpg |
| Document Type 12* | GRAPHIC |
| Document Description 12 | Graphic |
| Document Name 13* | bakken3213161-ex991x13x1.jpg |
| Document Type 13* | GRAPHIC |
| Document Description 13 | Graphic |
| Document Name 14* | bakken3213161-ex991x14x1.jpg |
| Document Type 14* | GRAPHIC |
| Document Description 14 | Graphic |
| Document Name 15* | bakken3213161-ex991x15x1.jpg |
| Document Type 15* | GRAPHIC |
| Document Description 15 | Graphic |
| Document Name 16* | bakken3213161-ex991x16x1.jpg |
| Document Type 16* | GRAPHIC |
| Document Description 16 | Graphic |
| Document Name 17* | bakken3213161-ex991x17x1.jpg |
| Document Type 17* | GRAPHIC |
| Document Description 17 | Graphic |
| Document Name 18* | bakken3213161-ex991x18x1.jpg |
| Document Type 18* | GRAPHIC |
| Document Description 18 | Graphic |
| Document Name 19* | bakken3213161-ex991x19x1.jpg |
| Document Type 19* | GRAPHIC |
| Document Description 19 | Graphic |
| Document Name 20* | bakken3213161-ex991x1x1.jpg |
| Document Type 20* | GRAPHIC |
| Document Description 20 | Graphic |
| Document Name 21* | bakken3213161-ex991x20x1.jpg |
| Document Type 21* | GRAPHIC |
| Document Description 21 | Graphic |
| Document Name 22* | bakken3213161-ex991x21x1.jpg |
| Document Type 22* | GRAPHIC |
| Document Description 22 | Graphic |
| Document Name 23* | bakken3213161-ex991x22x1.jpg |
| Document Type 23* | GRAPHIC |
| Document Description 23 | Graphic |
| Document Name 24* | bakken3213161-ex991x23x1.jpg |
| Document Type 24* | GRAPHIC |
| Document Description 24 | Graphic |
| Document Name 25* | bakken3213161-ex991x24x1.jpg |
| Document Type 25* | GRAPHIC |
| Document Description 25 | Graphic |
| Document Name 26* | bakken3213161-ex991x25x1.jpg |
| Document Type 26* | GRAPHIC |
| Document Description 26 | Graphic |
| Document Name 27* | bakken3213161-ex991x26x1.jpg |
| Document Type 27* | GRAPHIC |
| Document Description 27 | Graphic |
| Document Name 28* | bakken3213161-ex991x27x1.jpg |
| Document Type 28* | GRAPHIC |
| Document Description 28 | Graphic |
| Document Name 29* | bakken3213161-ex991x28x1.jpg |
| Document Type 29* | GRAPHIC |
| Document Description 29 | Graphic |
| Document Name 30* | bakken3213161-ex991x29x1.jpg |
| Document Type 30* | GRAPHIC |
| Document Description 30 | Graphic |
| Document Name 31* | bakken3213161-ex991x2x1.jpg |
| Document Type 31* | GRAPHIC |
| Document Description 31 | Graphic |
| Document Name 32* | bakken3213161-ex991x30x1.jpg |
| Document Type 32* | GRAPHIC |
| Document Description 32 | Graphic |
| Document Name 33* | bakken3213161-ex991x31x1.jpg |
| Document Type 33* | GRAPHIC |
| Document Description 33 | Graphic |
| Document Name 34* | bakken3213161-ex991x3x1.jpg |

| | |
|---|---|
| Document Description 34 | GRAPHIC |
| | Graphic |
| Document Name 35* | bakken3213161-ex991x4x1.jpg |
| Document Type 35* | GRAPHIC |
| Document Description 35 | Graphic |
| Document Name 36* | bakken3213161-ex991x5x1.jpg |
| Document Type 36* | GRAPHIC |
| Document Description 36 | Graphic |
| Document Name 37* | bakken3213161-ex991x6x1.jpg |
| Document Type 37* | GRAPHIC |
| Document Description 37 | Graphic |
| Document Name 38* | bakken3213161-ex991x7x1.jpg |
| Document Type 38* | GRAPHIC |
| Document Description 38 | Graphic |
| Document Name 39* | bakken3213161-ex991x8x1.jpg |
| Document Type 39* | GRAPHIC |
| Document Description 39 | Graphic |
| Document Name 40* | bakken3213161-ex991x9x1.jpg |
| Document Type 40* | GRAPHIC |
| Document Description 40 | Graphic |
| Document Name 41* | bakken3213161-ex992x1x1.jpg |
| Document Type 41* | GRAPHIC |
| Document Description 41 | Graphic |
| Document Name 42* | bakken3213161-ex993x10x1.jpg |
| Document Type 42* | GRAPHIC |
| Document Description 42 | Graphic |
| Document Name 43* | bakken3213161-ex993x11x1.jpg |
| Document Type 43* | GRAPHIC |
| Document Description 43 | Graphic |
| Document Name 44* | bakken3213161-ex993x12x1.jpg |
| Document Type 44* | GRAPHIC |
| Document Description 44 | Graphic |
| Document Name 45* | bakken3213161-ex993x13x1.jpg |
| Document Type 45* | GRAPHIC |
| Document Description 45 | Graphic |
| Document Name 46* | bakken3213161-ex993x14x1.jpg |
| Document Type 46* | GRAPHIC |
| Document Description 46 | Graphic |
| Document Name 47* | bakken3213161-ex993x1x1.jpg |
| Document Type 47* | GRAPHIC |
| Document Description 47 | Graphic |
| Document Name 48* | bakken3213161-ex993x2x1.jpg |
| Document Type 48* | GRAPHIC |
| Document Description 48 | Graphic |
| Document Name 49* | bakken3213161-ex993x3x1.jpg |
| Document Type 49* | GRAPHIC |
| Document Description 49 | Graphic |
| Document Name 50* | bakken3213161-ex993x4x1.jpg |
| Document Type 50* | GRAPHIC |
| Document Description 50 | Graphic |
| Document Name 51* | bakken3213161-ex993x5x1.jpg |
| Document Type 51* | GRAPHIC |
| Document Description 51 | Graphic |
| Document Name 52* | bakken3213161-ex993x6x1.jpg |
| Document Type 52* | GRAPHIC |
| Document Description 52 | Graphic |
| Document Name 53* | bakken3213161-ex993x7x1.jpg |
| Document Type 53* | GRAPHIC |
| Document Description 53 | Graphic |
| Document Name 54* | bakken3213161-ex993x8x1.jpg |
| Document Type 54* | GRAPHIC |
| Document Description 54 | Graphic |
| Document Name 55* | bakken3213161-ex993x9x1.jpg |
| Document Type 55* | GRAPHIC |
| Document Description 55 | Graphic |
| Document Name 56* | bakken3213161-ex994x1x1.jpg |
| Document Type 56* | GRAPHIC |
| Document Description 56 | Graphic |
| Document Name 57* | bakken3213161-ex994x2x1.jpg |

| | |
|---|---|
| | GRAPHIC |
| Document Description 57 | Graphic |
| Document Name 58* | bakken3213161-ex994x3x1.jpg |
| Document Type 58* | GRAPHIC |
| Document Description 58 | Graphic |
| Document Name 59* | bakken3213161-ex994x4x1.jpg |
| Document Type 59* | GRAPHIC |
| Document Description 59 | Graphic |
| Document Name 60* | bakken3213161-ex995x1x1.jpg |
| Document Type 60* | GRAPHIC |
| Document Description 60 | Graphic |
| Document Name 61* | bakken3213161-ex995x2x1.jpg |
| Document Type 61* | GRAPHIC |
| Document Description 61 | Graphic |
| Document Name 62* | bakken3213161-ex995x3x1.jpg |
| Document Type 62* | GRAPHIC |
| Document Description 62 | Graphic |
| Document Name 63* | bakken3213161-ex995x4x1.jpg |
| Document Type 63* | GRAPHIC |
| Document Description 63 | Graphic |
| Document Name 64* | bakken3213161-ex995x5x1.jpg |
| Document Type 64* | GRAPHIC |
| Document Description 64 | Graphic |
| Document Name 65* | bakken3213161-ex996x1x1.jpg |
| Document Type 65* | GRAPHIC |
| Document Description 65 | Graphic |
| Document Name 66* | bakken3213161-ex996x2x1.jpg |
| Document Type 66* | GRAPHIC |
| Document Description 66 | Graphic |
| Document Name 67* | bakken3213161-ex996x3x1.jpg |
| Document Type 67* | GRAPHIC |
| Document Description 67 | Graphic |
| Document Name 68* | bakken3213161-ex996x4x1.jpg |
| Document Type 68* | GRAPHIC |
| Document Description 68 | Graphic |
| Document Name 69* | bakken3213161-ex996x5x1.jpg |
| Document Type 69* | GRAPHIC |
| Document Description 69 | Graphic |
| Document Name 70* | bakken3213161-ex996x6x1.jpg |
| Document Type 70* | GRAPHIC |
| Document Description 70 | Graphic |
| Document Name 71* | bakken3213161-ex996x7x1.jpg |
| Document Type 71* | GRAPHIC |
| Document Description 71 | Graphic |
| Document Name 72* | bakken3213161-ex996x8x1.jpg |
| Document Type 72* | GRAPHIC |
| Document Description 72 | Graphic |
| Document Name 73* | bakken3213161-ex996x9x1.jpg |
| Document Type 73* | GRAPHIC |
| Document Description 73 | Graphic |
| Document Name 74* | bakken3213161-ex997x1x1.jpg |
| Document Type 74* | GRAPHIC |
| Document Description 74 | Graphic |
| Document Name 75* | bakken3213161-ex997x2x1.jpg |
| Document Type 75* | GRAPHIC |
| Document Description 75 | Graphic |
| Document Name 76* | bakken3213161-ex997x3x1.jpg |
| Document Type 76* | GRAPHIC |
| Document Description 76 | Graphic |
| Document Name 77* | bakken3213161-ex997x4x1.jpg |
| Document Type 77* | GRAPHIC |
| Document Description 77 | Graphic |
| Document Name 78* | bakken3213161-ex997x5x1.jpg |
| Document Type 78* | GRAPHIC |
| Document Description 78 | Graphic |
| Document Name 79* | bakken3213161-ex997x6x1.jpg |
| Document Type 79* | GRAPHIC |
| Document Description 79 | Graphic |
| | (End Document Information) |

| Notifications | |
|---|---|
| Notify via Website only | No |
| E-mail 1 | manila.production@dg3.com |
| E-mail 2 | us.print@dg3.com |
| (End Notifications) | |

| DG3 Production Team | Bakken Resources, Inc. | 02/17/2017 06:23 AM |
| 321316(1) - Rev 1 | 8-K | bakken3213161-8k.htm, Seq: 1 |

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

### FORM 8-K

### CURRENT REPORT

Pursuant to Section 13 or 15(d) of
the Securities Exchange Act of 1934

Date of Report (Date of earliest event reported): **February 13, 2017**

## Bakken Resources, Inc.
(Exact name of registrant specified in charter)

| Nevada | 000-53632 | 26-2973652 |
| (State of Incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

**825 Great Northern Boulevard, Expedition Block, Suite 304, Helena, MT 59601**
(Address of principal executive offices, including Zip Code)

**(406) 442-9444**
Issuer's Telephone Number

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instruction A.2. below):

[   ] Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

[   ] Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

[   ] Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

[   ] Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 8.01 Other Events**

Bakken Resources, Inc. ("Bakken," the "Company," "us," "we," "our") issues this Current Report on Form 8-K in order to disavow two recent filings on Form 5 and Schedule 13D submitted by a Bakken shareholder named Allan Holms on February 13 and February 14 of 2017, respectively. Allan Holms' filings improperly report that he acquired the 26,235,000 common shares from his recently deceased half-brother, Val M. Holms, by means of two transactions during the second half of 2016. These purported transactions took place following our May 5, 2016 announcement on Form 8-K, that our board terminated Val M. Holms as CEO for cause in part due to findings that he took a $200,000 kickback of company funds through his unauthorized activity. Allan Holms' Form 5 and Schedule 13D filings in question also improperly identify Allan Holms as a director and officer of the Company, and the Company has concerns regarding authenticity of the stock power documentation underlying Allan Holms' purported transactions. The Company requested that Allan Holms withdraw the Form 5 and Schedule 13D (or take similar action) filings by the close of business on February 16, 2017, and Allan Holms has not done so.

Allan Holms' Recent Filings

The recent Form 5 and Schedule 13D improperly report Allan Holm accumulated 46.24% of our common stock in 26,236,000 shares from his half-brother Val M. Holms, also indicating that Allan Holms is both a director and officer of the Company. The Company does not recognize the purported transactions, nor does it recognize Allan Holms as a director or an officer. Each filing is explained below, followed by some of our reasons for disavowing them both.

*Form 5 filed February 13, 2017*

Allan Holms' Form 5, filed February 13, 2017, indicates that Allan Holms became an officer, director, and an owner of the Company holding more than 10% following two transactions that transferred all 26,235,000 of Bakken common stock previously owned by Val M. Holms. Those two transactions are said to stem from: (1) an August 1, 2016 Representation Agreement for Val M. Holms to transfer 13,117,500 common shares to his half-brother Allan Holms, and (2) a December 10, 2016 Assignment Agreement for Val M. Holms to transfer his remaining 13,117,000 common shares to his half-brother Allan Holms. As consideration for the first transfer, Allan Holms hired a law firm with a $10,000 retainer for his half-brother Val M. Holms and agreed to split any amount the firm might recover. Allan's Form 5 did not disclose any definite payment beyond $10,000, meaning that Allan Holms' up front cost to acquire Val's first 13,117,000 shares was roughly eight-one-hundredths of a cent ($0.00076) per share. Bakken's stock was quoted at $0.13 on the date of the first transfer on August 1, 2016. As consideration for the second transfer, Allan Holms reportedly forgave a $1,088,000 debt owed by his half-brother Val M. Holms and generally released Val M. Holms from any past or future liability surrounding certain ongoing litigation. The Form 5 disclosed no definite payment beyond forgiving $1,088,000, meaning that Allan Holms' up front cost to acquire the remaining 13,117,000 shares was roughly eight cents ($0.0829) per share. Bakken's stock was quoted at $0.14 a day before the second transfer on December 10, 2016. For all 26,235,000 shares, Allan Holms' average up front cost was roughly four cents ($0.0419). Substantially all of the consideration relies upon the existence of an alleged debt owed by one half-brother (Val M. Holms) to another (Allan Holms). The Company has no supporting documentation to evidence this debt, and Allan Holms' counsel claims that he lacks authority to provide it.

*Schedule 13D filed February 14, 2017*

Allan Holms' Schedule 13D, filed February 14, 2017, discloses the same information as his Form 5 but also provides further information. The Schedule 13D indicates that Allan paid for Val M. Holms' shares with personal funds, and that Allan Holms also previously acquired 355,000 shares from Jay Edington with personal funds on October 31, 2014. Item 5 of Allan's Schedule 13D indicates that the purpose of these transactions was to replace our board with Allan and two others, which would then appoint Allan "as president of the Company." The apparent basis for this claimed purpose was Allan's attempted takeover of the Company on July 20, 2016, which we disclosed in a Current Report on Form 8-K filed July 26, 2016. As described in that Current Report, Allan Holms attempted takeover constituted triggering events under existing financing agreements that allowed one of our investors/lenders, Eagle Private Equity ("Eagle"), to exercise certain rights to obtain 600,000 shares of our Series A Preferred Stock, which has the voting power of 60 million shares of our common stock.

<u>Why the Company Disavows Allan Holms' Recent Form 5 and Schedule 13D</u>

Bakken does not recognize the validity of Allan Holms' purported transfers, nor does the Company recognize that Allan Holms was legally permitted to attempt such transfers in the first place. As described below, we question validity because the Medallion Signatures underlying documentation of both transfers cannot be verified, and we question legal permissibility to execute such transactions because injunctions from Nevada and Montana courts forbade such activity.

*Medallion Transfer Guarantee*

Both the Form 5 and Schedule 13D in question indicate that the two disclosed transactions relied on Stock Powers documents dated December 10, 2016. Each of the Stock Powers contained a Medallion Signature Guarantee mark. Such marks are part of widely-recognized programs – the Medallion Signature Guarantee programs – in which many American and Canadian transfer agent and financial institution participates. The purpose of these programs is to ensure authenticity and prevent fraud in the transfer of securities. Participating financial institutions will mark documents with special ink and thereby guaranty authenticity or else indemnify losses resulting from fraud.

Like most American transfer agents, our transfer agent – Nevada Agency and Transfer Company ("NATCO") – requires a Medallion Signature Guarantee mark in order to process the kind of transfer that Allan Holms requested. The Medallion Signature Guarantee mark that Allan Holms provided to NATCO in early February of 2017 appeared to have been guaranteed by Washington Trust Bank ("WTB"). However, a letter from WTB's in-house counsel dated February 9, 2017 stated: "This is to confirm that WTB is unable to verify the Medallion Stamps on the Holms transaction." As of this filing, Allan Holms has not addressed this issue, and he has provided NATCO with no alternative documentation permitting NATCO to execute the transfers that Allan Holms reported in his Form 5 and Schedule 13D filings.

*Outstanding Injunctions*

Had Allan Holms provided NATCO with acceptable documentation, he would have done so in violation of outstanding injunctions issued by the Montana and, possibly, Nevada state courts.

| DG3 Production Team | Bakken Resources, Inc. | 02/17/2017 08:23 AM |
| 321316(1) - Rev 1 | 8-K | bakken3213161-8k.htm, Seq: 4 |

A Montana restraining order issued on July 22, 2016 remains in place against Allan and Val Holms.[1] It restrained Val M. Holms from taking any "action of any kind that could have a material detrimental impact on [Bakken's] business/operations." Val transferring 26,235,000 shares to Allan Holms in order to replace our board and management directly violated this restraint. The order also restrains, in relevant part, Allan Holms from "taking any actions on behalf of [Bakken] including attempts to replace [Bakken's] Board, Corporate Officers or [Bakken's] attorneys," from "representing to any person or entity that [he is a] Director of [Bakken] with authority to conduct business or take actions on behalf of [Bakken]," from "attempting to act on behalf of [Bakken] in any manner whatsoever," and from "taking any actions that could affect the business/operations of [Bakken] in any respect." Allan Holms' recent filings directly violate these restraints. The Form 5 and Schedule 13D was an assertion of Allan's role as a director and officer with authority to act on behalf of the Company, and replacing both the board and management would clearly have an effect on our business operations.

A Nevada restraining order was also issued on July 22, 2016 and also remains in place.[2] Allan Holms' disclosures in this Form 5 and Schedule 13D is directly at odds with an existing Nevada restraining order where the Nevada court rules that "…the 60,000,000 [voting] shares held by Eagle Private Equity are the majority of voting shares of all BRI stock… and thus renders the subject takeover attempt ineffectual."

The same Nevada court also ruled in the Company's favor on June 27, 2016 concerning the Eagle transaction.[3] After briefing, a day of argument, and testimony from the Company's CFO, Dan Anderson, and Eagle's principal, Carl George, the Nevada court issued a preliminary injunction in favor of the Company. Based on part upon finding Mr. Anderson's and Mr. George's testimony "credible and persuasive," the court found that the Eagle transaction was in the best interests of the Company under the presumptions set forth in Nevada's business judgment rule. The Nevada court, in so granting the Company's preliminary injunction, dissolved an earlier temporary restraining order that it had granted in favor of Val Holms in the same case.

**Item 9.01     Financial Statements and Exhibits.**

(d)     Exhibits

Exhibit 99.1     Allan Holms February 7, 2017 e-mail to Nevada Agency and Trust Company (with attachments)

Exhibit 99.2     February 9, 2017 e-mail from Washington Trust Bank's Counsel to Nevada Agency Trust and Company

Exhibit 99.3     February 14, 2017 e-mail with attachments from Bakken's corporate and securities counsel (Paul Law Group) to Allan Holms' counsel (Witherspoon Kelly)

Exhibit 99.4     Additional Paul Law Group e-mails dated February 14, 2017 to Witherspoon Kelley

Exhibit 99.5     Excerpted December 12, 2016 Montana hearing transcript extending Montana restraining order to present

Exhibit 99.6     November 1, 2016 Nevada court order extending Nevada restraining order to present

Exhibit 99.7     July 14, 2016 Nevada order dissolving Val Holms' temporary restraining order issued against the Company regarding the transaction with Eagle Private Equity

---

[1] On July 22, 2016 a Montana court issued a temporary restraining order against both Val and Allan Holms in response to Allan Holms' attempted takeover on July 20, 2016. *Bakken Resources Inc. v. Holms*, Case No. CDV-2016-612, State of Montana, First Judicial District, Lewis and Clark County. The court then extended the restraining order on August 9, 2016. *Id.*, Case No. CDV-2016-612, p. 138, transcript of proceedings (referencing the temporary restraining order to indicate that the court will "leave everything in place until we get the briefs in."). The court then again extended the restraining order on December 20, 2016. *Id.*, Case No. CDV-2016-612, p. 40-42, transcript of proceedings (discussing the restraining order in question, the court declared that it wants "to keep everything – the goal here is to keep everything in place, [to keep] the status quo in place."). There have been no further proceedings in Montana to decide Bakken's restraining order against Val and Allan.

[2] The Nevada restraining order issued on July 22, 2016. *Holms v. Bakken Resources Inc. et. al.*, State of Nevada, Second Judicial District, Washoe County, Case No. CV16-01086 (July 22, 2016), consolidated with *Graiwer v. Holms*, State of Nevada, Second Judicial District, Washoe County, Case No. CV14-00544. The Nevada court then extended its restraining order indefinitely on November 1, 2016 pending resolution of trial later in 2017. *Id.*, Case No. CV14-00544, p. 2-3 (extending the temporary restraining order against Allan "though and including a formal decision following trial on the merits. . . ").

[3] See *Graiwer v. Holms*, State of Nevada, Second Judicial District, Washoe County, Case No. CV14-00544, June 27, 2016.

| DG3 Production Team | Bakken Resources, Inc. | 02/17/2017 06:23 AM |
|---|---|---|
| 321316[1] - Rev 1 | 8-K | bakken3213161-8k.htm, Seq: 5 |

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

Bakken Resources, Inc.

By: /s/ Dan Anderson

Dan Anderson
Chief Financial Officer
February 16, 2017

F I L E D
Electronically
CV17-00360
2017-02-21 11:25:21 AM
Jacqueline Bryant
Clerk of the Court
Transaction # 5958775 : csulezic

# EXHIBIT 11

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

# EXHIBIT 11

AUPIN, COX & LeGOY
ATTORNEYS AT LAW
P.O. BOX 30000
RENO, NEVADA 89520
(775) 827-2000

# Robson Forensic
**THE EXPERTS**

MARK SONGER, D-ABFE, CFC
Forensic Examiner

Former FBI Special Agent and FBI Forensic Examiner who has examined hundreds of handwriting cases ranging from homicides to white collar crimes. Court qualified expert in the fields of Forensic Document Examinations and Crime Scene Reconstruction, having testified as an expert in both federal and state courts on numerous occasions.

## PROFESSIONAL EXPERIENCE

2013 to present
**Robson Forensic, Inc.**
*Associate*
Provide technical investigations, analysis, reports, and testimony toward the resolution of disputes and litigation related to disputed documents or signatures including: wills, checks, contracts, deeds, account ledgers, medical records, and autograph authentication. Investigation and analysis includes: questioned signatures, suspect documents, forgeries, identity theft, anonymous letters, alterations, obliterations, erasures, typewritten documents, altered medical records, graffiti, handwritten numbers, and computerized and handwritten documents.

2000 to present
**Songer Institute**
*CEO and Founder*
Created a team of dedicated educational professionals, furthering the fields of Criminal Justice, Forensic Science, Emergency Management, Homeland Security and Strategic Intelligence, by channeling the training and development of students and practitioners through a continuous improvement model of delivery and content.

1993 to 2000
**Federal Bureau of Investigation**
**White Collar Crimes Program, Los Angeles Division**
*Special Agent*
Designated handwriting expert for Evidence Response Team (ERT). Instructed numerous law enforcement officers and civilian examiners in handwriting identification as well as the collection of writing samples. Trained in Threat Assessment Analysis and Behavioral Profiling. Served as Relief Supervisory Agent for squad. Also assigned to various cases involving Foreign-Counter Intelligence (FCI), and Domestic Terrorism (DT).

**Questioned Documents Unit, FBI Headquarters**
*Forensic Examiner*
Trained under the tutelage of some of the world's best handwriting experts to include William Bodziak (OJ Simpson Case) and Richard Williams (SSA Williams was the examiner of record in such cases as the bombing of the *Oklahoma City Federal Building*, the *Vince Foster* suicide, the kidnapping/murder of Exxon Chief Executive *Sidney Reso*, the fraud by wire investigation of the former *President Ferdinand* and *First Lady Imelda Marcos* of the Philippines, the *Joey Buttafuoco/Amy Fisher* affair and the investigation and subsequent conviction of *Chief Justice Sol Wachtler* of the New York State Supreme Court). Conducted examinations on hundreds of cases to include

# Robson Forensic
THE EXPERTS

**MARK SONGER, D-ABFE, CFC**
Forensic Examiner

bank robbery notes, death threats to Congressional members and suicide letters. Conducted analysis on paper, typewriters, computer generated documents, faxes, printers, copiers, inks, indented writings, tracings, cut/pastes, simulations and disguised writings.

## OTHER EMPLOYMENT

2015 to present
**Colorado Technical University**
*Adjunct Faculty Member, Forensic Science Programs*
Teach course in Advanced Criminalistics. Responsible for providing quality instruction to students through well prepared classes, relevant assignments, fair and holistic assessment of learning, clear documentation of student progress and support of the academic success for at-risk students.

1993 to 2003
**University of California, National University**
*Adjunct Professor*
Taught undergraduate and graduate level courses in Forensic Science to include Document Examinations, Forensic Anatomy and Physiology, Forensic Pathology, Forensic Psychology, Crime Scene and Behavioral Analysis and Forensic Anthropology and the Identification of Human Remains.

## PROFESSIONAL CREDENTIALS

Certified Forensic Consultant, American College of Forensic Examiners Institute, 2014

## EDUCATION

Masters in Forensic Science, College of Letters and Sciences, San Diego, CA, National University.
Bachelors in Criminal Justice, Excelsior College, regionally accredited through the University of the State of New York (Courses completed during active military service.)

*Specialized Training:*
Footwear Impression, Certificate Phase II, Sirchie Education and Training, Youngsville, NC, October 2015
Footwear Impression, Certificate Phase I, Sirchie Education and Training, Youngsville, NC, July 2015
Applied Polarized Light Microscopy, McCrone Research Institute, August 2014
New Agents Training, FBI Academy, Quantico, VA
San Diego Sheriff's Academy, Class 82, Chula Vista, CA
FBI Post Blast School

# Robson Forensic
**THE EXPERTS**

MARK SONGER, D-ABFE, CFC
Forensic Examiner

FBI FCI/DT Training Courses
FBI Evidence Response Team /Rapid Deployment Team
FBI Handwriting Identification School for FBI Examiners
FBI Typewriter Identification Training
FBI Printing Examination Training
Rochester Institute of Technology – Course for FBI Document Examiners
INS Course on counterfeit documents
U.S. Secret Service QD Course

*Military Training:*
Nuclear, Biological and Chemical Warfare School, Camp Pendelton, CA
USMC Communications and Electronics School, 29 Palms, CA
Tactical Air Control Party (TACP)
Jungle Warfare School, Ft. Sherman, Panama
Jungle Land Navigation Course, NTA, Okinawa
Jungle Environmental Survival Training (JEST), Subic Bay, Philippines
USMC Mountain Warfare School, Bridgeport, CA

*Law Enforcement Training:*
Defensive and Operational Tactics
Arrest and Control Procedures
Operational Planning
Operation of Witnesses and Informants
Physical and Electronic Surveillance
Undercover Operations
Development and Dissemination of Intelligence

**MEMBERSHIPS**

American College of Forensic Examiners
Member (Voting) - ASTM E-30 Forensic Science Committee
International Association for Identification

**FORENSIC ACCOMPLISHMENTS**

Founder of the Songer Institute in partnership with Sorenson Forensics

# Robson Forensic
### THE EXPERTS

MARK SONGER, D-ABFE, CFC
Forensic Examiner

## PUBLICATIONS

Practical Applications in Forensic Science: Crime Ink Publishing, Coronado, CA (2nd Edition, 2015)

## TEACHING EXPERIENCE and ACCOMPLISHMENTS

Co-founder of the Bachelors of Science in Criminal Justice Program, La Sierra University

Created several notable Forensic Science Programs with several institutions to include the University of California and Marymount California University. Established the first Forensic Science studies curriculum for the Republic of the Philippines.

Former Adjunct Professor of Forensic Science, National University, San Diego, CA



**EXPERT'S REPORT**

**of the**

**Val M. Holms Document Examination**

**RFI Case # 17WA0008**

**By:**

Mark L. Songer

**February 15, 2017**

### VAL M. HOLMS DOCUMENT EXAMINATION

**EXPERT REPORT**                                                 **February 15, 2017**

## 1.  INTRODUCTION

Bakken Resources Inc. ("BRI") was notified by BRI's Nevada stock transfer agent, Nevada Agency and Trust Company (NATCO)on February 7, 2017, that Allan Holms, half-brother of former and now deceased BRI CEO Val Holms, was attempting to transfer Val Holms's BRI common stock shares into Allan's name.  Allan Holms provided NATCO with five photocopied stock certificates, five stock power forms purportedly stamped with a Washington Trust Bank Medallion Stamp (dated Saturday, December 10, 2016),  and an Assignment Agreement between Val Holms and Allan Holms.  All documents were purportedly signed by Val Holms.

On February 9, 2017, Washington Trust Bank's legal counsel informed NATCO that the bank would not honor the Medallion Guarantee.  Upon review with management and general counsel, the stock certificates provided to NATCO were photocopies and the signatures appeared to be questionable.  Since the circumstances surrounding this stock transfer were highly unusual, BRI felt it necessary to verify the authenticity of the documents and signatures.

I, Mark Songer, was retained to investigate this matter. The purpose of my investigation was to determine if 1) Val M. Holms prepared the purported "Val M. Holms" signatures appearing on Q1c-Q6c, and 2) if Q1c-Q6c contained any changes or modifications that have been added or deleted.

## 2.  AVAILABLE INFORMATION

2.1 [Q1c] Photocopy of Irrevocable Stock/Bond Power Form, Certificate "335", dated December 10, 2016, bearing the purported signature of "Val M. Holms".

2.2 [Q2c] Photocopy of Irrevocable Stock/Bond Power Form, Certificate "1342", dated December 10, 2016, bearing the purported signature of "Val M. Holms".

2.3 [Q3c] Photocopy of Common Stock Certificate, dated December 10, 2016, bearing the purported signature of "Val M. Holms".

2.4 [Q4c] Photocopy of Common Stock Certificate, dated December 10, 2016, bearing the purported signature of "Val M. Holms".

2.5 [Q5c] Photocopy of Common Stock Certificate, dated December 10, 2016, bearing the purported signature of "Val M. Holms".

2.6 [Q6c] Photocopy of Assignment Agreement, dated December 10, 2016, bearing the purported signature of "Val M. Holms".

2.7 [K1c] Photocopy of Bakken Resources, Inc. Proxy, dated July 7, 2016, bearing the purported signature  of "Val M. Holms".

2.8 [K2c] Color copy of Settlement Agreement and Mutual Release signature page, undated, bearing the signature "Val Holms".

2.9 [K3c-K4c] Photocopy of Bakken Resources Annual 10-K Filing, dated April 15, 2014, bearing the signatures of "Val M. Holms".

2.10 [K5c] Photocopy of Settlement Agreement and Mutual Release signature page, undated, bearing the signature "Val Holms".

2.11 [K6c] Photocopy of Last Will and Testament signature page, dated October 28, 2016, bearing the signature "Val M. Holms".



2.12 [K7c] Photocopy of Last Will and Testament notary page, dated October 28, 2016, bearing the signature "Val M. Holms".

2.13 [K8c] Photocopy of Contract, dated July 13, 2013, bearing the signature of "Val M. Holms".

2.14 [K9c] Photocopy of Valley Bank check, number 1005, dated July 13, 2013, bearing the signature of "Val M. Holms".

2.15 [K10c] Photocopy of Armstrong Operating Letter, dated April 6, 2011, bearing the signatures of "Val M. Holms".

2.16 [K11c] Photocopy of AAPL Operating Agreement, dated June 21, 2010, bearing the signature of "Val  M. Holms".

2.17 [K12c] Photocopy of Exploration Agreement, dated June 22, 2010, bearing the signature of "Val M. Holms".

2.18 [K13c] Photocopy of Integrated Agreement, dated March 3, 2011, bearing the signature of "Val  M. Holms".

2.19 [K14c] Photocopy of Three Forks Incorporated letter, dated January 14, 2014, bearing the signature of "Val  M. Holms".

2.20 [K15c] Photocopy of Agreement, undated, bearing the signature of "Val M. Holms".

2.21 [K16c] Photocopy of Wells Fargo signature card, dated May 22, 2014, bearing the signature of "Val M. Holms".

2.22 [K17c] Photocopy of Wells Fargo signature card, dated May 22, 2014, bearing the signature of "Val M. Holms".

2.23 [K18c] Photocopy of Wells Fargo signature card, dated May 22, 2014, bearing the signature of "Val M. Holms".

2.24 [K19c] Photocopy of Wells Fargo signature card, dated May 22, 2014, bearing the signature of "Val M. Holms".

2.25 [K20c] Photocopy of Wells Fargo signature card, dated May 22, 2014, bearing the signature of "Val M. Holms".

2.26 [K21c] Photocopy of Wells Fargo signature card, dated May 22, 2014, bearing the signature of "Val M. Holms".

2.27 [K22c] Photocopy of Wells Fargo signature card, dated May 22, 2014, bearing the signature of "Val M. Holms".

2.28 [K23c] Photocopy of Wells Fargo signature card, dated May 27, 2014, bearing the signature of "Val M. Holms".

2.29 [K24c] Photocopy of Wells Fargo signature card, dated May 22, 2014, bearing the signature of "Val M. Holms".

2.30 [K25c] Photocopy of Wells Fargo signature card, dated May 22, 2014, bearing the signature of "Val M. Holms".

2.31 [K26c] Photocopy of Wells Fargo check, dated May 3, 2011, bearing the signature of "Val M. Holms".

## 3.   THE WRITINGS INVOLVED IN THIS EXAMINATION

Documents Q1c through Q6c and K1c through K26c were submitted to me for examination by Dan Anderson, Chief Financial Officer with the Bakker Resources, Inc. It is my understanding that all the known documents provided to me are true and accurate representations of Val Holms's writing. For purposes of this investigation, documents are labeled as Known Documents or "K"s and Questioned Documents or "Q"s. The smaller case letter "c" denotes the document is a photocopy.



## 4.  METHODOLOGY

I conducted a laboratory examination of Q1c through Q6c, as well as photocopies of known documents labeled Kc1 through K26. The methodology used in my analysis is based on standards developed by professionals in the Forensic Document Examination discipline and guidelines published by the National Institute of Science and Technology's (NIST) Organization of Scientific Area Sub-Committee in Forensic Document Examinations (OSAC), as well as the Scientific Working Group for Forensic Document Examiners (SWGDOC). The aforementioned standards have been thoroughly studied through extensive scientific research and validated through rigorous peer review and publication. As a former FBI Agent and Document Examiner for over 22 years, I have found this methodology to be reliable and widely accepted in the field of forensic document examinations.

The fundamental principle of handwriting identification is based on the premise that no two writings are ever **exactly** alike. Handwriting is a complex motor skill consisting of sensory, neurological and physiological impulses. Through practice and repetition, writers interject their own individual characteristics into their writings which become a pattern of habitual formations that are repeated from one writing to the next. Given a sufficient quantity and quality of writing to compare, it can be demonstrated that no two writers share the same unique combination of handwriting characteristics. This is known as the principle of individuality which forms the basis for handwriting analysis. A writer's identity cannot be established through a single individual feature but rather, it is established through a combination of significant and unique identifying features absent of any significant differences.

In this case, I was provided with known Holms's writings which are represented as K1c through K26c. These known documents were compared to properly assess Holms's range of natural writing variation. After determining the writer's range of variation, individual letter form and other writing features appearing on the questioned documents (Q1c-Q6c) were examined and compared to the known samples (K1c-K26c). These include size, alignment, beginning and ending strokes, spacing of letters and words, letter form, line quality, fluency, rhythm and skill. My analysis was also conducted using various angles and slope measuring devices including Sirchie Templates 372H and 373H and visual techniques such as stereomicroscopy and infrared and ultra violet excitation.

It should be noted that limitations were present in this case due to the original questioned documents not being available for comparison at the time of my examination. However, in this case, image quality and resolution still yielded enough significant characteristics to support my findings in this report.

## 5.  ANALYSIS AND DISCUSSION

### Beginning Strokes

The beginning or entry strokes are the initial writing movements at the start of a letter or word. The type of beginning stroke and its location on the paper or surface varies greatly among writers.

I examined the occurrences of letters with beginning strokes within the questioned signatures (Q1c-Q6c), and found the "Val M. Holms" signatures (K1c-K26c) to be inconsistent with the beginning strokes found on the questioned entries.



[4]

**Ending Strokes**

The ending or terminals strokes are those that immediately follow the formation of a letter or word. Ending strokes can take many forms and can end in different locations.

I examined the occurrences of letters with ending strokes within the questioned entries signatures (Q1c-Q6c) and found the "Val M. Holms" signatures (K1c-K26c) to be inconsistent with the ending strokes found on the questioned entries.

**Letter Form**

Letter form is the shape of individual letters. To properly evaluate letter- form, the writer's natural range of variation must be assessed. This is done by dissecting each of the known writings, letter by letter, to determine all of the different ways in which the writer forms his/her lower and upper case letters. Next, the questioned writing is broken down into individual letters and each letter is compared to the sample of known writing to determine if the questioned letter- forms are within the known writer's range of natural variation. *"If the known and unknown writings contain a sufficient number of distinctive writing characteristics so that the likelihood of accidental coincidence can be eliminated, and provided no basic or fundamental differences exist between the two sets of writing, then it's safe to conclude that the questioned and specimen writings were written by the same person".* (Kelly and Lindblom, Scientific Examination of Questioned Documents 2006).

I examined the occurrences of letters pertaining to letter-form within the questioned signatures (Q1c-Q6c), and found the "Val M. Holms" writings (K1c-K26c) to be inconsistent and with Holms's writing variation.

**Analysis of Document**

All six questioned documents purport to have been executed on December 10, 2016 by "Val M. Holms". I conducted a side by side comparison of both Q1c and Q2c. I discovered that the hand printed entries *"Allan G. Holms, 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, common stock,* and *Bakken Resources, Inc."* were **identical** with one another, meaning that they were copies of one another. It should be noted that the medallion stamp images on both Q1c and Q2c appear to be consistent; however, due to some loss of detail in the "barcode" portion of the stamp, limitations were present in this segment of my examination.  My observations were confirmed by creating acetate transparencies of both Q1c-Q2c and overlaying those transparencies on top of one another by means of a transmitted light examination.  This technique illustrated complete alignment agreement in terms of content, arrangement, size, style and design. This finding contravenes the fundamental principle in handwriting identification that no two writings from any one individual will ever be **exactly** identical to another.

I also discerned that both Q1c and Q2c contained portions of writings that were completely different from one another and were **not** photocopied due to the presence of writing variations. The hand printed entries *"12/10/16, 6,235,000, 335,* and the purported signatures of *"Val M. Holms"* and *"Randy Casto"* appearing in Q1c, and the hand printed entries *"12/10/16, 5,000,000, 1342,* and the purported signatures of *"Val M. Holms"* and *"Randy Casto"* appearing on Q2c, were all prepared separately from one another.



Using the same methodology and laboratory techniques as applied in my examination of both Q1c and Q2c, it was observed that the printed entries *"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, Allan G. Holms, 1314 S. Grand Blvd #2-112,* and *Spokane, WA 99202"* appearing on Q3c-Q5c were **identical** with one another. Furthermore, it was noted that the entries *"12/10/16,* and the purported signatures of *"Val M. Holms"* and *"Randy Casto"* appearing on Q3c-Q5c were notably different and also contained writing variation.

In addition, the medallion stamp images on Q3c-Q5c appear to be consistent with one another, however, limitations were present due to the stamp's image quality.

## 6.   FINDINGS

Within the bounds of reasonable scientific certainty, and subject to change if additional information becomes available, it is my professional opinion that:

6.1   The occurrences of letters pertaining to beginning strokes within the questioned signatures (Q1c-Q6c) were inconsistent with the "Val M. Holms" signatures appearing on K1c-K26c.

6.2   The occurrences of letters pertaining to ending strokes within the questioned signatures (Q1c-Q6c) were inconsistent with the "Val M. Holms" signatures appearing on K1c-K26c.

6.3   The occurrences of letters pertaining to letter-form within the questioned signatures (Q1c-Q6c) were inconsistent with the "Val M. Holms" signatures appearing on K1c-K26c.

6.4   Val M. Holms, the writer of K1-K26c, did not write the "Val M. Holms" signatures appearing on Q1c-Q6c.

6.5   No natural variation exists in comparing the hand printed entries *"Allan G. Holms, 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, common stock,* and *Bakken Resources, Inc.",* appearing on both Q1c and Q2c. This is attributed to both writings being exactly **identical** to one another which indicates copier fabrication.

6.6   The hand printed entries *"12/10/16, 6,235,000, 335,* and the purported signatures of *"Val M. Holms"* and *"Randy Casto"* appearing in Q1c, are different from the entries *"12/10/16, 5,000,000, 1342",* and the purported signatures of *"Val M. Holms"* and *"Randy Casto"* appearing in Q2c, indicating both documents had been changed or modified.

6.7   No natural variation exists in comparing the hand printed entries *"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, Allan G. Holms, 1314 S. Grand Blvd #2-112,* and *Spokane, WA 99202"* appearing on Q3c-Q5c. This is attributed to both writings being exactly **identical** with one another which indicates copier fabrication.


Mark Songer
Forensic Document Examiner


**EXHIBITS**

I may use any or all of the documents listed in Section 2.0 of this Report as Exhibits. I may combine, enlarge, darken, overlay, bend, fold, and/or enhance the documents to illustrate the approach taken to arrive at my opinions.



[6]

## IRREVOCABLE STOCK/BOND POWER FORM

Date _12 10 15_

For value received, the Undersigned does (do) hereby sell, assign and transfer to

_ALLAN G. HOLMS_

|  | Taxpayer Identifying No. |
|---|---|
|  | _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_ |

**If Stock, complete this portion**

_1,350,000_ shares of the _COMMON_ stock of _BAKKEN RESOURCES INC._ represented by Certificate(s) No.(s) _335_ _____ inclusive, standing in the name of the undersigned on the books of said Company.

**If Bonds, complete this portion**

_____ bonds of _____ in the principal amount of $_____, No.(s)_____inclusive, standing in the name of the undersigned on the books of said Company.

The undersigned does (do) hereby irrevocably constitute and appoint _____

_____ attorney to transfer the said stock or bond(s), as

the case may be, on the books of said Company, with full power of substitution in the premises.

In Presence of                                                    _____(SEAL)

_____                          (Person executing this power signs here)
                                          **S I G N A T U R E   G U A R A N T E E D**

**IMPORTANT – READ CAREFULLY**

The signature(s) to this Power must correspond with the name(s) as written upon the face of the stock certificate(s) or bond(s), as the case may be, in every particular without alteration or enlargement or any change whatever.

(Name of Bank, Trust Company or Broker)

_____
(Official Signature)


**PLAINTIFF'S EXHIBIT**
_CD1c_

# IRREVOCABLE STOCK/BOND POWER FORM

Date _____

For value received, the Undersigned does (do) hereby sell, assign and transfer to

_ALLAN G. HOBBS_____

| | Taxpayer Identifying No. |
|---|---|
| | 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 |

**If Stock, complete this portion** { _____ shares of the _COMMON_ stock of _BAKKEN RESOURCES, INC._

represented by Certificate(s) No.(s) _1342_____ inclusive,

standing in the name of the undersigned on the books of said Company.

**If Bonds, complete this portion** { _____ bonds of _____

in the principal amount of $_____, No.(s)_____ inclusive,

standing in the name of the undersigned on the books of said Company.

The undersigned does (do) hereby irrevocably constitute and appoint _____

_____ attorney to transfer the said stock or bond(s), as the case may be, on the books of said Company, with full power of substitution in the premises.

In Presence of

_____ (SEAL)

(Person executing this power signs here)
SIGNATURE GUARANTEED

## IMPORTANT – READ CAREFULLY

The signature(s) to this Power must correspond with the name(s) as written upon the face of the stock certificate(s) or bond(s), as the case may be, in every particular without alteration or enlargement or any change whatever.

(Name of Bank, Trust Company or Broker)

(Official Signature)

PLAINTIFF'S EXHIBIT
02c

The following abbreviations, when used in the inscription of the face of this certificate, shall be construed as though they were written out in full according to applicable laws or regulations:

TEN COM — as tenants in common

TEN ENT — as tenants by the entireties

JT TEN — as joint tenants with right of survivorship and not as tenants in common

UNIF GIFT MIN ACT — _____ Custodian
(Cust)                    (Minor)
under Uniform Gifts to Minors Act

_____ _____
(State)

Additional abbreviations may also be used though not in the above list.

*For Value Received, _____ hereby sells, assigns and transfers unto*

PLEASE INSERT SOCIAL SECURITY
OR OTHER IDENTIFYING NUMBER

| 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 |

ALLAN G. HOLMS
(PLEASE PRINT OR TYPE NAME AND ADDRESS INCLUDING POSTAL ZIP CODE OF ASSIGNEE)

1314 S. GRAND BLVD #2-112

SPOKANE, WA 99202                          *Shares*

*of the Common Stock represented by this Certificate and hereby irrevocably constitues and appoints*

_____ *Attorney*

*to transfer the said stock on the books of the within-named Corporation with full power of substitution in the premises.*

*Dated* 12/10/10

NOTICE   THE SIGNATURE(S) TO THIS ASSIGNMENT MUST CORRESPOND WITH THE NAME(S) AS WRITTEN UPON THE FACE OF THIS CERTIFICATE, IN EVERY PARTICULAR, WITHOUT ALTERATION OR ENLARGEMENT OR ANY CHANGE WHATSOEVER.

SIGNATURE(S) GUARANTEED

NOTICE   THE SIGNATURE(S) SHOULD BE GUARANTEED BY AN ELIGIBLE GUARANTOR INSTITUTION, (BANKS, STOCKBROKERS, SAVINGS AND LOAN ASSOCIATION AND CREDIT UNIONS) WITH MEMBERSHIP IN AN APPROVED SIGNATURE GUARANTEE MEDALLION PROGRAM PURSUANT TO S.E.C. RULE 17Ad-15

PLAINTIFF'S
EXHIBIT

Q3c

The following abbreviations, when used in the inscription of the face of this certificate, shall be construed as though they were written out in full according to applicable laws or regulations:

TEN COM — as tenants in common

TEN ENT — as tenants by the entireties

JT TEN — as joint tenants with right of survivorship and not as tenants in common

UNIF GIFT MIN ACT — _____ Custodian _____
                              (Cust)              (Minor)
                    under Uniform Gifts to Minors Act

_____
(State)

Additional abbreviations may also be used though not in the above list.

*For Value Received,* _____ *hereby sells, assigns and transfers unto*

PLEASE INSERT SOCIAL SECURITY
OR OTHER IDENTIFYING NUMBER

┌─────────────────┐
│ 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 │
└─────────────────┘

*ALLAN G. ADAMS*
(PLEASE PRINT OR TYPE NAME AND ADDRESS INCLUDING POSTAL ZIP CODE OF ASSIGNEE)

*1314 S GRANT BLVD #2-112*

*SPOKANE, WA 99202* _____ *Shares*

*of the Common Stock represented by this Certificate and hereby irrevocably constitues and appoints*

_____ *Attorney*

*to transfer the said stock on the books of the within-named Corporation with full power of substitution in the premises.*

*Dated* ___2/20/16___

NOTICE   THE SIGNATURE(S) TO THIS ASSIGNMENT MUST CORRESPOND
WITH THE NAME(S) AS WRITTEN UPON THE FACE OF THE
CERTIFICATE IN EVERY PARTICULAR WITHOUT ALTERATION OR
ENLARGEMENT OR ANY CHANGE WHATSOEVER

SIGNATURE(S) GUARANTEED:

NOTICE   THE SIGNATURE(S) SHOULD BE GUARANTEED BY AN ELIGIBLE
GUARANTOR INSTITUTION, (BANKS, STOCKBROKERS, SAVINGS
AND LOAN ASSOCIATION AND CREDIT UNIONS) WITH MEMBERSHIP
IN AN APPROVED SIGNATURE GUARANTEE MEDALLION PROGRAM
PURSUANT TO S.E.C. RULE 17AD-15.

PLAINTIFF'S
EXHIBIT

Q4C

The following abbreviations, when used in the inscription of the face of this certificate, shall be construed as though they were written out in full according to applicable laws or regulations:

TEN COM  — as tenants in common

TEN ENT  — as tenants by the entireties

JT TEN  — as joint tenants with right
of survivorship and not as
tenants in common

UNIF GIFT MIN ACT — _____ Custodian _____
(Cust)                       (Minor)
under Uniform Gifts to Minors Act

_____
(State)

Additional abbreviations may also be used though not in the above list

*For Value Received,* _____ *hereby sells, assigns and transfers unto*

PLEASE INSERT SOCIAL SECURITY
OR OTHER IDENTIFYING NUMBER

| 5 4 4 - 3 4 - 5 1 9 8 |

ALLAN G. HOLMS
(PLEASE PRINT OR TYPE NAME AND ADDRESS, INCLUDING POSTAL OR ZIP CODE, OF ASSIGNEE)

1314 S. GRAND BLVD #2-112
SPOKANE, WA 99202   *Shares*

*of the Common Stock represented by this Certificate and hereby irrevocably constitutes and appoints*

*to transfer the said stock on the books of the within-named Corporation with full power of substitution in the premises.*

*Dated* __4/10/12__

NOTICE   THE SIGNATURE(S) TO THIS ASSIGNMENT MUST CORRESPOND
WITH THE NAME(S) AS WRITTEN UPON THE FACE OF THIS
CERTIFICATE IN EVERY PARTICULAR WITHOUT ALTERATION OR
ENLARGEMENT OR ANY CHANGE WHATSOEVER.

SIGNATURE(S) GUARANTEED

NOTICE   THE SIGNATURE(S) SHOULD BE GUARANTEED BY AN ELIGIBLE
GUARANTOR INSTITUTION, (BANKS, STOCKBROKERS, SAVINGS
AND LOAN ASSOCIATION AND CREDIT UNIONS) WITH MEMBERSHIP
IN AN APPROVED SIGNATURE GUARANTEE MEDALLION PROGRAM
PURSUANT TO S.E.C. RULE 17Ad-15

PLAINTIFF'S
EXHIBIT

Q5c

## ASSIGNMENT AGREEMENT

This Assignment Agreement (this "Assignment Agreement") is entered into as of December 10, 2016, by and between ___Val M. Holms (the "Assignor"), and Allan G. Holms (the "Assignee").

**WHEREAS**, Assignor currently owns ___26,235,000 shares of the common stock, par value $0.001 per share, of _____Bakken Resources, Inc._ , a ___public__ Company, as represented by Certificates No. ___335, 1342, 1343, 1344, 1345 (the "Common Stock"); and,

**WHEREAS**, Assignor has agreed to transfer and otherwise assign the Common Stock owned by him to Assignee; and,

**WHEREAS**, the Assignor wishes to transfer and assign to the Assignee all of the Assignor's rights and interests in and to the Common Stock, and the Assignee wishes to be the assignee and transferee of such right, and interests;

NOW, THEREFORE, the parties hereto, intending to be legally bound, do hereby agree as follows:

1.     Assignment. The Assignor hereby transfers and assigns to the Assignee, and the Assignee hereby acquires from the Assignor all of the Assignor's right, title, and interest, of whatever kind or nature, in and to Certificates No. 335, 1342, 1343, 1344, 1345.

2.     Retention of Obligations. Notwithstanding anything in this Assignment Agreement to the contrary, the Assignor shall remain obligated, as a principal and not a guarantor, to Assignee with respect to all of the Assignor's obligations, duties, liabilities and commitments under the Common Stock, of whatever kind or nature.

3.     Effectiveness. This Assignment Agreement shall be effective as of the date set first set forth above.

4.     Assignor's Representations and Warranties.  Assignor represents and warrants to Assignee:

　　i.     he is the sole, legal and beneficial owner of the Common Stock;

　　ii.     the Common Stock is not subject to a pending, or, to his knowledge, threatened, claim, proceeding or action;

　　iii.     he has full legal title to all of such shares free and clear of any liens, security interests, encumbrances, pledges, charges, claims, voting trusts, restrictions on transfer, and of any rights or interest therein, direct or contingent, in favor of any other parties;

　　iv.     he has full and unrestricted right, power and authority to sell, assign, transfer and deliver the same or to cause the same to be transferred to Assignee in accordance with this agreement;

　　v.     he has not sold or otherwise disposed of or encumbered the Common Stock assigned herein; and,

　　vi.     he has, and will convey to the Assignee hereunder, good and marketable title to the Common Stock, free and clear of any claims, liens, pledges, security interests or encumbrances, of any kind.

5.     Governing Law; Binding Effect. This Assignment Agreement shall be governed by and construed in accordance with the laws of the State of  Montana applicable to contracts made and performed in such state

1


PLAINTIFF'S EXHIBIT

0606(15)

without giving effect to the choice of law principles of such state that would require or permit the application of the laws of another jurisdiction.

6.    <u>Representations by Assignee</u>. Assignor is an "accredited investor" within the meaning of the Securities and Exchange Commission Rule 501 of Regulation D, as presently in effect and that this transaction is intended to be exempt from registration under the Act by virtue of section 4a(2) of the Act and the provisions of Rule 506 of Regulation D as promulgated thereunder.

7.    <u>Counterparts</u>. This Assignment Agreement may be executed in one or more counterparts, including facsimile counterparts, each of which shall be deemed to be an original copy of this Assignment Agreement, and all of which, when taken together, shall be deemed to constitute one and the same agreement. Delivery of such counterparts by facsimile or electronic mail (in PDF or .tiff format) shall be deemed effective as manual delivery.

IN WITNESS WHEREOF, the Assignee and Assignor have executed this Assignment Agreement as of the date first set forth above.

By: _____
Name:
Title:


By: _____
Name:

2

**PLAINTIFF'S EXHIBIT**

CP6c (2-2)

# BAKKEN RESOURCES, INC.

# PROXY

The undersigned, Val M. Holms, a stockholder of Bakken Resources, Inc., ("BRI" or "Company"), a Nevada corporation, owning 26,235,000 shares of Common Stock represented by certificate numbers 335, 1342, 1343, 1344, and 1345, hereby appoint Allan Holms as Proxy for the undersigned, with full power of substitution. In doing so, I hereby authorize Allan Holms, without limitation; (1) to vote on behalf of the undersigned all shares of common stock of the corporation held or owned by the undersigned stockholder at any annual or special meeting of stockholders of the Corporation; (2) to express consent to dissent to corporate actions in writing without a meeting; and (3) to exercise in Allan Holms' sole discretion any and all stockholder rights, powers, or privileges of the undersigned.

This proxy automatically revokes any Proxy previously granted by the undersigned. This Proxy shall remain in force and full effect for a period of six (6) months from the date of execution.

Dated this 7th day of July, 2016.

Signature

Printed Name: _Val M. Holms_

PLAINTIFF'S EXHIBIT

161

Settlement Agreement and Mutual Release
*Manuel Graiwer et al. v. Val Holms et al.*
CV14-00544

**SIGNATURES**

_____
Manuel Graiwer

_____
T.J. Jesky

*DERIVATIVELY ON BEHALF*
*OF BAKKEN RESOURCES, INC.*

_____
Val Holms

_____
John Aberusteri, Esq.

_____
Thomas C. Bradley, Esq.

_____
*ATTORNEYS FOR PLAINTIFFS*

_____
Douglas R. Brown, Esq.

_____
Joseph C. Pierzchala, Esq.

*ATTORNEYS FOR VAL HOLMS*

APPROVED AS TO FORM:



**PLAINTIFF'S EXHIBIT**
Koc

## SIGNATURES

In accordance with Section 13 or 15(d) of the Exchange Act of 1934, as amended, the registrant caused this Annual Report on Form 10-K to be signed on its behalf by the undersigned, thereunto duly authorized, in Helena, MT on this 15th day of April, 2014.

BAKKEN RESOURCES, INC.

Date: April 15, 2014

By: /s/ Val M. Holms

Val M. Holms
President, CEO, and Director
(principal executive officer)

> PLAINTIFF'S EXHIBIT
> K3c

In accordance with Section 13 or 15(d) of the Exchange Act of 1934, as amended, this Annual Report on Form 10-K has been signed below by the following persons on behalf of the registrant in the capacities indicated below on this 15th day of April, 2014.

Date: April 15, 2014

By: /s/ Val M. Holms

Val M. Holms
President, CEO, and Director
(principal executive officer)

Date: April 15, 2014

By: /s/ David Deffinbaugh

David Deffinbaugh
Chief Financial Officer and Director
(principal financial and accounting officer)

Date: April 15, 2014

By: /s/ Karen Midtlyng

Karen Midtlyng
Secretary and Director

Date: April 15, 2014

By: /s/ Bill M. Baber

Bill M. Baber
Director

Date: April 15, 2014

By: /s/ W. Edward Nichols

Edward W. Nichols
Director

Date: April 15, 2014

By: /s/ Herman R. Landeis

Herman R. Landeis
Director



PLAINTIFF'S EXHIBIT
K4c

Settlement Agreement and Mutual Release
*Manuel Graiwer et al. v. Val Holms et al.*
CV14-00544

SIGNATURES

APPROVED AS TO FORM:

_____
Manuel Graiwer

_____
John Aberasturi, Esq.

_____
T.J. Jesky

_____
Thomas C. Bradley, Esq.

*DERIVATIVELY ON BEHALF
OF BAKKEN RESOURCES, INC.*

*ATTORNEYS FOR PLAINTIFFS*

_____
Val Holms

_____
Douglas R. Brown, Esq.

_____
Joseph C. Pierzchala, Esq.

*ATTORNEYS FOR VAL HOLMS*



PLAINTIFF'S
EXHIBIT

*150*

accordance with the laws and decisions of the State of Montana, specifically the Montana Trust Code.

**9.11**   **Situs of any Trust created by Last Will and Testament.**   The original situs of any trust created under this Instrument shall be the State of Montana.   However, the situs of any trust created under this Instrument may be maintained in any jurisdiction (including any jurisdiction outside the United States), as the trustee and a majority of the beneficiaries, or their legal guardians if they are under eighteen years, may determine, and thereafter transferred at any time or times to any jurisdiction selected by the trustee and majority of the beneficiaries.   Upon any such transfer of situs, the trust estate may thereafter, at the election of the trustee and the majority of the beneficiaries of the trust, be administered exclusively under the laws of (and subject, as required, to the exclusive supervision of the courts of) the jurisdiction to which it has been transferred.   Accordingly, if the trustee and a majority of the beneficiaries of any trust created by this Instrument elect to change the situs of any such trust, the trustee of said trust is hereby relieved of any requirement of having to qualify in any other jurisdiction and of any requirement of having to account in any court of such other jurisdiction.

### ARTICLE X.
### MUTUAL AND RECIPROCAL LAST WILL

**10.1**   **Mutual and Reciprocal Wills.**   I hereby acknowledge and declare that I am making a mutual and reciprocal Last Will and contract concerning succession with my spouse on this date concerning the provisions of this Last Will, including specifically the provisions of Articles III, IV, and V.   I, therefore, agree that if my spouse should predecease me that I will not revoke this Last Will, or materially alter the provisions or the intent expressed in III, IV· and V as to the property distributions which should pass to any devisee or beneficiary, in any further Last Will or any other estate planning or beneficiary documents, without the consent of such devisee or beneficiaries; and that this paragraph and Last Will shall be construed as a contract concerning succession with my spouse in accordance with the provisions of Mont. Code Ann. § 72-2-534.

### ARTICLE XI.
### EXECUTION AND ATTESTATION OF LAST WILL

IN WITNESS WHEREOF, I have hereunto set my hand this 25th day of October, 2016.

Val M. Holms

I, Val M. Holms, the Testator, sign my name to this Instrument this ____ day of October, 2016, and being first duly sworn, do hereby declare to the undersigned authority that I sign and execute this Instrument as my Last Will and that I sign it willingly, that I execute it as my free



and voluntary act for the purposes therein expressed, and that I am 18 years of age or older, of sound mind, and under no constraint or undue influence.

_Val M. Holms_
Val M. Holms

We, _Ben Hoover_ and _Cheryl Mc Reynolds_, the witnesses, sign our names to this Instrument, being first duly sworn, and do hereby declare to the undersigned authority that the Testator signs and executes this Instrument as his Last Will and that she signs it willingly and that each of us, in the presence and hearing of the Testator, hereby signs this Will as witness to the Testator signing, and that to the best of our knowledge, the Testator is 18 years of age or older, of sound mind, and under no constraint or undue influence.

Print Name: _Ben Hoover_       Print Name: _Cheryl Mc Reynolds_
Address: _48901 Hwy 93_        Address: _48901 Hwy 93 Suite A_
_Polson, MT 59860_             _Polson, mt. 59860_

STATE OF MONTANA    )
                    : ss.
County of _LAKE_    )

Subscribed, sworn to, and acknowledged before me by VAL M. HOLMS, the Testator, and subscribed and sworn to before me by _BEN HOOVER_ and _CHERYL MCREYNOLDS_, the witnesses, this _28_ day of October, 2016.

_Cheryl M Reynolds_
Notary Public

f6005004.docx

CHERYL MCREYNOLDS
NOTARY PUBLIC for the
State of Montana
Residing at Big Arm, Montana
My Commission Expires
April 27, 2019
SEAL

Last Will & Testament of Val M. Holms                    Page 22 of 22



PLAINTIFF'S
EXHIBIT
K7c

TO WHOM IT MAY CONCERN:

This Contract sets forth the intention of Mr. Val & his wife Mari P. Holms to purchase from Mr. Herman R. & his wife Mary-B. Landeis, a collection of Ancient Native American Artifac                                    ction. The number of pieces in this collecti                                    ces, plus or minus. The buyers of this coll                                    s (the Landeis') an amount equal to $_____                                    buyers (the Holms) will pay down an amou                                    e of closing to the *vmH* Landeis'.The remainder                                    leis' within one *$* *2 or sooner* year of date of closing.                                    prior to payoff) the total balance amount r                                    state; equally, shall death occur to Mr. or N                                    te shall pay off the remaining balance & re

*we Hvdlam -Thousand*

Sellers: Herman R. Lan
        Mary Belle Lan                                    *-13*
                                                          *2-13*

Buyers: Val M. Holms _____ Date 7/13/13
        ~~Mari P. Holms~~ _____ Date_____

PLAINTIFF'S EXHIBIT
K8c

Helena Checking Acc

                                                          75,000.00

---

VAL M HOLMS
WK. 406-442-9444
P O BOX 1839
HELENA, MT 59624                                    1005
                                                    93-151/878
Pay to the
Order of *Herman Landeis*        *7/13/13*  Date
                                          $ 5000.—
*Five Thousand* _____
Dollars

Valley Bank   Division of Glacier Bank
              P.O. Box 5269
              Helena, MT 59604
              (406) 495-3600

For *Artifacts*

⑆092001512⑆021000004528⑈1005

Harland Clarke

PLAINTIFF'S EXHIBIT
K9c



April 6, 2011

TO:    Working Interest Owners

RE:    Nesbit #2 Well
       Sec. 4: SE¼NE¼, T31N-R51E
       Roosevelt County, MT

Please be advised that, after review of electric logs and other data, we
recommend that the above referenced well be plugged and abandoned.

Please indicate your approval to plug and abandon by dating, signing and
returning a copy of this letter to us by e-mail at gordi@arm-corp.net or by facsimile
at (701) 227-4444.

Please call me at (701) 227-0811 if you have any questions.

Respectfully,

ARMSTRONG OPERATING, INC.

G.L. Pirkl

I/we concur with the recommendation to plug and abandon the Nesbit 2 Well.

Signature: _____

Owner Name: _Toll Reserve Consortium_

By: _____ _Pres_

Date: _4/06/11_

PLAINTIFF'S
EXHIBIT

410 c

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

| Allan G. Holms | Toll Reserve Consortium |
|---|---|
| By: _____ | By: _____ |
| Title: _____ | Title: _President_ |
| Date: _____, 2010 | Date: _6/21_____, 2010 |
| A B Production Company | Ichor Exploration, Inc. |
| By: _____ | By: _____ |
| Title: _____ | Title: _____ |
| Date: _____, 2010 | Date: _____, 2010 |
| St. Croix Exploration Company | Two Half-Hitches Oil & Gas LLC |
| By: _____ | By: _____ |
| Title: _____ | Title: _____ |
| Date: _____, 2010 | Date: _____, 2010 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
30
31
32
33
34
35
36
37

COPY

Revised 4/8/10                    -19-

PLAINTIFF'S EXHIBIT

exhibit  Kllc

Exploration Agreement– Mineral Bench Prospect
Effective February 18, 2010
Page 10 of 10

| BBE Holdings LLC | Hawkins Exploration |
|---|---|
| By: _____ | By: _____ |
| Title: _____ | Title: _____ |
| Date: _____ _____, 2010 | Date: _____ _____, 2010 |
| Two Half-Hitches Oil & Gas LLC | Toll Reserve Consortium |
| By: _____ | By: _JHWM_____ |
| Title: _____ | Title: _Presideпt_____ |
| Date: _____ _____, 2010 | Date: _6/22/_____ _____, 2010 |

**Allan G. Holms**

By: _____

Title: _____

Date: _____ _____, 2010

COPY

**Operator:**

| Armstrong Operating, Inc. |
|---|
| By: _____ |
| Title: _____ |
| Date: _____ _____, 2010 |

PLAINTIFF'S
EXHIBIT
KDc

6.3    INTEGRATED AGREEMENT. THIS AGREEMENT CONSTITUTES THE ENTIRE UNDERSTANDING AND AGREEMENT AMONG THE PARTIES HERETO WITH RESPECT TO THE SUBJECT MATTER HEREOF, AND THERE ARE NO AGREEMENTS, UNDERSTANDINGS, RESTRICTIONS OR WARRANTIES AMONG THE PARTIES OTHER THAN THOSE SET FORTH HEREIN PROVIDED FOR.


**THE PARTIES HAVE EXECUTED THIS AGREEMENT FAITHFULLY, UNDER PENALTIES OF PERJURY, BY EACH COMPANY'S DULY AUTHORIZED SIGNATORY, AS WITNESSED BELOW.**

**THIS AGREEMENT IS AGREED TO AND CONFIRMED, ON THIS  5ᵗʰ DAY OF MARCH 2011.**

**ISSUED AND SIGNED BY:**                    TOLL RESERVE CONSORTIUM
                                                                VmH
                                            (~~"HOLMS ENERGY, LLC"~~)


BY:          **MR. VAL HOLMS**

SIGNATURE  : .........................................

PASSPORT   : .........................................


                                            **("MCFRA_VIPS GROUP, LLC ")**


BY:          **MR. JOHN A.  MCCLEOD JR,**


SIGNATURE  : .........................................

             **462225134, USA**

PASSPORT   : .........................................


4



PLAINTIFF'S
EXHIBIT

163c



January 20, 2014

Holms Energy Development Corporation
c/o Val M. Holms, President
P.O. Box 1839
Helena, Montana 59624

Dear Mr. Holms:

Pursuant to the Farmout Agreement dated December 31, 2012, by and between Holms Energy Development Corporation (HEDC) and Three Forks, Inc. (TFI) for properties in Archer County, Texas, TFI has met all of the Farmout Agreement terms and conditions by timely drilling and completing five wells and submitting W-2's to the Texas Railroad Commission (TRRC), copies of which have been sent to Mr. Geoffrey Hale for lease assignment document preparation as requested and per Section 5, B-1 of the Farmout Agreement. As you are probably aware, we have sold eleven loads of oil to date and finalization of the lease assignment and revenue deck are necessary for proceeds disbursement. Your immediate attention to the lease assignments once you receive them from Mr. Hale will be most appreciated.

We have staked five new wells, filed drilling applications for these wells with the TRRC on January 8, 2014, and paid the expediting fee for permit processing, but last week upon checking the status of our drilling permits, we were told by the TRRC permitting department that the TRRC is just now processing the permit applications for December 2013 and our permit approvals would be delayed due to heavy permitting volumes. Additionally, we contacted Smalley Drilling back in December 2013 and Mr. Bill Smalley reported that their first rig availability would be late March or early April. Other drilling contractors have been contacted and none of them have rigs available prior to early April.

Pursuant to Section 3 of the subject Farmout Agreement, wherein up to a total of 10 wells can be drilled under the term of this Farmout Agreement, and wherein delays due to permitting and rig availability were recognized as a potential delay to work execution, and due to known delays of 60-75 days for rig availability and/or well permitting, we hereby request an extension of 75 days to both the work time between wells and the Farmout Agreement end date of 18-months. Specifically, the last work completed on the leases occurred on December 21, 2013 so the 45-day clock would expire on February 5, 2014 and this date would be extended until close of business on April 21, 2014, and the Farmout Agreement end date would be extended until close of business on September 13, 2014.

Please indicate your acceptance of this letter and the terms and conditions stated herein by signing and dating in the space provided below, and by scanning and emailing a copy of this executed Farmout Agreement extension to ed@threeforksinc.com.

Sincerely,

Ed Nichols, CEO
Three Forks, Inc.

I hereby accept the above letter and its terms and conditions as a written addendum of the Farmout Agreement dated December, 31, 2012.

Val M. Holms, President
Holms Energy Development Corporation

1-29-14
Date

PLAINTIFF'S EXHIBIT
114c

Page 8 of 8

12. **WHEREAS,** this agreement and its exhibits constitute the entire contract of the Parties, and there are no agreements, undertakings, obligations, promises, assurances or conditions, whether precedent or otherwise, except those identified and specifically set forth herein.

**IN WITNESS WHEREOF,** the Parties have executed this Agreement as of the date first above written above.

HOLMS ENERGY DEVELOPMENT CORP.,
"Formerly Toll Reserve Consortium Corp."

By: _____
Val M. Holms, President (Farmor)

2012

THREE FORKS, INC.

By: _____
Ed Nichols, Executive Chairman (Farmee)

VMH



PLAINTIFF'S
EXHIBIT
1650

**Certified/Agreed To**

Owner/Key Individual 1 Name
VAL M HOLMS

Position/Title:
OWNER

Owner/Key Individual 1 Signature

[X] Submit manually
[ ] Signature not required

Date:
05/22/2014

**Certified/Agreed To**

Owner/Key Individual 2 Name
KAREN S MIDTLYNG

Position/Title:
OFFICE

[X] Submit manually
[ ] Signature not required

Date:
05/22/2014

...re Capture - New A...

New Authorized Signer 1 Name
DAN ANDERSON

Position/Title:

New Authorized Signer 1 Signature

[X] Submit manually
[ ] Signature not required

Date:
05/22/2014

BBG5351 (8-07 SVP)
© 2007 Wells Fargo Bank, N.A. All rights reserved.

2W02-000652425850-02



PLAINTIFF'S
EXHIBIT
exhibit  _Killoc_

**Certified/Agreed To**

Owner/Key Individual 1 Name
VAL M HOLMS

Position/Title:
OWNER

Owner/Key Individual 1 Signature

☒ Submit manually
☐ Signature not required

Date:
05/22/2014

**Certified/Agreed To**

Owner/Key Individual 2 Name
KAREN S MIDTLYNG

Position/Title:
OFFICE

☒ Submit manually
☐ Signature not required

Date:
05/22/2014

New Authorized Signer 1 Name
DAN ANDERSON

Position/Title:

New Authorized Signer 1 Signature

☒ Submit manually
☐ Signature not required

Date:
05/22/2014



2W02-000652426836-02

PLAINTIFF'S
EXHIBIT

**Certified/Agreed To**

Owner/Key Individual 1 Name
VAL M HOLMS

Position/Title:
OWNER

Owner/Key Individual 1 Signature

☒ Submit manually
☐ Signature not required

Date:
05/22/2014

**Certified/Agreed To**

Owner/Key Individual 2 Name
KAREN S MIDTLYNG

Position/Title:
OFFICE

Owner/Key Individual 2 Signature

☒ Submit manually
☐ Signature not required

Date:
05/22/2014

New Authorized Signer 1 Name
DAN ANDERSON

Position/Title:

New Authorized Signer 1 Signature

☒ Submit manually
☐ Signature not required

Date:
05/22/2014

BBGS351 (8-07 SVP)
© 2007 Wells Fargo Bank, N.A. All rights reserved.

2W02-000652427718-02



**PLAINTIFF'S
EXHIBIT**

K18c

**Certified/Agreed To**

Owner/Key Individual 1 Name
VAL M HOLMS

Position/Title:
OWNER

Owner/Key Individual 1 Signature

☒ Submit manually
☐ Signature not required

Date:
05/22/2014

**Certified/Agreed To**

Owner/Key Individual 2 Name
KAREN S MIDTLYNG

Position/Title:
OFFICE

☒ Submit manually
☐ Signature not required

Date:
05/22/2014

New Authorized Signer 1 Name
DAN ANDERSON

Position/Title:

New Authorized Signer 1 Signature

☒ Submit manually
☐ Signature not required

Date:
05/22/2014

BBG5351 (8-07 SVP)
© 2007 Wells Fargo Bank, N.A. All rights reserved.



2W02-000652384586-02



PLAINTIFF'S
EXHIBIT

K19c

**Certified/Agreed To**

Owner/Key Individual 1 Name

VAL M HOLMS

Position/Title:

OWNER

Owner/Key Individual 1 Signature

☒ Submit manually
☐ Signature not required

Date:

05/22/2014

**Certified/Agreed To**

Owner/Key Individual 2 Name

KAREN S MIDTLYNG

Position/Title:

OFFICE

Owner/Key Individual 2 Signature

☒ Submit manually
☐ Signature not required

Date:

05/22/2014

**Signature Capture - New Authorized Signers**

New Authorized Signer 1 Name

DAN ANDERSON

Position/Title:

New Authorized Signer 1 Signature

☒ Submit manually
☐ Signature not required

Date:

05/22/2014

BBG5351 (8-07 SVP)
© 2007 Wells Fargo Bank, N.A. All rights reserved.

2W02-000652386292-02



PLAINTIFF'S
EXHIBIT

K20c

tabbies

**Certified/Agreed To**

Owner/Key Individual 1 Name
DAN ANDERSON

Position/Title:
President

Owner/Key Individual 1 Signature

[X] Submit manually
[ ] Signature not required

Date:
05/22/2014

**Certified/Agreed To**

Owner/Key Individual 2 Name
VAL M HOLMS

Position/Title:
OWNER

Owner/Key Individual 2 Signature

[X] Submit manually
[ ] Signature not required

Date:
05/22/2014

**Signature Capture - New Authorized Signers**

New Authorized Signer 1 Name
DAVID L DEFFINBAUGH

Position/Title:
CFO

New Authorized Signer 1 Signature
Being Removed from Account

[X] Submit manually
[ ] Signature not required

Date:
05/22/2014

BBG5351 (8-07 SVP)
© 2007 Wells Fargo Bank, N.A. All rights reserved.

2W02-000652508978-02



PLAINTIFF'S
EXHIBIT
Kyle

**Certified/Agreed To**

Owner/Key Individual 1 Name
MARI P HOLMS

Position/Title:

Owner/Key Individual 1 Signature

*will be deleted from account*

☒ Submit manually
☐ Signature not required

Date:
05/22/2014

**Certified/Agreed To**

Owner/Key Individual 2 Name
VAL M HOLMS

Position/Title:
OWNER

Owner/Key Individual 2 Signature

☒ Submit manually
☐ Signature not required

Date:
05/22/2014

**Signature Capture - New Authorized Signers**

New Authorized Signer 1 Name
DAN ANDERSON

Position/Title:

New Authorized Signer 1 Signature

☒ Submit manually
☐ Signature not required

Date:
05/22/2014

BBG5351 (8-07 SVP)
© 2007 Wells Fargo Bank, N.A. All rights reserved.   2W02-000652420906-02



PLAINTIFF'S
EXHIBIT

webber

**Certified/Agreed To**

Owner/Key Individual 1 Name
DAN ANDERSON

Position/Title:
President

Owner/Key Individual 1 Signature

☒ Submit manually
☐ Signature not required

Date:
05/27/2014

**Certified/Agreed To**

Owner/Key Individual 2 Name
VAL M HOLMS

Position/Title:
OWNER

Owner/Key Individual 2 Signature

☒ Submit manually
☐ Signature not required

Date:
05/27/2014

BBG5351 (8-07 SVP)
© 2007 Wells Fargo Bank, N.A. All rights reserved.

2W02-000653143158-02



PLAINTIFF'S
EXHIBIT
exhibiter
1628c

**Certified/Agreed To**

Owner/Key Individual 1 Name
MARI P HOLMS

Position/Title:

Owner/Key Individual 1 Signature
will be deleted from account

☒ Submit manually
☐ Signature not required

Date:
05/22/2014

**Certified/Agreed To**

Owner/Key Individual 2 Name
VAL M HOLMS

Position/Title:
OWNER

Owner/Key Individual 2 Signature

☒ Submit manually
☐ Signature not required

Date:
05/22/2014

**Signature Capture - New Authorized Signers**

New Authorized Signer 1 Name
DAN ANDERSON

Position/Title:

New Authorized Signer 1 Signature

☒ Submit manually
☐ Signature not required

Date:
05/22/2014

BBG5351 (8-07 SV?)
© 2007 Wells Fargo Bank, N.A. All rights reserved.

2W02-000652422766-02



PLAINTIFF'S
EXHIBIT
exhibit   KHc

**Certified/Agreed To**

Owner/Key Individual 1 Name
MARI P HOLMS

Position/Title:

Owner/Key Individual 1 Signature

Will be deleted from account

☒ Submit manually
☐ Signature not required

Date:
05/22/2014

**Certified/Agreed To**

Owner/Key Individual 2 Name
VAL M HOLMS

Position/Title:
OWNER

Owner/Key Individual 2 Signature

☒ Submit manually
☐ Signature not required

Date:
05/22/2014

**Signature Capture - New Authorized Signers**

New Authorized Signer 1 Name
DAN ANDERSON

Position/Title:

New Authorized Signer 1 Signature

☒ Submit manually
☐ Signature not required

Date:
05/22/2014

BBG5351 (8-07 SVP)
© 2007 Wells Fargo Bank, N.A. All rights reserved.   2W02-000652421680-02



PLAINTIFF'S
EXHIBIT

1625c

**Deposit:**

(Check One)   ☒ Checking   ☐ Savings   ☐ Money Market Access

WELLS FARGO

Checking, Savings, Money Market Access account number

\* 1 7 6 3 9 5 8 2 9 3        Date May 3 2011

Please print: Name

International Consultants

Please print: Street Address, City, State, Zip Code

2461 Hampton Rd  LV (Henderson) NV

Please sign in teller's presence for cash received. Two forms of ID may be required for cash back transactions.

X

Bank Use Only (When SVT is Not Available)

| Customer Id: | Exp date: | Token Verified (✓) ☐ | Approval: |

TLR8607 (08/09)  WF9117  10538360

Cash

Total Checks _(include total from other side)_   26,000.00

Subtotal

Minus cash back

Total $   26,000.00

⑈ 2 9 8 5 0 2 8 9 7 ⑈ ⑆ 5 0 0 0 0 0 3 7 7 ⑈

---

TOLL RESERVE CONSORTIUM          1095
8883 W Flamingo Rd Ste 102
Las Vegas, NV 89147-8734      94-7074/8212 6795
                             7733838011

                    May 3 2011

Pay to the
Order of  International Consultants          $ 26,000.00

twenty-six thousand + 00/100S ———— Dollars

WELLS FARGO  Wells Fargo Bank, N.A.
             Nevada
             wellsfargo.com

For Inv. 50211 - AD pac

⑆ 3 2 1 2 7 0 7 4 2 ⑆  7 7 3 3 8 3 3 0 1 1 ⑈  0 1 0 9 5

---

PLAINTIFF'S
EXHIBIT

K26c

F I L E D
Electronically
CV17-00360
2017-02-21 11:25:21 AM
Jacqueline Bryant
Clerk of the Court
Transaction # 5958775 : csulezic

# EXHIBIT 12

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

# EXHIBIT 12

AUPIN, COX & LeGOY
ATTORNEYS AT LAW
P.O. BOX 30000
RENO, NEVADA 89520
(775) 827-2000

# Invoice

Date: 11/24/2010
Invoice # 3001

TO:

**Multisys Language Solutions, Inc.**
8045 Dolce Volpe Ave.
Las Vegas, NV 89178
Attention: Janelle L. Edington, President

**MANUEL P. GRAIWER PC**
"A Professional Law Corporation"
550 Chalette Dr.
Beverly Hills, CA. 90210
Tel. 310-278-3760
Fax. 213-383-1078

| | For Legal Service Rendered from  (May 5 thru November 24, 2010) | Payment Terms | Due Date |
|---|---|---|---|
| | | Due on receipt | |

| Description of Services Rendered | Hours | Hourly Rate | Total |
|---|---|---|---|
| Option Agreement between Holms Energy and Multisys (Multiple Revisions) | 4 | $275 per hour | $ 1,100 |
| Asset Purchase Agreement  between Holms Energy and Multisys (Multiple Revisions) | 4 | $275 per hour | $ 1,600 |
| Option Agreement between Holms Energy and Greenfields (Multiple Revision) | 6 | $275 per hour | $ 1,650 |
| Asset Purchase Agreement  between Holms Energy and Greenfields (Multiple Revisions) | 6 | $275 per hour | $ 1,650 |
| Escrow Agreement  between Holms Energy and Greenfields (Multiple Revisions) | 3 | $275 per hour | $ 825 |
| Private Placement (Partial Drafting and Multiple Revisions) | 21 | $275 per hour | $ 5,775 |
| Stock Subscription documents | | | |
| • Common Stock And Warrant Purchase Agreement (Drafting and Revisions) | 4 | $275 per hour | $ 1,100 |
| • Common Stock Purchase Warrant ( Drafting and Revisions) | 4 | $275 per hour | $ 1,100 |
| • Registration Rights Agreement (Drafting and Revisions) | 4 | $275 per hour | $ 1,100 |
| Holms and Greenfield Options extensions (Consulting and Drafting) | 2 | $275 per hour | $ 550 |
| Multisys 10-Q quarterly reports (Drafting) | 4 | $275 per hour | $ 1,100 |
| Six Board Resolutions (Drafting) | 2 | $275 per hour | $ 550 |
| Super 8-K: (partial preparation and review) | 4 | $275 per hour | $ 1,100 |
| Promissory Notes and MLS Loan Transaction (Drafting) | 2 | $275 per hour | $ 550 |
| Misc expenses (cost related to two investors meetings in L.A.) | | | $ 675 |
| | | | |
| | | TOTAL | $18,929 |

Make all checks payable to "Manuel P. Graiwer PC"
Thank you for your business!



EXHIBIT
316
Graiwer

F I L E D
Electronically
CV17-00360
2017-02-21 11:25:21 AM
Jacqueline Bryant
Clerk of the Court
Transaction # 5958775 : csulezic

# EXHIBIT 13

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

# EXHIBIT 13

AUPIN, COX & LeGOY
ATTORNEYS AT LAW
P.O. BOX 30000
RENO, NEVADA 89520
(775) 827-2000

**From:** Jay Edington [mailto:josephedington@gmail.com]
**Sent:** Wednesday, November 24, 2010 8:41 AM
**To:** Kent Jensen; Val Holms; Val Holms; Karen Midtlyng; karen@holmsenergy.com
**Subject:** Re: Holms reimbursement bill to MLS

Kent, MLS cannot write a check to Holms except for anything was related to capital formation and selling of the units............this has to be consistent with the PPM which states the costs are estimated at $50,000. Holms has to have some costs in the transaction, Val cannot expect to engage in this process without some expenses. We originally were going to get $200,000 from Alan Holms to cover this process and that was substituted out by selling Interest in the LLC, but the advantage was that selling interest in the LLC was less on the dilutions side and not shares were issued to Alan. If MLS would have acquired Holms as a merger, the company being acquired has costs. This needs to be discussed, a public company cannot pay operating costs of the private company, the auditors will go nuts. The approach you are taking was never discussed and we have to be very careful of related party transactions. For Holms to do a transaction of this type and to expect to have no expenses is unrealistic. I have no idea what your are referring to regarding the $15,000 in commissions going to Manny.

**From:** Kent Jensen
**Sent:** Wednesday, November 24, 2010 8:23 AM
**To:** 'Jay Edington' ; 'Val Holms' ; 'Val Holms' ; 'Karen Midtlyng' ; karen@holmsenergy.com ; 'Jerod Edington'
**Subject:** RE: Holms reimbursement bill to MLS

Attached is a draft of the reimbursement calculation due from MLS to Holms Energy LLC

The $15,000 in commissions are really legal fees to Manny.
The $25,000 is to cover the $15,000 first given to Greenfield and the $10,000 that was short paid by Greenfield.
The $1,600 in rent and $675.50 utilities are long term deposits to be taken over by MLS.
The other expenses should be straight forward.

I will make up a formal invoice on Friday and attach any receipt copies next week.

Kent

**From:** Jay Edington [mailto:josephedington@gmail.com]
**Sent:** Wednesday, November 24, 2010 7:44 AM
**To:** Val Holms; Val Holms; Kent Jensen; Karen Midtlyng; karen@holmsenergy.com; Jerod Edington
**Subject:**

Attached is a spread sheet designating which parties are responsible for which sales.

If the investor's name is in white, they have expressed a strong interest, but have not given a firm commitment or expressed an amount (Possible Investor). This group of investors is designated by the letter P.

If the investor is designated in yellow, this means they have given a firm commitment, but we have not be appraise of them sending funds or already having fund in the account. Letter C designation on the spread sheet.

If they are designated in Green, then we have the funds or they are confirmed be in the wire process or sending of checks. Letter X in Red designates fund are in or will be.

The good news is that we are over the minimum and maybe even hit the $2,000,000 mark, depending on the

EXHIBIT

95

people in the P category and any people that may pop up in the next few days.

The plan is to close the offering and move as much of the cleared funds from the project account to the corporate account. Then on Monday or Tuesday, depending on how fast the bank operates, Val takes over the corporate account and the project account.

There is still an issue related to how these commissions get paid. But I will have it sorted out and scheduled by tomorrow. Graiwer will not receive any fees for his personal investment of $150,000 (saves $15,000)

Val, Kent, Karen, MLS will need the final invoice for expense advanced by Holms Energy on Friday. I want this to be arm's length and have the check signed by Janelle and not Val. This will be best from a perspective of the auditor.

On Friday, there will be a single certificate cut for 40,000,000 shares of restricted common stock. This will have to be sent to transfer with a sheet to disburse these shares. Time is approaching when we have to freeze the ownership in the LLC. I am revising the spread sheet for this transaction and assuming I can stay off the phone this morning, I will have this completed and with supporting foot notes by noon.

Val, please make it a priority to review this list in detain and let me know any changes.

Jerod, please review this list to make sure that there are not investors that are not on this list.

For the time being, please let me control this document and if there are any amendments, just send them to me and I will generate the appropriate changes. On Monday, we can have the final review and see who actually made the dead line and then see where we stand with the others. I think we should have the second close to pick up the stragglers set at December 15th, with the stipulation that we do not take any checks after Dec 8th.

Cheers, Jay

| | |
|---|---|
| From: | Jay Edington <josephedington@gmail.com> |
| Sent: | Thursday, November 25, 2010   7:12 PM |
| To: | Val Holms <vholms@msn.com>; Val Holms <val@holmsenergy.com>; Karen Midilyng <karenmidilyng@yahoo.com>; karen@holmsenergy.com |
| Subject: | Late Accounting issues |
| Attach: | Expense report Holms to MLS.xls |

Val,

This is exactly where I DID NOT want to be the night before the closings!!!!!!!!!!!! Pisses me off to wait until the very last minute and I can tell you that Kent is a nice religious man, but he does not know jack shit about how a public company needs to operate. When a public company puts out a PPM, this is more or less a contract with the investor, all the terms a nd conditions are laid out. There is no way in hell MLS can pay Holms back $15,000 legal fees for Manny, if Holms did not disburse this amount. The same thing goes for the $25,000 mineral rights. What mineral right paid by whom? Holms put out $7,500 to acquire the option from Greenfield. This was their cost to get the contract. MLS had a cost of $392,500 to exercise the option, but instead paid $385,000 directly to Greenfield, so MLS owes $7,500 to Holms, which is the difference between $385,000 and $392,500. The historical cost basis in the option was $7,500, this is the Holms basis in the asset and they got $100,000 and 40,000,000 shares to pay for the assets. Accounting wise, MLS/BRI will book the option with a historical cost basis of Holmes at $7,500 and the exercise price will be booked by BRI at $392,750, the amount actually paid to move from the option to the purchase agreement. I just set it up in such a way that the $7,500 applied to the purchase price, but $7,500 was the Holms cost basis. I will try to work this out with Kent in the morning before the closing, which is scheduled for 9 am, when the bank opens. MLS has to clean up its liabilities, pay out expense for the offering and then whatever is left goes to BRI. The MLS accountant will do a month end statement, Holms will get the 40,000,000 share certificate dated tomorrow, but due to Friday being an off day for the transfer agent, the certificate will be cut on Monday and delivered on Tuesday.

I have a commission schedule all worked out and I have things worked out with Manny to get part of his fees via a legal invoice to MLS. The reality is that Jerod and I did all the work he is going to invoice for, so this is a real number, but just a legal way of getting funds to him in the form of services rendered and not so much for finder's fee. The consultant for a portion of finders fee is an investment company in HK that will document the clients they introduced to MLS. Most of these will be Manny's clients, but I have piggy backed a few into this invoice. All distributions will be done legally correct and pursuant to the terms of the PPM, so we will not have any audit problems or SEC problems.

On Friday, Janelle will a form from the bank to add you to the MLS bank account and she will send you the checks. When FINRA allows the name change, which will be filed on Monday, you can simply take the Amendment to the Wells Fargo Bank, show it to them, show them a copy of the request for a name change with the IRS, which will also be file this coming Monday. Then you can write a single check out of MLS to Bakken Resources and we can then close down the two MLS checking accounts. There will be some stragglers, so these two accounts will be shut down about the 15th. We cannot accept any checks after the 8th, if we want to do a shut down on or about the 15th. After the 8th, it is all wires or nothing.

We still have to determine how to pay other third parties finder's fees and get that accomplished that objective, not later than this coming Monday. I will be up early in the morning, lots to get straightened around. Jay

EXHIBIT

96

F I L E D
Electronically
CV17-00360
2017-02-21 11:25:21 AM
Jacqueline Bryant
Clerk of the Court
Transaction # 5958775 : csulezic

# EXHIBIT 14

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

# EXHIBIT 14

AUPIN, COX & LeGOY
ATTORNEYS AT LAW
P.O. BOX 30000
RENO, NEVADA 89520
(775) 827-2000

1

2

3

4    IN THE SECOND JUDICIAL DISTRICT COURT OF THE STATE OF NEVADA

5               IN AND FOR THE COUNTY OF WASHOE

6                  -oOo-

MANUEL GRAIWER AND T.J. JESKY,     Case No. CV14-00544

7    derivatively on behalf of

BAKKEN RESOURCES, INC., a        Dept No. B7

8    Nevada Corporation,

             Plaintiffs,

9    vs.

10   VAL HOLMS, an individual,

     HERMAN LANDEIS, an individual,

11   KAREN MIDTLYNG, an individual,

     DAVID DEFFINBAUGH, an

12   individual, BILL BABER, an

     individual, W. EDWARD NICHOLS,

13   an individual, WESLEY PAUL, an

     individual, and DOES 1-100,

14           Defendants.

     _____/

15   BAKKEN RESOURCES, INC., a

     Nevada Corporation.

16   _____/

17

18                  VOLUME I

19          VIDEOTAPED DEPOSITION OF

20            MANUEL GRAIWER

21            DECEMBER 9, 2014

22             RENO, NEVADA

23

24   REPORTED BY:      CORRIE L. WOLDEN, NV CSR #194, RPR, CP

25            JOB NO. 225607

MANUEL GRAIWER, VOLUME I - 12/09/2014

1  and said is that your signature.  No, not that I can recall
2  ever signing something like that.
3      Q    Going on to Exhibit Number 85.
4      A    Uh-huh.
5      Q    And there is an E-mail from you to Jay Edington
6  dated November 8, 2010?
7      A    I see that.
8      Q    "Jay get the $200,000 I lent transferred as if I
9  had bought the new offering."
10     A    Right.
11     Q    What are you talking about there?
12     A    Well, I lent $200,000 so that they could close the
13  deal with the sister, and then everything was coming up
14  roses and I had the option on that loan to have it
15  transferred into stock or they would pay me back the money.
16     Q    And what happened?
17     A    I took the stock like an idiot.
18     Q    And how many shares of stock did you get out of
19  that $200,000?
20     A    Well, they were, for $0.50 you got 2 shares.  If
21  you do the math, I think it is a million.
22     Q    And is that stock you hold in your name personally
23  or did it go into one of your other entities?
24     A    No, no, no, I believe it was personally, but
25  whether it went into a company or otherwise, you know, it is

1  the same thing.  It is me, and I declare it and I pay the
2  taxes and that's all there is.
3      Q    Let's go on to Exhibit Number 91.  Do you have
4  that in front of you, Mr. Graiwer?
5      A    I do.
6      Q    And there is, at the very bottom this is, well,
7  just for the record it is an E-mail from Jay Edington to you
8  and Val Holms dated Friday, November 12, 2010.  Do you see
9  that?
10     A    I'm sorry, could you repeat?
11     Q    At the very top?
12     A    Yes, sir.
13     Q    And there is a statement by Edington at the bottom
14  that says, "One will be for the benefit of one of Manny's
15  clients."  And what entity is that?  How do you pronounce
16  that, Li --
17     A    Livorno.
18     Q    What is that?
19     A    It is some people in Latin America I represent.
20     Q    Do you have any ownership in that entity?
21     A    No, not as of today.
22     Q    And when you say people you represent in Latin
23  America, is it, without disclosing any attorney/client
24  privilege can you just tell me the general nature of the
25  area you represent that, that client?

1      A    No, I could not.
2      Q    You don't know what it is for?
3      A    Oh, I know what the company is for and I know who
4  I represent, but based on requirements that I have set up
5  with these people I cannot discuss any aspects of my
6  representation, who they are or what I do.  You know that
7  and I know it.
8      Q    I just asked for a general area.
9      A    I'm sorry, but --
10     Q    That's fine.  I respect that.  That's fine.
11     A    I'm not going to violate the attorney/client
12  privilege.
13     Q    That's fine.  And Southwest Consulting Services,
14  we already talked about that one, haven't we?
15     A    Yes, we have.
16     Q    Okay.  Let's go on to Exhibit 93, and this is
17  another Edington E-mail from Edington to Karen Midtlyng and
18  Val Holms with a cc to Jerod Edington with investor list.
19  Do you see that?
20     A    Uh-huh, yes.
21     Q    And in the third paragraph it says, "If Manny can
22  convert some of the people in white that would help, but not
23  likely, he is headed to Mexico for another vacation on
24  Thursday."  Do you see that?
25     A    Sure.

1      Q    Do you know what these other, what Edington is
2  referring to as to these other people?
3      A    No.  Ask him.
4      Q    Let's go on to Exhibit Number 95.
5      A    Okay.
6      Q    And it looks like another E-mail chain involving
7  Jay Edington and Kent Jensen.  Do you see that?
8      A    Yes.
9      Q    Do you know who Kent Jensen is?
10     A    No.
11     Q    Did you ever talk to or meet with Kent Jensen?
12     A    Not that I know of.
13     Q    And then Mr. Jensen mentions, "The $15,000 in
14  commissions are really legal fees to Manny."  Do you see
15  that?
16     A    Yes.
17     Q    Do you know what Mr. Jensen is referring to there?
18     A    Ask him.  I don't know.  I have never done any
19  legal work for Multisys, I have never done any legal work
20  for Bakken, and I brought in a bunch of people and they were
21  to give me a finder's fee.
22     Q    You did get a finder's fee?
23     A    They were supposed to.
24     Q    Okay.  You got a finder's fee in this case for the
25  money you raised?

MANUEL GRAIWER, VOLUME I - 12/09/2014

Page 110

1    A    I don't remember if they ever paid it or not.  If
2    they did, I took it in, put it into the account and --
3    Q    Put it into what account?
4    A    My bank account.
5    Q    Okay.
6    A    One of many bank accounts.
7    Q    Do you recall how much you were paid in a finder's
8    fee?
9    A    Sir, let me repeat the question.  I don't remember
10   if they paid me.  I don't remember how much they were
11   supposed to pay me.  I think the best evidence would be any
12   checks that would come out of Bakken to me --
13   Q    Okay.  And --
14   A    -- with my signature on the back.
15   Q    Okay.  And we are going to provide that to you.
16   Now, do you recall, just so I'm clear, you got a finder's
17   fee?
18   A    Again, I don't recall if I got a finder's fee.  I
19   don't recall if I didn't get a finder's fee.  The best
20   evidence will be the check that was sent to me.
21   Q    Okay.
22   A    They can call it, call it whatever they want to
23   call it.  What it was was a finder's fee.
24   Q    Okay.  Are you a registered dealer or broker
25   for --

Page 111

1    A    No.
2    Q    -- securities?
3    A    No.
4         MR. ANDERSON:  Again, I'm going to just ask again
5    if you can let him finish the question before you answer, I
6    would appreciate it.
7         THE WITNESS:  Sure, sorry.
8    BY MR. GREER:
9    Q    Are you a registered dealer or broker for
10   securities?
11   A    No.
12   Q    Have you ever been a registered dealer or broker
13   for securities?
14   A    No.
15        MR. GREER:  Is this a good time for a break?
16   Paul, good time for a break?
17        MR. ANDERSON:  Fine with me.
18        THE WITNESS:  Good.
19        THE VIDEOGRAPHER:  We are off the video record.
20   The time is approximately 12:24 p.m.
21
22   (Whereupon a break was taken from 12:24 p.m. to 1:31 p.m.)
23
24        THE VIDEOGRAPHER:  We are back on the video
25   record.  The time is approximately 1:31 p.m.

Page 112

1    BY MR. GREER:
2    Q    Good afternoon, Mr. Graiwer.  We are back on the
3    record.
4    A    Good afternoon, Counsel.
5    Q    I direct your attention to Exhibit Number 96.
6    A    Okay.
7    Q    Do you have that in front of you?
8    A    Yes.
9    Q    It is an E-mail from Jay Edington to Val Holms and
10   Karen Midtlyng dated November 25th, 2010.  Do you see the
11   date is at the top?
12   A    Yes.
13   Q    And go down to the second paragraph.
14   A    When a public company, or I have a commission
15   schedule?
16   Q    Yes.
17   A    Uh-huh.
18   Q    It says, "I have a commission," this is
19   Mr. Edington.
20   A    Uh-huh.
21   Q    Stating, "I have a commission schedule all worked
22   out and I have things worked out with Manny to get part of
23   his fees via a legal invoice to MLS.  The reality of this is
24   that Jerod and I did all of the work he is going to invoice
25   for, so this is a real number, but just a legal way of

Page 113

1    getting funds to him in the form of services rendered and
2    not so much for a finder's fee."  Do you see that?
3    A    I do.
4    Q    Do you know what Mr. Edington is talking about
5    there?
6    A    Ask Mr. Edington.  I wasn't there and I haven't
7    discussed it with him.
8    Q    Okay.  So your testimony is you did not discuss
9    this commission fee schedule or issue with Mr. Edington at
10   any time?
11   A    None that I can recall at this time.
12   Q    Okay.  Let's mark this as Exhibit Number 316.
13
14   (Exhibit Number 316 was marked for identification.)
15
16   BY MR. GREER:
17   Q    Counsel, do you -- Or, Mr. Graiwer, do you have
18   Exhibit 316 in front of you?
19   A    I do.
20   Q    And it says Manual P. Graiwer, PC, A Professional
21   Law Corporation.  Do you see that?
22   A    I do.
23   Q    And this is an invoice from Multisys Language
24   Solutions, Inc.  Or, no, actually, it is an invoice from
25   Manuel P. Graiwer, PC to Multisys Language Solutions, Inc.,

MANUEL GRAIWER, VOLUME I - 12/09/2014

Page 114

1  Attention: Janelle Edington, President and this is for
2  legal services rendered from May 1st --
3      A    Uh-huh.
4      Q    -- through November 24th, 2010.  Do you see that?
5      A    I do.
6      Q    And do you see Invoice Number 3001 at the top
7  right?
8      A    I do.
9      Q    Did you prepare this invoice?
10     A    Absolutely not.
11     Q    Okay.  Who prepared it?
12     A    How would I know?
13     Q    I'm just asking you who prepared this?
14     A    Sir, if I didn't do it, I have no idea who did.
15     Q    Do you think Jay Edington prepared it?
16     A    Sir, it is not my job to think or to create
17 illusions or to guess.  I don't know who did it.  I don't
18 know if his son did it.  I don't know if Val Holms did it.
19 I don't know if Janelle Edington did it.
20         How am I supposed to know who did it, one?  Two, I
21 do not bill out of my home.  Three, the name of my firm is
22 not Manuel P. Graiwer, PC.  It doesn't exist.  It is Graiwer
23 & Kaplan, A Professional Law Corporation.  Four, why would
24 there be a fax number on there that belongs to my office and
25 my own personal home phone.  Somebody created this, but I

Page 115

1  didn't consent to it.  I didn't allow it.  I didn't okay it,
2  nothing.
3      Q    And the amount down there at the bottom is
4  $19,929?
5      A    Sir, the document speaks for itself, doesn't it,
6  if that's what it says?
7      Q    Did you receive a check for $19,929?
8      A    I don't remember.
9          MR. GREER:  Okay.  Let's mark this as Exhibit 317.
10
11         (Exhibit Number 317 was marked for identification.)
12
13         MR. ABERASTURI:  The bill is 316?
14         MR. GREER:  Yes.
15         THE WITNESS:  Okay.  I have it.
16 BY MR. GREER:
17     Q    Do you see Exhibit 3, excuse me, that is 317?
18     A    I do.
19     Q    Did you receive this check?
20     A    It says copy.  I don't know if I got the original.
21     Q    Look at the top right hand corner.  It says wire.
22     A    Wire?
23     Q    Yes.
24     A    Why would I, why would it say wire and a check
25 simultaneously?  It doesn't make sense to me.

Page 116

1      Q    I'm just asking what you remember.
2      A    I don't remember.
3      Q    Do you remember having the sum of $19,929 wired
4  into your bank account on November 26, 2010?
5      A    Sir, I would have to go and check that every bank
6  account for on or about November 2010 and see if that wire
7  came in and I will let my attorneys know.
8      Q    Did you receive the sum of $19,929 from BR Metals
9  Corporation, P.O. Box 1839, Helena, Montana?
10         MR. BRADLEY:  Objection; asked and answered.
11 BY MR. GREER:
12     Q    You can go ahead and answer.
13     A    I will give you the same answer as I gave before.
14 I will check it.  I will find out if I got it.  If I did, I
15 will let my Counsel know.
16     Q    Do you have a personal recollection of receiving
17 any type of fee from MLS or BR Metals Corporation in
18 November of 2010?
19     A    I have no independent recollection at this time.
20 As I said, again, this is the third time, I will check it.
21 I will see if I got a check for the sum of $19,929 and go
22 from there.
23     Q    Let's go to -- By the way, who is your personal
24 assistant?
25     A    For what?

Page 117

1      Q    For your law firm.  I mean, I'm --
2      A    I don't have a personal assistant for my law firm.
3      Q    Okay.  Is there a person by the name of Victoria
4  Rae or --
5      A    Yes.  She is the office manager.
6      Q    Does she have authority to sign certain documents
7  on your behalf?
8      A    When I tell -- there is a few that I have
9  authorized her to.
10     Q    And I will get into that in a minute here.  Let's
11 go to Exhibit Number --
12     A    Can you hold one sec?
13         MR. BRADLEY:  I have them.
14         THE WITNESS:  Oh, you do.  Okay.  Perfect.  Thank
15 you.  Yes.
16 BY MR. GREER:
17     Q    Let's go to Exhibit 105, and it is a, looks like a
18 chain of E-mails starting from Jay Edington to Michael
19 Espey, to Val Holms, Karen Midtlyng, looks like various
20 dates of March 10th and March 9th.
21     A    I'm just glancing at it.
22     Q    Go ahead.  Take your time.
23     A    I mean, if we are going to spend two hours here.
24 Okay.  So what is your question?
25     Q    Okay.  My question is, let's go to Bates

F I L E D
Electronically
CV17-00360
2017-02-21 11:25:21 AM
Jacqueline Bryant
Clerk of the Court
Transaction # 5958775 : csulezic

# EXHIBIT 15

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

# EXHIBIT 15



MAUPIN | COX | LEGOY
ATTORNEYS AT LAW
P.O. Box 30000
Reno, Nevada 89520



H

Page 3 of 4
Statement Period
11/01/10 through 11/30/10
E0   P  PA   0A 45        0076047
Enclosures 0
Account Number  5010 0470 2900

MULTISYS LANGUAGE SOLUTIONS INC
DEPOSIT ACCOUNT

## Withdrawals and Debits - Continued
## Other Debits

| Date Posted | Amount ($) | Description | Bank Reference |
|---|---|---|---|
| 11/26 | 19,929.00 | Wire Type:Wire Out Date:101126 Time:1227 Et Trn:2010112600285190 Service Ref:006533 Bnf:Manuel Graiwer ID:019488969 Bnf Bk:City Nation AL Bank ID:122016066 Pmt Det:01101126001764Nn | 903711260285190 |
| 11/26 | 19,952.69 | Wire Type:Wire Out Date:101126 Time:1239 Et Trn:2010112600289863 Service Ref:006709 Bnf:Holms Energy Llc ID:1081499 Bnf Bk:Valley Bank Of Helena ID:092001512 Pmt Det:01101126001840Nn | 903711260289863 |
| 11/26 | 80,000.00 | Wire Type:Intl Out Date:101126 Time:1223 Et Trn:2010112600283393 Service Ref:700664 Bnf:Peter Swan Investment Cons ID:817188006838 Bnf Bk:Hong Kong And Shanghai ID:006550390580 Pmt Det:01101126001673Nn | 903711260283393 |
| 11/26 | 25.00 | Wire Transfer Fee | 903711260129389 |
| 11/26 | 25.00 | Wire Transfer Fee | 903711260129386 |
| 11/26 | 25.00 | Wire Transfer Fee | 903711260129394 |
| 11/26 | 45.00 | Wire Transfer Fee | 903711260129384 |
| 11/29 | 200.00 | Online Banking transfer to Chk 6842 Confirmation# 3790528531 | 957111297545338 |
| Card Account # 4635 8900 0184 6566: | | | |
| 11/12 | 143.37 | CheckCard  1111 Oyshi | 917411110156255 |
| 11/15 | 155.80 | CheckCard  1112 Usps 31490400931719164 | 917411120320656 |
| 11/22 | 97.50 | CheckCard  1120 Corp Kit Legal Supplie | 917411200241164 |
| Subtotal | 396.67 | | |

## Daily Ledger Balances

| Date | Balance ($) | Date | Balance ($) | Date | Balance ($) |
|---|---|---|---|---|---|
| 11/01 | 2,228.07 | 11/12 | 21,414.17 | 11/22 | 14,960.87 |
| 11/02 | 7,228.07 | 11/15 | 20,058.37 | 11/23 | 13,388.87 |
| 11/03 | 5,228.07 | 11/16 | 65,058.37 | 11/24 | 10,332.62 |
| 11/05 | 5,213.12 | 11/18 | 20,058.37 | 11/26 | 876,610.83 |
| 11/08 | 2,960.34 | 11/19 | 15,058.37 | 11/29 | 876,410.83 |